Rebecca A. Musarra (SBN 291250)
**GRANT & EISENHOFER P.A.**
123 Justison Street, 7th Floor
Wilmington, Delaware 19801
Telephone: (302) 622-7000
Facsimile: (302) 622-7100
E-mail: rmusarra@gelaw.com

Mark C. Molumphy (SBN 168009)
Tyson C. Redenbarger (SBN 294424)
Gia Jung (SBN 340160)
**COTCHETT, PITRE & MCCARTHY, LLP**
840 Malcolm Road
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
E-mail: mmolumphy@cpmlegal.com
tredenbarger@cpmlegal.com
gjung@cpmlegal.com

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| OKLAHOMA LAW ENFORCEMENT RETIREMENT SYSTEM,<br><br>Plaintiff,<br><br>v.<br><br>LARRY PAGE, SERGEY BRIN, SUNDAR PICHAI, FRANCES ARNOLD, JOHN L. HENNESSY, R. MARTIN CHÁVEZ, L. JOHN DOERR, ROGER W. FERGUSON JR., K. RAM SHRIRAM, ROBIN L. WASHINGTON, RUTH PORAT, KEITH ENRIGHT, KENT WALKER, and LEE-ANNE MULHOLLAND,<br><br>Defendants,<br><br>- and -<br><br>ALPHABET INC.,<br><br>Nominal Defendant. | CASE NO.<br><br>**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY**<br><br>**JURY TRIAL DEMANDED**<br><br>[PUBLIC VERSION] |

## Table of Contents

Page

I. NATURE OF THE ACTION ..... 1
II. JURISDICTION AND VENUE ..... 6
III. THE PARTIES ..... 7
 A. Plaintiff ..... 7
 B. Nominal Defendant ..... 7
 C. Company Director Defendants ..... 8
 D. Officer Defendants ..... 12
 E. Controlling Stockholder Defendants ..... 13
PLAINTIFF'S DEMAND TO INSPECT ALPHABET'S BOOKS AND RECORDS ..... 15
SUBSTANTIVE ALLEGATIONS ..... 17
I. A LONG HISTORY OF CIVIL AND REGULATORY ACTIONS AND INVESTIGATIONS PUT ALPHABET'S BOARD ON NOTICE OF THE COMPANY'S PRIVACY VIOLATIONS ..... 17
 A. Google's Early Privacy Violations Include Reading Users' Emails ..... 17
 B. Google Scrapes Private Information from Homeowners' WiFi Networks ..... 19
 C. Google Slapped With Sanctions For Violating Privacy Laws In Its Promotion of Google Buzz ..... 20
 D. Google Immediately Violated the FTC's Privacy Order and Had To Pay Historic Fines ..... 21
II. THE BOARD IGNORED RED FLAGS AND CONTINUED TO VIOLATE USERS' PRIVACY ..... 22
 A. Google Expands Its Pattern of Privacy Violations to Children, Resulting Again in Record-Setting Penalties ..... 22
 B. State Attorneys General Actions Cost Alphabet More Than $2 Billion ..... 26
  1. Google Illegally Tracked Users' Locations ..... 26
  2. Google Misrepresented the Privacy Protections Afforded by Its Incognito Mode ..... 30
  3. Google Violates State Laws Governing The Collection And Use Of Biometric Information ..... 31
 C. Google Misuses Data Relating To Women's Sexual And Menstrual Health ..... 34
 D. Google Promises Users They Can Disable Tracking, Then Continues Tracking Them Anyway ..... 34
 E. Google Retains and Uses Conversations Improperly Recorded By Its Devices ..... 35
 F. Google Improperly Uses Users' Cellular Data Connections To Collect Information ..... 36
 G. Google Conceals Material Privacy Breaches From Its Stockholders, Resulting in a $350 Million Settlement ..... 37
 H. Google Conceals Its Use of Users' Personal Data for Advertising For More Than Four Years ..... 38
 I. Google Continues to Violate the Same European Privacy Requirements, Resulting in More than €600 Million in French Regulatory Penalties ..... 39

III. GOOGLE ENGAGES IN NEW PRACTICES THAT HAVE EXPOSED IT TO THE SCRUTINY OF REGULATORS AND PRIVACY ADVOCATES ... 45
A. Google Allegedly Shares Private Information of U.S. Users With Foreign Entities In Violation of Federal Law ... 45
B. Google Breaks Its Promise To Protect Reproductive Health Location Privacy ... 46
C. Google Violates Its Promise To Notify Users Of Government Demands For Their Data ... 47
D. Congress Renews Concerns About Google's Treatment of Children Under 13 Through YouTube ... 48
IV. AS A RESULT OF THE BOARD'S OVERSIGHT FAILURES, ALPHABET HAS SHELLED OUT BILLIONS OF DOLLARS IN FINES, PENALTIES, SETTLEMENTS, AND JUDGMENTS AND CONTINUES TO FACE ADDITIONAL RISK ... 48
A. Defendants' Decision to Knowingly Ignore Google's Illegal Privacy Practices Has Already Cost The Company Billions of Dollars ... 48
B. Defendants' Misconduct Continues to Jeopardize the Company's Stability and Opportunity For Growth ... 50
V. DATA PRIVACY IS MISSION-CRITICAL FOR ALPHABET ... 51
VI. DESPITE RECOGNIZING THAT PROTECTING ITS USERS' DATA IS MISSION CRITICAL, ALPHABET'S BOARD FAILED TO IMPLEMENT AND OVERSEE CONTROLS RELATING TO ITS COMPLIANCE WITH CONSUMER PRIVACY LAWS AND REGULATIONS ... 54
"Oversight" of Data Privacy In 2020 ... 55
Full Board of Directors "Oversight" ... 55
Audit Committee "Oversight" ... 60
"Oversight" of Data Privacy in 2021 ... 64
Full Board "Oversight" ... 64
Audit Committee "Oversight" ... 71
"Oversight" of Data Privacy in 2022 ... 76
Full Board of Directors "Oversight" ... 76
Audit Committee "Oversight" ... 81
"Oversight" of Data Privacy in 2023 ... 84
Full Board of Directors "Oversight" ... 86
Audit Committee "Oversight" ... 89
"Oversight" Of Data Privacy In 2024 ... 92
Full Board of Directors "Oversight" ... 92
Audit Committee "Oversight" ... 99
"Oversight" of Data Privacy in 2025 ... 106
Audit Committee "Oversight" ... 110
THE BOARD CONTINUES TO OPPOSE STOCKHOLDER CALLS FOR ACTION TO ADDRESS DATA PRIVACY CONCERNS IN 2026 ... 112

VII. THE PROXY DEFENDANTS VIOLATED SECTION 14(A) OF THE EXCHANGE ACT AND SEC RULE 14A-9 BY CAUSING ALPHABET TO FILE MATERIALLY MISLEADING PROXY STATEMENTS ..... 113

A. The Director Defendants Caused Alphabet to Issue the Materially False or Misleading 2023 Proxy Statement. ..... 113

B. The Director Defendants Caused Alphabet To Issue The Materially False And Misleading 2024 Proxy ..... 116

C. The Director Defendants Caused Alphabet To Issue The Materially False And Misleading 2025 Proxy ..... 117

D. The Director Defendants Caused Alphabet to Issue the Materially False or Misleading 2026 Proxy Statement ..... 119

VIII. DEFENDANTS' FIDUCIARY DUTIES ..... 122

A. Defendants' Fiduciary Duties Under *Caremark* and *Massey* ..... 122

B. Alphabet's Audit Committee Was Responsible For Monitoring and Addressing Data Privacy Issues ..... 123

C. Alphabet's Full Board of Directors Is Responsible For Monitoring Alphabet's Data Privacy Compliance ..... 123

IX. DERIVATIVE ALLEGATIONS ..... 124

X. DEMAND ON THE BOARD IS EXCUSED AS FUTILE ..... 124

A. Demand Is Futile Because Every Member of The Demand Board Faces A Substantial Likelihood of Liability For Breaching Their Fiduciary Duties ..... 125

B. Demand Is Also Futile Because At Least Half Of The Demand Board Lacks Independence ..... 127

PAGE AND BRIN ..... 128

PICHAI ..... 130

SHRIRAM ..... 131

DOERR ..... 131

HENNESSY ..... 132

ARNOLD ..... 134

CLAIMS FOR RELIEF ..... 134

FIRST CLAIM FOR RELIEF ..... 134

(Against All Director Defendants For Breach Of Fiduciary Duty: Massey Claim) ..... 134

SECOND CLAIM FOR RELIEF ..... 135

(Against All Director Defendants For Breach Of Fiduciary Duty: Caremark Claim) ..... 135

THIRD CLAIM FOR RELIEF ..... 136

(Against All Officer Defendants for Breach of Fiduciary Duty) ..... 136

FOURTH CLAIM FOR RELIEF ..... 137

(Against The Controlling Stockholder Defendants For Breach Of Fiduciary Duty) ..... 137

FIFTH CLAIM FOR RELIEF ... 138
(Against The Director and Officer Defendants For Unjust Enrichment) ... 138
SIXTH CLAIM FOR RELIEF ... 139
Violation of Section 14(a) of the Exchange Act ... 139
SEVENTH CLAIM FOR RELIEF ... 140
Violation of Section 29(b) of the Exchange Act ... 140
PRAYER FOR RELIEF ... 141
JURY TRIAL DEMANDED ... 142

Plaintiff Oklahoma Law Enforcement Retirement System ("Plaintiff"), by and through its undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant Alphabet Inc. ("Alphabet" or the "Company"), against members of the Company's Board of Directors (the "Board") and certain of its executive officers seeking to remedy the Individual Defendants' (defined below) breaches of fiduciary duties. Plaintiff alleges the following based upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Company's internal documents obtained pursuant to a books-and-records demand made under § 220 of the Delaware Corporation Law (the "220 Documents"), publicly available documents, filings with the U.S. Securities and Exchange Commission ("SEC"), press releases published by and regarding the Company, legal filings, news reports, transcripts of congressional testimony, lawsuits and regulatory actions pursued against the Company, and other publicly available information.

## I. NATURE OF THE ACTION

1. This is a stockholder derivative action brought by Plaintiff on behalf of Alphabet against certain of its officers and members of the Company's Board for breaches of their fiduciary duties.

2. Plaintiff brings this action to hold Alphabet's fiduciaries accountable for the extraordinary financial and reputational harm that Alphabet and its subsidiary, Google LLC ("Google"), have suffered arising from the Company's violations of state, federal, and European data privacy laws and regulations and of its privacy commitments to its users.

3. Nominal Defendant Alphabet is an American technology company based in San Jose, California, and is Google's parent company.[1] It was formed in 2015 in a restructuring of Google. Alphabet is "essentially a holding company" whose "lifeblood is Google."[2]

4. Google's business model is complex, but based on a simple premise: it offers services—often free—to customers; in exchange, it mines highly specific information about those customers that

[1] For convenience, Alphabet and Google are sometimes referred to herein collectively as "Alphabet."

[2] *In re Alphabet Inc. Sec. Litig.*, 1 F.4th 687, 694 (9th Cir. 2021).

it uses to sell targeted ads to advertisers.[3] In using its customers' information to sell targeted ads, Google must operate within legal and regulatory frameworks that have been set up to protect users' information and it must ensure that it obtains consent from users—informed by adequate disclosures—before leveraging that data. Further, for users to continue to avail themselves of Google's products and services, users must trust that Alphabet will not misuse their personal information. Alphabet has acknowledged this, admitting that "[o]ur brands have been, and may in the future be, negatively affected by . . . reputational issues . . . [and] data privacy and security issues and developments."[4] Alphabet also noted that the failure to comply with privacy, data protection, and data usage laws and regulations "could harm our business, reputation, financial condition, and operating results."[5] Thus, ensuring compliance with data privacy laws and regulations is mission critical for Alphabet.

5. But under the leadership of its controlling stockholders Larry Page ("Page") and Sergey Brin ("Brin"), Alphabet developed a business model based on collecting as much data as possible—and extracting as much revenue from that data as possible—even if privacy laws and commitments to users were broken in the process. In short, Alphabet adopted a "pay the speeding ticket" business model, in violation of Delaware law.

6. For the Board's part, it sat supine as the Company executed Page/Brin's "pay the speeding ticket" business model. Alphabet's Board was repeatedly alerted that the Company's practices violated both applicable laws and its commitments to users, as the Company was repeatedly sued and repeatedly fined and as stockholders time and again raised alarms through stockholder proposals. In the

[3] "Google provides many of its key services at no financial cost to Internet users….In exchange, Google collects data from and about the users of these free services, and monetizes that data by selling advertisements targeted to these users. Over the past two decades, Google has established increasingly detailed knowledge about the billions who have used its products, including by collecting data pertaining to their web browsing, search activity, physical location, demographic characteristics, app usage, communications, shopping activity, and device and network information." *United States v. Google LLC*, 778 F. Supp. 3d 797, 822-23 (E.D. Va. 2025) (internal citations omitted); *see also* Alphabet Inc., 2025 Annual Report (Form 10-K) 9 (Feb. 5, 2026) ("We generate a significant portion of our revenues from advertising. Reduced spending by advertisers, a loss of partners, shifts in online advertising, new and evolving advertising formats, or new or existing technologies that block ads online or affect our ability to personalize ads could harm our business.").

[4] Alphabet Inc., 2023 Annual Report (Form 10-K) 13 (Jan. 31, 2024).

[5] *Id.* at 20.

face of these repeated red flags, the Director Defendants repeatedly failed to demand that Alphabet implement meaningful corrective measures.

7. During the past eighteen months alone, Alphabet has incurred historic privacy-related fines and now faces a new wave of allegations that it has continued to violate promises to users and to flout laws governing data privacy and security.

8. Worse, Alphabet continued to violate data privacy laws while making misrepresentations to stockholders to convince them to defeat proxy proposals concerning data privacy, to secure their votes for the Directors Defendants' re-election to the Board, and to secure their "FOR" votes on Say-on-Pay matters. Year after year, Defendants caused Alphabet to misleadingly reassure investors that Alphabet maintained robust privacy controls. They did so for the purpose of defeating stockholder proposals intended to shore up the Company's governance and internal controls and to ensure their continued re-election to Alphabet's Board (and their continued receipt of lavish directors' fees and stock options). But these assurances were not true; if Alphabet's Board truly had "maintain[ed] robust oversight of data privacy"—as its directors repeatedly told investors—the Company would have avoided the nearly ***$4.5 billion*** in fines, penalties, and settlements it has paid to date as a result of its data privacy violations.

9. Defendants' ongoing, knowing disregard for Alphabet's privacy commitments and legal and regulatory obligations—including recently uncovered conduct that may reveal Americans' sensitive data to foreign adversaries—has exposed Alphabet to massive harm and creates substantial ongoing legal and financial risk for the Company.

10. For over fifteen years, Google has been involved in a substantial number of private and public legal actions relating to its misuse of consumers' personal information and its failure to truthfully disclose how it was using that information, including its use of information contained in e-mail messages, its tracking of the physical location and web browsing habits of individuals (including, most notoriously, children), its recording of personal conversations, and its collection of biometric information. Many of these actions have resulted in costly settlements, fines, and forced revisions to Google's practices. In total, Alphabet has to date expended nearly ***$4.5 billion*** in fines, penalties, and settlements—to say nothing of the massive legal fees it has undoubtedly racked up defending itself against these various actions and the incalculable damage to its reputation.

11. The Company's steady stream of privacy violations did not arise in a vacuum. Rather, they are the latest manifestations of a pattern of privacy-related misconduct that extends back more than two decades. Illustrative examples of Alphabet's longstanding pattern of patent disregard of users' privacy include the following:

(a) Google monitored and used its users' email messages for more than a decade, easing this nefarious practice only after a federal judge concluded that the activity could violate federal wiretap statutes;

(b) Google collected personal information from private WiFi networks using antennas mounted on the tops of vehicles that were ostensibly being used to capture photographs for its Google Maps program;

(c) Google violated laws and its promises to users by attempting to enroll users of its other Google platforms and products into its Google Buzz social network without their knowledge or consent;

(d) Google illegally tracked and used private information about children under the age of 13 to promote advertising on its YouTube platform, in direct violation of federal and state law;

(e) Google placed tracking technology in Google-created applications directed at children;

(f) Google collected personal information about children using Google-issued Chromebooks in schools without obtaining the required consent;

(g) Google misled users about the extent to which Google had embedded technology in third-party applications that transmitted users' private information to Google;

(h) Google misrepresented to users of other companies' browsers the extent to which Google placed tracking cookies on those browsers; and

(i) Google misled its stockholders about inadvertent privacy breaches that exposed the Company to substantial financial and reputational harm.

12. Even in the face of repeated payments of hundreds of millions of dollars in settlements, penalties, and other sanctions to resolve proven privacy violations, Alphabet continued to violate data privacy laws and break its privacy commitments to its users in various ways, including:

(a) Google misled its customers about the extent to which their privacy would be protected while using Google Chrome's "Incognito" mode;

(b) Google accepted private information concerning users' sexual and menstrual health from an application developer using Google's software after assuring users that such information would not be shared;

(c) Google disclosed users' location information to the federal government in response to subpoenas without providing the advance notice promised to users, thereby depriving them of the opportunity to challenge these subpoenas;

(d) Google used private voice recordings of its customers—without authorization—to be reviewed by contractors for the purpose of training its artificial intelligence ("AI") models;

(e) Google misled users about the extent to which it tracked and shared their location data;

(f) Google used cell data of Android phone users to collect information about those users even when their devices were dormant;

(g) Google misled its users about the extent to which their private information was shared with prospective advertisers through Google's "Real-Time Bidding" program;

(h) Google violated state statutes prohibiting the collection of biometric information from Google users and individuals appearing in photographs uploaded by those users;

(i) Google disclosed private user information to entities associated with foreign governments in alleged violation of federal law, prompting congressional scrutiny; and

(j) Google retained location information associated with visits to women's health clinics, abortion providers, domestic violence shelters, and other sensitive locations after expressly representing that such information would be promptly deleted.

13. Alphabet's stockholders repeatedly have expressed concern regarding the Company's history of privacy-related misconduct and the adequacy of the Board's oversight of Alphabet's data privacy policies, practices, and compliance with applicable laws and regulations. Each time such concerns were raised, the Board assured stockholders that the Company's compliance systems were effective and urged them to reject proposals aimed at strengthening oversight.

14. Those assurances were unfounded. The books and records Alphabet produced reveal scant Board-level consideration of many of the significant privacy issues that have exposed the Company to substantial legal, financial, and reputational harm. By assuring stockholders that the Company's oversight mechanisms were functioning effectively, the Board discouraged stockholders from pursuing additional measures to strengthen compliance oversight and from voting against the directors who were allowing Alphabet to continue to violate the law.

15. In view of the substantial evidence of Alphabet's pattern of privacy violations, the long list of significant red flags that the Board failed to heed, and the Board's laissez-faire attitude in the face of mounting corporate traumas, there is more than a plausible inference that (i) Alphabet's controlling stockholders (Page and Brin) caused Alphabet to develop and execute a business model predicated on intentional violation of federal, state, and European data privacy laws; (ii) Alphabet's Board allowed the Company to continue to pursue a business model predicated on illegal conduct and prioritizing profits over compliance and/or (iii) Alphabet's Board consciously ignored glaring red flags that Alphabet was not operating in compliance with applicable data privacy laws and was making false and misleading statements to Alphabet's investors about its compliance with applicable laws. This misconduct has inflicted massive harm on Alphabet.

## II. JURISDICTION AND VENUE

16. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, as well as Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa (the "Exchange Act"), over the

claims asserted herein for, *inter alia*, violations of Sections 14(a) of the Exchange Act, 15 U.S.C. §§78(n)(a), and the rules promulgated thereunder. The Court has supplemental jurisdiction over the state law claims asserted herein under 28 U.S.C. §1367.

17. This Court has jurisdiction over each Defendant because each Defendant is either a resident of California or otherwise has sufficient minimum contacts with California and/or the United States as a whole to render the exercise of jurisdiction by this Court permissible. Alphabet maintains its headquarters in California and each Defendant's conduct was thus purposefully directed at California for purposes of the derivative claims. This Court retains general jurisdiction over each named Defendant who is a resident of California. Additionally, this Court has personal jurisdiction over each named non-resident Defendant because their affiliations with California are so continuous and systematic as to render jurisdiction by this Court permissible under traditional notions of fair play and substantial justice. Moreover, the locus of the conduct at issue in this action occurred substantially in California, where Alphabet maintains its headquarters and numerous officers. Exercising jurisdiction over any non-resident Defendant is reasonable under the circumstances.

18. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Alphabet is headquartered in this District, Defendants have conducted business in this District, and a substantial portion of the transactions and wrongs complained of herein occurred in this District.

19. Venue is proper in this Court pursuant to C.C.P. § 395(a) because the conduct at issue took place and had an effect in this County where Alphabet maintains its headquarters.

## III. THE PARTIES

### A. PLAINTIFF

20. Plaintiff Oklahoma Law Enforcement Retirement System is an Alphabet stockholder. Plaintiff has continuously owned shares of the Company's common stock at all times relevant to this Complaint.

### B. NOMINAL DEFENDANT

21. Nominal Defendant Alphabet is a Delaware corporation with its principal executive offices located at 1600 Amphitheatre Parkway, Mountain View, California. Alphabet, formerly Google, underwent corporate restructuring on October 2, 2015, by which Alphabet became the holding company

of Google and its subsidiaries. Alphabet's common stock is traded on the NASDAQ exchange under the ticker symbol "GOOG." The Company operates various online and cloud-based programs, including, among others, Google Search, Android, Chrome, YouTube, and Gmail.

### C. Company Director Defendants

22. Defendant Larry Page ("Page") is a co-founder of Google and has been a director of Alphabet since its formation in connection with the October 2015 restructuring of Google. Before the restructuring, Page served as a Google director since its inception in September 1998. Page served as Google's Chief Executive Officer ("CEO") from September 1998 to July 2001 and from April 2011 until July 2015. From July 2015 until December 2019, Page served as Alphabet's CEO. Page has served as a member of the Board's Executive Committee since 2004 and has served as chairman since April 2018. According to Alphabet's April 24, 2026 Proxy, Page owns 389,051,160 shares of Class B Common Stock (equaling 46.5% of Alphabet's super-voting Class B shares) and controls 27.4% of the Company's total voting power. Page is currently the second richest person in the world.

23. Defendant Sergey Brin ("Brin") is a co-founder of Google and has served as a director of Alphabet since its formation in connection with the October 2015 restructuring of Google. Before the restructuring, Brin served as a Google director since its inception in September 1998. Brin served as Alphabet's President from October 2015 to December 2019. Brin has served as a member of the Board's Executive Committee since 2004. According to Alphabet's April 24, 2026 Proxy, Brin owns 37,469 shares of Class A Common stock, 358,939,978 shares of Class B Common Stock (equaling 42.9% of Alphabet's super-voting Class B shares) and controls 25.3% of the Company's total voting power.[6] Brin is currently the fifth-richest person in the world.

24. Defendant Sundar Pichai ("Pichai") has served as a Company director since July 2017. Pichai has served as Google's CEO since August 2015, and Alphabet's CEO since December 2019. Pichai was a member of the OC (Google's executive-level Operating Committee). Pichai has served as

[6] Brin's ownership includes (i) 37,469 of Class A common stock; (ii) 172,700 shares of Class B common stock held by SMB Pacific 2021 Charitable Remainder Unitrust I, of which Brin is the sole trustee; and (iii) 172,700 shares of Class B common stock held by SMB Pacific 2021 Charitable Remainder Unitrust II, of which Brin is the sole trustee.

a member of the Board's Executive Committee since April 2018. Between 2020 and the end of 2025, the Company paid Pichai the following compensation:

| Year | Salary | Bonus | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2025 | $2,007,692 | | | $8,898,387 | $10,906,079 |
| 2024 | $2,015,385 | | $405,630 | $8,379,679 | $10,800,694 |
| 2023 | $2,000,000 | | | $6,802,824 | $8,802,824 |
| 2022 | $2,000,000 | | $218,037,684 | | $225,985,145 |
| 2021 | $2,000,000 | | | $4,322,599 | $6,322,599 |
| 2020 | $2,015,385 | | | $5,410,162 | $7,425,547 |
| **TOTAL** | | | | | **$262,817,341** |

Pichai is named as both a Director Defendant and an Officer Defendant.

25. Defendant John L. Hennessy ("Hennessy") has served as a director of Alphabet since its formation in connection with the October 2015 restructuring of Google. Before the restructuring, Hennessy served as a Google director since April 2004. Hennessy has been Chairman of the Board since January 2018, and chairman of the Board's Nominating and Corporate Governance Committee[7] since October 2015. Between 2020 and the end of 2025, the Company paid Hennessy the following compensation:

| Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2025 | $100,000 | $517,529 | $617,529 |
| 2024 | $100,000 | $529,546 | $629,546 |
| 2023 | $100,000 | $497,633 | $597,633 |
| 2022 | $100,000 | $511,532 | $611,532 |
| 2021 | $100,000 | $520,310 | $620,310 |
| 2020 | $100,000 | $503,314 | $603,314 |
| **TOTAL** | | | **$3,068,332** |

26. Defendant Frances H. Arnold ("Arnold") has been a Company director since December 2019. Arnold has served as a member of the Board's Nominating and Corporate Governance Committee

[7] In January 2022, the Board amended the charter of the Leadership Development and Compensation Committee and renamed it the "Leadership Development, Inclusion and Compensation Committee." References to the "Compensation Committee" include the Leadership Development, Inclusion and Compensation Committee after January 2022 and the Leadership Development and Compensation Committee before January 2022.

since December 2019. Between 2020 and the end of 2025, the Company paid Arnold the following compensation:

| Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2025 | $75,000 | $362,396 | $437,396 |
| 2024 | $75,000 | $370,681 | $445,681 |
| 2023 | $75,000 | $348,392 | $423,392 |
| 2022 | $75,000 | $359,455 | $434,455 |
| 2021 | $75,000 | $364,217 | $439,217 |
| 2020 | $38,248 | $1,188,057 | $1,226,305 |
| **TOTAL** | | | **$3,406,446** |

27. Defendant R. Martin "Marty" Chávez ("Chávez") has been a Company director since July 2022. Chávez has served as a member of the Company's Audit Committee[8] since July 2022, and as a member of the Company's Risk and Compliance Committee since October 2025. Between 2022 and the end of 2025, the Company paid Chávez the following compensation:

| Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2025 | $75,000 | $362,396 | $437,396 |
| 2024 | $75,000 | $373,259 | $448,259 |
| 2023 | $75,000 | $348,392 | $423,392 |
| 2022 | | $1,048,115 | $1,048,115 |
| **TOTAL** | | | **$2,357,162** |

28. Defendant L. John Doerr ("Doerr") has been a director of Alphabet since its formation in connection with the October 2015 restructuring of Google. Before the restructuring, Doerr served as a Google director since May 1999. Doerr has served as a member of the Board's Leadership Development, Inclusion, and Compensation Committee since June 2016. Doerr also served as a member of the Board's Audit Committee from May 2007 to January 2012, and from December 2015 to June 2016. According to Alphabet's April 24, 2026 Proxy, Doerr is the beneficial owner of 472,165 shares of Class A Common stock, 22,348,940 shares of Class B Common Stock (equaling 2.7% of the Class B

[8] In October 2020, the Board amended the charter of the Audit Committee and renamed it as the "Audit and Compliance Committee." References to the "Audit Committee" include the Audit and Compliance Committee after October 2020 and the Audit Committee prior to October 2020.

super-voting stock) and controls approximately 1.6% of Alphabet's total voting power.[9] Between 2020 and the end of 2025, the Company paid Doerr the following compensation:

| Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2025 | $75,000 | $362,396 | $437,396 |
| 2024 | $75,000 | $370,693 | $445,693 |
| 2023 | $75,000 | $348,392 | $423,392 |
| 2022 | $75,000 | $359,455 | $434,455 |
| 2021 | $75,000 | $364,217 | $439,217 |
| 2020 | $75,000 | $352,320 | $427,320 |
| **TOTAL** | | | **$2,607,473** |

29. Defendant Roger W. Ferguson Jr. ("Ferguson Jr.") has been a Company director since June 2016. Ferguson has served a member of the Board's Audit Committee since June 2016, and as chairman of the Board's Risk and Compliance Committee since October 2025. Between 2020 and the end of 2025, the Company paid Ferguson Jr. the following compensation:

| Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2025 | $100,000 | $362,396 | $462,396 |
| 2024 | $89,812 | $370,693 | $460,505 |
| 2023 | $75,000 | $348,392 | $423,392 |
| 2022 | $75,000 | $359,455 | $434,455 |
| 2021 | $75,000 | $364,217 | $439,217 |
| 2020 | $75,000 | $352,320 | $427,320 |
| **TOTAL** | | | **$2,647,285** |

30. Defendant K. Ram Shriram ("Shriram") has been a director of Alphabet since its formation in connection with the October 2015 restructuring of Google. Before the restructuring, Shriram was as a Google director since September 1998. Shriram has served as a member of the Board's Leadership Development, Inclusion and Compensation Committee since October 2015. Shriram has also served as a member of the Board's Audit Committee from November 2005 to July 2014. Between 2020 and the end of 2025, the Company paid Shriram the following compensation:

[9] Doerr's ownership includes (i) 402,465 shares of Class A common stock held by The Benificus Foundation and (ii) 22,348,940 shares of Class B common stock held by Vallejo Ventures Trust. Doerr is an officer and trustee of The Benificus Foundation and shares the investment authority over the shares held by The Benificus Foundation. Doerr disclaims any pecuniary interest in the shares held by The Benificus Foundation. Doerr is a trustee of Vallejo Ventures Trust and shares voting and investment authority over the shares held by such trust.

| Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2025 | $75,000 | $362,396 | $437,396 |
| 2024 | $75,000 | $370,693 | $445,693 |
| 2023 | $75,000 | $348,392 | $423,392 |
| 2022 | $75,000 | $359,455 | $434,455 |
| 2021 | $75,000 | $364,217 | $439,217 |
| 2020 | $75,000 | $352,320 | $427,320 |
| **TOTAL** | | | **$2,607,473** |

31. Defendant Robin L. Washington ("Washington") has been a Company director since April 2019. Washington has served as chairman of the Board's Leadership Development, Inclusion and Compensation Committee since January 2021, as a member of the Audit Committee since October 2023, and as a member of the Board's Risk and Compliance Committee since October 2025. Between 2020 and the end of 2025, the Company paid Washington the following compensation:

| Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2025 | $75,000 | $362,396 | $437,396 |
| 2024 | $75,000 | $370,693 | $445,693 |
| 2023 | $75,000 | $348,392 | $423,392 |
| 2022 | $75,000 | $359,455 | $434,455 |
| 2021 | $75,000 | $364,217 | $439,217 |
| 2020 | $75,000 | $352,320 | $427,320 |
| **TOTAL** | | | **$2,607,473** |

32. Page, Brin, Pichai, Hennessy, Arnold, Chávez, Doerr, Ferguson Jr., Shriram, and Washington are collectively referred to as "Director Defendants."

## D. OFFICER DEFENDANTS[10]

33. Defendant Ruth Porat ("Porat") has been the President and Chief Investment Officer ("CIO") of Alphabet and Google since September 2023. Porat was the Company's Senior Vice President and Chief Financial Officer from 2015 until 2023, when she became President and CIO. Between 2020 and the end of 2025, the Company paid Porat the following compensation:

| Year | Salary | Bonus | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2025 | $1,003,846 | | $28,123,532 | | $11,750 | $29,139,128 |

[10] As noted *supra*, Defendant Pichai is named as both a Director Defendant and an Officer Defendant.

| Year | Salary | Bonus | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2024 | $1,007,692 | | $27,143,064 | $2,000,000 | $15,671 | $30,166,427 |
| 2023 | $1,000,000 | | $24,831,430 | $1,500,000 | $15,700 | $27,347,130 |
| 2022 | $1,000,000 | | $22,663,723 | $775,000 | $15,046 | $24,453,769 |
| 2021 | $650,000 | | $13,995,065 | | $17,411 | $14,662,476 |
| 2020 | $650,000 | | $50,217,913 | | $17,770 | $50,885,683 |
| **TOTAL** | | | | | | **$176,654,613** |

34. Defendant Keith Enright ("Enright") was Google's Chief Privacy Officer from September 2018 until August 2024.

35. Defendant Kent Walker ("Walker") was the Company's President of Global Affairs and Chief Legal Officer since 2021. Walker has been with the Company since 2008. Between 2020 and the end of 2025, the Company paid Walker the following compensation:

| Year | Salary | Bonus | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2025 | $1,003,846 | | $28,132,532 | | $11,750 | $29,139,128 |
| 2024 | $1,007,692 | | $27,143,064 | $2,000,000 | $12,004 | $30,162,760 |
| 2023 | $1,000,000 | | $24,831,430 | $1,500,000 | $11,737 | $27,343,167 |
| 2022 | $1,000,000 | | $22,663,723 | $775,000 | $12,541 | $24,451,264 |
| 2021 | $650,000 | | $13,995,065 | | $12,697 | $14,657,762 |
| 2020 | $650,000 | | $50,217,913 | | $9,750 | $50,877,663 |
| **TOTAL** | | | | | | **$353,286,357** |

36. Defendant Lee-Anne Mulholland ("Mulholland") has been Vice President of Alphabet's Regulatory Response, Investigations and Strategy (ARRIS) / Global Head of Regulatory Affairs since 2021.

37. Pichai, Porat, Enright, Walker, and Mulholland are collectively referred to as the "Officer Defendants."

### E. CONTROLLING STOCKHOLDER DEFENDANTS

38. Defendants Page and Brin are Alphabet's controlling stockholders. They maintain majority voting control through their ownership of Class B super-voting stock. As the Company's co-founders, Page and Brin determined Google's business strategy and have steered the company since its

founding including by, *inter alia*, occupying its most senior managerial positions at various times throughout its history.

39. That Page and Brin would control all aspects of Alphabet's operations was made clear from Day 1. In Google's IPO Registration Statement, Page and Brin included a "Founders' IPO Letter" titled "'An Owner's Manual' for Google's Shareholders."[11] The Founders' IPO Letter made clear that Page and Brin would exercise total control, together with (now former Google Chair and CEO Eric Schmidt), stating:

> ***We run Google as a triumvirate***. Sergey and I have worked closely together for the last eight years, five at Google. Eric, our CEO, joined Google three years ago. ***The three of us run the company collaboratively with Sergey and me as Presidents. The structure is unconventional, but we have worked successfully in this way***.
>
> ***To facilitate timely decisions, Eric, Sergey and I meet daily to update each other on the business and to focus our collaborative thinking on the most important and immediate issues. Decisions are often made by one of us, with the others being briefed later.*** This works because we have tremendous trust and respect for each other and we generally think alike. Because of our intense long term working relationship, we can often predict differences of opinion among the three of us. We know that when we disagree, the correct decision is far from obvious. For important decisions, we discuss the issue with a larger team appropriate to the task. Differences are resolved through discussion and analysis and by reaching consensus. ***Eric, Sergey and I run the company without any significant internal conflict***, but with healthy debate. As different topics come up, we often delegate decision-making responsibility to one of us.
>
> * * *
>
> In the transition to public ownership, ***we have set up a corporate structure that will make it harder for outside parties to take over or influence Google.*** This structure will also make it easier for our management team to follow the long term, innovative approach emphasized earlier. This structure, called a dual class voting structure, is described elsewhere in this prospectus. The Class A common stock we are offering has one vote per share, while the Class B common stock held by many current shareholders has 10 votes per share.
>
> ***The main effect of this structure is likely to leave our team, especially Sergey and me, with increasingly significant control over the company's decisions and fate, as Google shares change hands.*** After the IPO, Sergey, Eric and I will control 37.6% of the voting power of Google, and the executive management team and directors as a group will control 61.4% of

[11] https://abc.xyz/investor/founders-letters/ipo-letter/default.aspx

> the voting power. ***New investors will fully share in Google's long term economic future but will have little ability to influence its strategic decisions through their voting rights.***[12]

40. Between 2004 and 2018, Page and Brin issued annual Founders' Letters to the Company's stockholders, detailing their vision for the Company. Beginning with the formation for Alphabet in 2015, Page and Brin began to bring Google CEO Pichai into the fold, with Page telling stockholders, "I am also very pleased with Sundar's performance as our new Google CEO. Since the majority of our big bets are in Google, I wanted to give him most of the bully-pulpit here to reflect on Google's accomplishments and share his vision. In the future, you should expect that Sundar, Sergey and I will use this space to give you a good personal overview of where we are and where we are going."[13] In accordance with Page and Brin's decision, Pichai signed the Founders' Letters in 2015 and 2018.

41. In December 2019, Page and Brin decided to relinquish their managerial positions, turning the day-to-day reins over to their hand-picked successor Pichai. Despite their titular changes, Page and Brin remained instrumental in ensuring that the corporate strategy and culture they had designed would continue, telling their investors that they remained "deeply committed to Google and Alphabet for the long term, and will remain actively involved as Board members, shareholders and co-founders" and planned to "continue talking with Sundar regularly."[14] Page and Brin, of course, retain voting control and thus remain positioned to approve or block board-level decisions and direct Alphabet's long-term strategy.

**PLAINTIFF'S DEMAND TO INSPECT ALPHABET'S BOOKS AND RECORDS**

42. As part of Plaintiff's thorough pre-suit investigation, Plaintiff made a demand to inspect Alphabet's books and records pursuant to 8 *Del. C.* § 220 (the "Section 220 Demand").

43. On November 19, 2025, Plaintiff served Alphabet with a Section 220 Demand seeking to inspect books and records from January 1, 2016, to the present relating to, *inter alia*, Alphabet's compliance with user data privacy and personal data collection laws, which had resulted in numerous

---

[12] https://abc.xyz/investor/founders-letters/ipo-letter/default.aspx (emphasis added).
[13] 2015 Founders' Letter; https://abc.xyz/investor/founders-letters/2015/default.aspx
[14] A letter from Larry and Sergey, December 3, 2019; https://blog.google/alphabet/letter-from-larry-and-sergey/

governmental investigations and litigation, as well as private litigation (collectively, the "Data Privacy Actions")[15] identified in the Section 220 Demand.[16]

44. In response to Plaintiff's Section 220 Demand, Alphabet agreed by letter dated December 5, 2025, to meet and confer to discuss an "appropriate scope of production."[17]

45. On December 18, 2025, the parties met and conferred to discuss the scope of Alphabet's document production in response to the Section 220 Demand.

46. By letter dated January 23, 2026, Alphabet agreed to produce Board minutes and materials from between November 19, 2023, and November 19, 2025 that: (i) relate to the Data Privacy Actions; (ii) set forth Alphabet's data privacy policies and practices relating to the Data Privacy Actions; (iii) relate to Alphabet's compliance with the consent decree entered in *In the Matter of Google Inc*., No. 1023136 (F.T.C.) ("2011 FTC Consent Order"); or (iv) relate to Alphabet's use of data collected in connection with "Incognito Mode," "Location History," "Google Assistant device," and/or "Web and App Activity" features. In addition, Alphabet agreed to produce Board minutes and materials from between June 1, 2020 and November 19, 2025 relating to the California Consumer Class Action,[18] and to the extent Board minutes and materials relate to the matters identified in the foregoing items (i) through (iv), as well as director questionnaires related to Alphabet's most recent proxy.

---

[15] *State of Arizona v. Google LLC*, Case No. CV2020-006219 (Az. Super. Ct. Cty. of Maricopa) (the "Arizona AG Location-Tracking Litigation"), *State of Georgia v. Google LLC,* Docket No. 2022CV372732 (Ga. Super. Ct.) (the "Multistate AG Location Tracking Action"), *The State of Texas v. Google LLC*, C.A. No. 22-01-88230-D (Tex. Dist. Ct., Victoria County) (the "Texas AG Incognito/Location Tracking Action"), *In re Google Assistant Privacy Litigation*, No. 5:19-cv-04286-BLF (N.D. Cal.) (the "Google Assistant Litigation"), *Brown et al. v. Google LLC et al.*, No. 5:20-cv-03664 (N.D. Cal.) (the "California Consumer Class Action"), *In re Google RTB Consumer Privacy Litigation*, No. 4:21-cv-02155-LHK-VKD (N.D. Cal.) (the "RTB Class Action"), and *Rodriguez v. Google LLC,* 3:20-cv-04688, (N.D. Cal.) (the "Web & App Litigation"). The Data Privacy Actions collectively challenge a broad array of data privacy related misconduct (collectively, the "Data Privacy Misconduct"). Alphabet produced 2,193 pages of Board Materials from the November 19, 2023 to November 19, 2025 time period. As discussed below, large portions of these documents have been redacted as Not Responsive (i.e., not relating to oversight of Data Privacy Misconduct).

[16] Exhibit 1.

[17] Exhibit 1 at 9.

[18] Alphabet produced 2,707 pages of Board Materials from the June 1, 2020 through November 19, 2023 time period. As discussed below, large portions of these documents have been redacted as Not Responsive (i.e., not relating to oversight of Data Privacy Misconduct).

47. By email on May 21, 2026, Alphabet certified that "its production is substantially complete with respect to the categories of documents that the Company agreed to produce in its letter dated January 23, 2026."

48. The Company's own documents—and the lack thereof—show that the Board, including each of its committees, failed to effectively monitor reporting systems to oversee Alphabet's compliance with applicable data privacy laws and regulations and judicial consent orders in collecting and handling users' confidential personal data. These failures were despite global awareness and concern with these issues as detailed in Plaintiff's Section 220 Demand, stockholder proposals detailed in Alphabet's proxy statements, congressional action taken to pass legislation protecting Americans' personal information, widespread press coverage, and wide-scale litigation in state and federal courts around the country, and as alleged herein.

49. Alphabet's books and records, along with other information obtained by Plaintiff through its investigation, demonstrate that Alphabet's Board failed to engage in any meaningful oversight relating to (i) the Company's known collection, retention, and use of users' confidential personal information; (ii) the Company's compliance with applicable state, federal, and international legislation and applicable judicial consent orders relating to data privacy; and/or (iii) the risks to the Company created by such violations of data privacy laws and the Board's oversight failures.

## SUBSTANTIVE ALLEGATIONS

## I. A LONG HISTORY OF CIVIL AND REGULATORY ACTIONS AND INVESTIGATIONS PUT ALPHABET'S BOARD ON NOTICE OF THE COMPANY'S PRIVACY VIOLATIONS

### A. GOOGLE'S EARLY PRIVACY VIOLATIONS INCLUDE READING USERS' EMAILS

50. Google's history of legal and regulatory scrutiny over its treatment of users' private communications began with the launch of Gmail in 2004. At the time Gmail was introduced, Google decided it would scan the contents of users' emails to facilitate targeted advertising, promoting immediate concern from privacy advocates[19] and legislators.[20]

[19] *Privacy and Civil Liberties Organizations Urge Google to Suspect Gmail*, PRIVACY RIGHTS CLEARINGHOUSE (Apr. 6, 2004), https://privacyrights.org/resources-tools/advocacy/privacy-and-civil-liberties-organizations-urge-google-suspend-gmail

[20] Susan Kuchinskas, *California Lawmaker to Google: Do Not Gmail*, INTERNET NEWS (Apr. 13, 2004), https://www.internetnews.com/it-management/california-lawmaker-to-google-do-not-gmail/

51. As those concerns developed, users and regulators also questioned whether Google had adequately disclosed the nature and scope of its email-scanning practices.

52. Rather than expressly informing Gmail users that it would read the contents of their emails and use that information to develop targeted advertising, Google relied on broad and generalized disclosures in its Terms and Privacy Policies.

53. Google later contended that these disclosures provided notice of, and consent to, its practices. Among the language on which Google relied was the following:

> "Google reserves the right (but shall have no obligation) to pre-screen, review, flag, filter, modify, refuse or remove any or all Content from Any Service….For some of the Services, Google may provide tools to filter out explicit sexual content….[A]dvertisements may be targeted to the content of information stored on the Services, queries made through the Services or other information."[21]

54. Gmail users sued, alleging that the disclosures were inadequate because they did not inform users that Google would read the contents of their emails and use that information for advertising purposes.

55. In 2008 and again in 2010 after litigation had begun, Google revised its privacy policies. A federal court nevertheless concluded that the revised policies did not adequately disclose Google's practices, explaining that "these Privacy Policies do not demonstrate explicit consent, and in fact suggest the opposite."[22]

56. Google revised its privacy policies again in 2012. The same federal court concluded that the revised policies ***still*** failed to adequately disclose that Google was intercepting users' emails, finding that a Gmail user reviewing the policies "would not have necessarily understood that her emails were being intercepted to create user profiles or to provide targeted advertisements."

57. Finally, in 2017, after years of litigation over its Gmail-scanning practices, Google announced that it would discontinue such scanning for advertising purposes.

---

[21] *See* Google Terms of Service (in effect Apr. 16, 2007-Mar. 1, 2012), https://policies.google.com/terms/archive/20070416-20120301?gl=US&hl=en .

[22] *See In re Google Inc. Gmail Litig.*, Case No. 13-MD-02430-LHK (N.D. Cal. Sept. 26, 2013), ECF #69 (ORDER), at 26.

58. But in 2018, reports revealed that although Google ***itself*** had ceased scanning Gmail messages for advertising purposes, it continued to permit certain ***third-party email application developers*** to access users' Gmail accounts.

**B. GOOGLE SCRAPES PRIVATE INFORMATION FROM HOMEOWNERS' WIFI NETWORKS**

59. While Google was under fire for its improper collection and use of information from consumers' Gmail accounts, Google was also engaged in the unauthorized collection of sensitive information transmitted over homeowners' WiFi networks. Specifically, Google equipped vehicles that were ostensibly photographing streets and neighborhoods to enhance the Street View feature of Google Maps with WiFi antennas and software capable of intercepting and downloading data transmitted over nearby residential wireless networks. Google collected this information without the knowledge or consent of the affected homeowners.

60. The U.S. Court of Appeals for the Ninth Circuit made specific factual findings regarding this conduct between 2007 and 2010:

> Photographs for enhancing Street View were taken from cameras mounted on vehicles owned by Google that traveled on public roads and photographed their surroundings. Between 2007 and 2010, Google equipped those same cars with Wifi antennas and software that collected data transmitted by Wifi networks in nearby homes and businesses. Aside from basic identifying information, these antennas also gathered and stored "payload data" that was sent and received over unencrypted Wifi connections. This payload data included personal emails, user names, passwords, videos, and documents.

61. After these practices became public, Google admitted what it had done, apologized, and stopped collecting WiFi payload data. But Google resisted federal efforts to investigate the scope of its activities. The Federal Communications Commission (the "FCC") found that "[f]or many months, Google deliberately impeded and delayed the Bureau's investigation by failing to respond to requests for material information and to provide certifications and verifications of its responses." As a result of that conduct, the FCC imposed a $25,000 civil penalty against Google for deliberately obstructing its investigation.

62. In 2013, Google entered into an "Assurance of Voluntary Compliance" with 38 state Attorneys General to resolve claims arising from its unauthorized collection of WiFi data. As part of

that resolution, Google agreed to pay $7 million. Google subsequently had to pay an additional $13 million to resolve related private civil claims arising from the same conduct.[23]

### C. GOOGLE SLAPPED WITH SANCTIONS FOR VIOLATING PRIVACY LAWS IN ITS PROMOTION OF GOOGLE BUZZ

63. During this same period, Google was also overstating to customers the extent to which it would protect their personal information from misuse by its own internal promotional purposes. From October 2005 through October 2010, Google assured users: "When you sign up for a particular service that requires registration, we ask you to provide personal information. If we use this information in a manner different than the purpose for which it was collected, then we will ask for your consent prior to such use."

64. Google promptly violated this promise. In February 2010, Google launched its social networking service, Google Buzz, and used Gmail users' personal information—without their consent—to populate the new platform. Worse still, even users who ***affirmatively indicated*** that they did not wish to participate in Google Buzz were nevertheless enrolled in certain of its features.

65. In 2011, the FTC filed a formal complaint and concomitant consent order (the "2011 Consent Order") against Google arising from Google's conduct in connection with its Google Buzz platform. The FTC found that Google's privacy deficiencies extended well beyond the specific misconduct at issue in Google Buzz. Rather than fashioning relief limited to that product, the FTC required Google to ***implement sweeping, company-wide privacy reforms that remained in effect for the extraordinary period of twenty years***, i.e., until 2031. Those remedies included:

(a) Enjoining Google from misrepresenting its privacy commitments to its users;

(b) Requiring that Google get the affirmative consent of its users if it changed any of its sharing practices, laying out a lengthy description of what did and did not constitute an appropriate notice (given Google's history of half-measures with respect to remedying other prior violations);

[23] *In re Google LLC Street View Electric Comms. Litig.*, Case No. 3:10-md-02194-CRB (N.D. Cal. July 19, 2019), ECF 166-1, https://www.streetviewsettlement.com/docs/Settlement%20Agreement.pdf.

(c) Requiring that Google design a comprehensive privacy program that, among other things, would protect the privacy and confidentiality of "covered information"; and

(d) Requiring Google to submit to biennial assessments of its privacy controls to be created by a "qualified, objective, independent, third-party professional." These biennial assessments were specifically required to explain how the privacy controls in place met or exceeded the requirements of the rest of the FTC's order, and to "certify that the privacy controls are operating with sufficient effectiveness to provide reasonable assurance to protect the privacy of covered information and that the controls have so operated throughout the reporting period."[24]

### D. GOOGLE IMMEDIATELY VIOLATED THE FTC'S PRIVACY ORDER AND HAD TO PAY HISTORIC FINES

66. The FTC approved the 2011 Consent Order in October 2011. Within a year, the FTC found that Google was flagrantly violating it. Google's violation was so serious that the FTC imposed a $22.5 million fine, which it described as the "***largest penalty the agency has ever obtained*** for violation of a Commission Order."[25]

67. The FTC found that Google had falsely represented to users of Apple's Safari browser that they need not take any action to prevent third-party "cookies"—which enable tracking of users' browsing activity—from being placed on their browsers. In reality, Google was ***deliberately overriding*** Safari's default privacy settings and causing tracking cookies to be installed anyway. Unlike earlier privacy violations (i.e., reading of Gmail and forced enrollment in Google Buzz), in which Google was able to claim that users had somehow misunderstood an ambiguous or incomplete disclosure, Google had nowhere to hide this time. Google's representations were simply false. Google's deliberate deception prompted the FTC's unprecedented civil penalty for violating the 2011 Consent Order.

---

[24] Agreement Containing Consent Order, *In re Matter of Google Inc.*, FTC File No. 102 3136 (Oct. 13, 2011).

[25] Press Release, *Google Will Pay $22.5 Million to Settle FTC Charges it Misrepresented Privacy Assurances to Users of Apple's Safari Internet Browser*, Federal Trade Comm'n (Aug. 9, 2012), https://www.ftc.gov/news-events/news/press-releases/2012/08/Google-will-pay-225-million-settle-ftc-charges-it-misrepresented-privacy-assurances-users-apples (emphasis added).

68. The FTC's record-setting enforcement action did not put concerns about Google's compliance with the 2011 Consent Order to rest. Numerous third parties—including members of Congress—subsequently questioned whether Google was complying with its obligations under the 2011 Consent Order.

## II. THE BOARD IGNORED RED FLAGS AND CONTINUED TO VIOLATE USERS' PRIVACY

### A. GOOGLE EXPANDS ITS PATTERN OF PRIVACY VIOLATIONS TO CHILDREN, RESULTING AGAIN IN RECORD-SETTING PENALTIES

69. Even as Alphabet was confronting investigations, enforcement actions, a consent order, and public criticism arising from Google's Gmail scanning, WiFi surveillance, and nonconsensual use of users' personal information through Google Buzz, the Company was continuing to implement new types of improper or illegal privacy practices that would result in yet another wave of investigations, enforcement actions, and historic regulatory sanctions.

70. Google long recognized that collecting information from minors presented a significant legal and regulatory risk. From the time Google became a public company, its Form 10-Ks repeatedly identified children's online privacy as a material risk factor. Indeed, Google's 2004 and 2005 10-K filings specifically referenced the Children's Online Privacy Protection Act ("COPPA")—the very statute Google would later be found to have violated. Google expressly acknowledged that COPPA imposed restrictions on online services' collection of information from minors and warned investors that a failure to comply with the applicable laws could subject the Company to additional liabilities. Thus, from its earliest years as a public company, Google recognized both its obligations concerning the collection of children's information and the significant legal and financial consequences that could result from failing to comply with those obligations.

71. Despite expressly acknowledging that children's privacy was an area of heightened regulatory scrutiny and legal risk, Google proceeded to collect personal information from children using YouTube, a platform that Google owned and controlled, in violation of COPPA and other applicable law.

72. Alphabet's violations of children's statutory privacy rights were brazen. A 2018 "Request for Investigation" application to the FTC submitted by more than 20 children's advocacy and

consumer advocacy organizations detailed the misconduct. The Request for Investigation alleged, among other things, that Google collected unique identifiers, mobile phone numbers, location information, and "persistent identifiers"—which allow Google to track a user across time and platforms—from its users, including children, in violation of COPPA, which prohibits the collection of such personal information from children under the age of thirteen without verifiable parental consent. The Request for Investigation alleged that YouTube made no effort to obtain parental consent before collecting this information from young children watching the hundreds of millions of children's videos on YouTube.

73. The allegations set forth in the Request for Investigation prompted enforcement action by federal and state regulators. On September 4, 2019, the FTC and the New York Attorney General filed a complaint against Google and YouTube in the U.S. District Court for the District of Columbia that largely tracked the Request for Information's allegations.[26] Among other things, regulators alleged that Google and YouTube enabled channel owners to "monetize" child-directed videos by tracking viewers' persistent identifiers and using that information to deliver behaviorally targeted advertising while the videos were being viewed. The regulators also alleged that Google had marketed YouTube to advertisers, including toy manufacturers such as Mattel and Hasbro, by highlighting YouTube's extraordinary popularity among young children.

74. The same day the complaint was filed, the parties announced a settlement under which Google agreed to pay $136 million to the FTC and an additional $34 million to the State of New York ("FTC/NY COPPA Settlement"). In announcing the settlement, New York Attorney General Letitia James stated, "Google and YouTube ***knowingly and illegally*** monitored, tracked, and served targeted ads to young children just to keep advertising dollars rolling in. These companies put children at risk and abused their power, which is why we are imposing major reforms to their practices and making them pay one of the largest settlements for a privacy matter in U.S. history."

75. The FTC described the monetary relief assessed against Google as "***by far the largest amount the FTC has ever obtained in a COPPA case***...." The settlement was also one of the largest

[26] *United States & People of the State of New York v. Google LLC & YouTube, LLC*, 1:19-cv-02642-BAH (D.D.C.) (filed Sept. 4, 2019) ("FTC/NY COPPA Litigation").

settlements of any privacy matter in U.S. history. The settlement represented the second time in a matter of years that Google agreed to pay a record-setting privacy penalty following allegations that it had violated consumers' privacy rights. Following the settlement, Google paid an additional $30 million to resolve private class-action litigation arising from the same underlying conduct.[27]

76. Notably, two of the FTC's five commissioners publicly dissented from the settlement because they believed that even the record-setting penalty did not go far enough. Commissioner Rohit Chopra noted it was the ***third time*** since 2011 that Google had been sanctioned by the FTC, and characterized the "latest violation" as "extremely serious."[28] As Commissioner Chopra described it, Google "baited children using nursery rhymes, cartoons, and other kid-directed content on curated YouTube channels to feed its massively profitable behavioral advertising business."[29] He noted that "Google ***knew*** that content on YouTube channels was directed to young children, but did not disable illegal data collection" and that this "illegal[] harvesting [of] children's data was ***extremely lucrative***."[30] Commissioner Chopra observed that, "[i]n reality, Google solicits and encourages the creation of content that young children can easily find on YouTube, rather than on YouTube Kids . . ."[31] Based on the evidence of Google's conduct that he reviewed, and the avoided costs of compliance, Commissioner Chopra concluded that the FTC settlement was far too low. Instead, if the FTC had used a multiplier similar to the one the Commission used against Google in 2012, Commissioner Chopra concluded that the penalty would be at least $1 billion (though the exact penalty figure he proposed in his dissent is redacted).

> penalty of more than five times the company's unjust gains.[16] Had we used a similar multiplier, that would result in a target of [redacted] billion.

---

[27] *Hubbard v. Google LLC*, No. 5:19-cv-07016-SVK, 2025 WL 4056924 (N.D. Cal. Sept. 23, 2025) (order granting preliminary approval of class action settlement) ("COPPA Class Action").

[28] Dissenting Statement of Commissioner Rohit Chopra, *In re Matter of Google LLC and YouTube, LLC*, Commission File No. 1723083 (Sept. 4, 2019), https://www.ftc.gov/legal-library/browse/cases-proceedings/public-statements/statement-commissioner-rohit-chopra-regarding-youtube

[29] *Id.*

[30] *Id.* (emphases added).

[31] *Id.*

77. Commissioner Kelly Slaughter also dissented from the settlement, indicating that she was "concerned that it does not go far enough. . . ."[32] She noted that the Commission was alleging that Google had:

> committed widespread and brazen violations of COPPA because of their actual knowledge of the child-directed content they host and monetize with behavioral advertising. The Commission's staff, working alongside the Attorney General of New York and her staff, have assembled a powerful complaint against YouTube and Google that **should leave no doubt** in the mind of a judge—or the minds of parents—that YouTube and Google **were knowingly profiting off of the unlawful tracking of children,** which is forbidden by COPPA and its implementing rule.[33]

78. The YouTube COPPA matter was not the only enforcement action arising from Google's alleged collection of children's personal information. Google was also subject to enforcement proceedings brought by the New Mexico Attorney General concerning allegations that tracking technologies had been embedded in child-directed applications distributed through Android and administered by Google.[34] In a separate action, the New Mexico Attorney General alleged that Google improperly collected student data through its Google Education products and school Chromebooks despite representations Google had made concerning student privacy (the "New Mexico AG Chromebooks Litigation").[35] Google resolved both actions in December 2021 through a global settlement that required, among other things, $3.85 million in funding for the Google New Mexico Kids Initiative.[36] Google later agreed to pay $8.25 million to resolve related private class-action litigation concerning the collection of children's information through Google Play applications, subject to final

---

[32] Dissenting Statement of Commissioner Kelly Slaughter, *In re Matter of Google LLC and YouTube, LLC*, Commission File No. 1723083 (Sept. 4, 2019), https://www.ftc.gov/legal-library/browse/cases-proceedings/public-statements/dissenting-statement-commissioner-rebecca-kelly-slaughter-matter-google-llc-youtube-llc

[33] *Id.* (emphasis added).

[34] *New Mexico ex rel. Balderas v. Tiny Lab Productions*, 457 F. Supp. 1103 (D.N.M. 2020) ("NM Google Play Litigation").

[35] *New Mexico ex rel. Balderas v. Google LLC*, No. 1:20-cv-00143-NF-KHR (D.N.M.).

[36] *New Mexico ex rel. Balderas v. Tiny Lab Productions*, No. 1:18-cv-00854-MV-JFR (D.N.M., filed Sept. 2018); *see also* Press Release, *Attorney General Hector Balderas Announces Landmark Settlements with Google Over Children's Online Privacy* (Dec. 13, 2021), https://nmdoj.gov/press-release/attorney-general-hector-balderas-announces-landmark-settlements-with-google-over-childrens-online-privacy/.

court approval.[37] In a separate matter, Google also settled claims asserted by the New Mexico Attorney General arising from its collection of student data through school Chromebooks in violation of the privacy representations Google had made to parents.

### B. State Attorneys General Actions Cost Alphabet More Than $2 Billion

#### 1. Google Illegally Tracked Users' Locations

79. While Google was breaking the law and its own promises by illegally gathering information about its child users, it was also gathering information on the location of ***all of its users*** while reassuring the public that it was not doing so.

80. On August 13, 2018, the Associated Press published an investigative report entitled "Google tracks your movements, like it or not." The report raised alarm bells on Capitol Hill and representatives grilled Pichai over Alphabet's data practices.[38] It also became the catalyst for a series of enforcement actions by state attorneys general, beginning with Arizona (the "Arizona AG Location-Tracking Litigation")[39] and ultimately expanding into nationwide litigation challenging Google's representations concerning its collection and use of users' location data.

81. The Associated Press reported that "Google's support page on [Location History] states 'You can turn off Location History at any time. With Location History off, the places you go are no longer stored.' That isn't true." The article further reported that "[e]ven with Location History paused, some Google apps automatically store time-stamped location data without asking."

82. In May 2020, the Arizona Attorney General filed *State of Arizona v. Google LLC*, Case No. CV2020-006219 (Az. Super. Ct. Cty. of Maricopa) (previously defined as the "Arizona AG Location-Tracking Litigation"). The Arizona AG Location-Tracking Litigation alleged that Google's public representations concerning Location History were materially misleading. As the Attorney General explained:

---

[37] *A.B. v. Google LLC*, No. 5:23-cv-03101-PCP (N.D. Cal.) (proposed $8.25 million settlement awaiting final approval) ("Google Play Child-Privacy Litigation").

[38] Jillian D'Onfro, *Google's Sundar Pichai was grilled on privacy, data collection, and China during congressional hearing*, CNBC (Dec. 11, 2018), https://www.cnbc.com/2018/12/11/google-ceo-sundar-pichai-testifies-before-congress-on-bias-privacy.html

[39] *State of Arizona v. Google LLC*, No. CV2020-006219 (Ariz. Super. Ct., Maricopa Cnty.) ("Arizona AG Location-Tracking Litigation").

> The [Associated Press] article discusses Google's Location History service, which enables users to view where they have been. Google provided users the ability to disable Location History. At the same time, Google told users that 'with Location History off, the places you go are no longer stored.' But the AP article revealed that ***this statement was blatantly false: even with Location History off, Google would surreptitiously collect location information through other settings such as Web & App Activity and use that information to sell ads***…. [With] Location History off, Google continues to collect location information through Web & App Activity-a title that reveals nothing about the setting's connection to harvesting location data."[40]

83. Through Web & App Activity—which the Attorney General noted is a title that reveals nothing about the setting's connection to harvesting location data—"Google logs information relating to a user's activity on Google's websites and apps, such as conducting a search on Google Search. A critical component of this information from Google's perspective is a user's location."

84. Three days after publication of the Associated Press investigation, Google revised the disclosure language on its Location History support page. But Google did not change the underlying practice of collecting users' location information through the separate Web & App Activity setting. In reporting on the revised disclosure, the Associated Press quoted the original whistleblower as observing that the revised page still failed to disclose that disabling the separate "Web & App Activity" setting—not merely Location History—was necessary to prevent Google from continuing to record users' location data.

85. Expert evidence later submitted in the Arizona AG Location-Tracking Litigation demonstrated that Google's collection of user data extended well beyond the practices highlighted in the Associated Press investigation. Using an Android device configured with factory-default settings, the expert replicated Google's data collection practices as they existed in 2018. The study found that, in addition to the location tracking through Web & App Activity that formed the basis of the Attorney General's allegations, the Android operating system and the Chrome browser together transmitted data to Google more than ninety times per hour, with approximately twenty percent of those transmissions containing the user's location. By contrast, when an iPhone user browsed with Safari rather than Google Chrome, Google received ***no data*** unless the user ***affirmatively interacted*** with a Google application.

[40] Complaint for Injunctive & Other Relief ¶¶8-9(a), *State ex rel. Brnovich v. Google LLC*, No. CV2020-006219 (Ariz. Super. Ct., Maricopa Cnty.) ("Arizona AG Location-Tracking Litigation").

The expert also concluded that Google collected location information through the device's "WiFi Scanning" feature even when that setting had been disabled.

86. As the Arizona Attorney General explained in filing the Arizona AG Location-Tracking Litigation, "Location information allows Google to enable advertisers to target users in a specific geographic location, and it also allows Google to validate the effectiveness of ads by reporting to advertisers how often online ad clicks are converted into real-world store visits."[41] In other words, Google chose to collect this private user information to improve the ad sales that drive the overwhelming majority of its revenue.[42]

87. Nearly two years after Arizona initiated its enforcement action, the Texas Attorney General filed a separate lawsuit against Google in January 2022.[43] Drawing upon additional evidence developed during the intervening period, the Texas complaint contained internal documents and communications that provided further evidence that Google understood the misleading nature of its location-related disclosures and the manner in which its location-tracking systems operated.

88. The Texas complaint describes a 2014 internal presentation setting out a specific scenario in which a Google user would reasonably be deceived by Google's design choices. The example involved a hypothetical individual who "opted out of Google location" but then finds that, nevertheless, "Google maps has house-level accurate location," leaving the user wondering—in Google's words— "how does Google know my location? I thought I said no!"

89. Texas's complaint also revealed that Google employees agreed after publication of the AP article that Google's disclosures were misleading. The Texas complaint alleged that Google's employees agreed that Google's disclosures regarding Location History were "definitely confusing" and

---

[41] *State of Arizona v. Google LLC*, Case No. 2020-cv-006219 (Ariz. Super. Ct. May 27, 2020) (COMPLAINT), at ¶ 5, https://embed.documentcloud.org/documents/6929494-Brnovich-v-Google/?mode=document&embed=1

[42] In its most recent Form 10-K (filed with the SEC on February 6, 2026), Alphabet disclosed that it "generated more than 70% of total revenues for online advertising in 2025." Alphabet Inc., 2025 Annual Report (Form 10-K) 9 (Feb. 9, 2026). Alphabet was even more reliant on advertising during the 2020 fiscal year, in which Alphabet reported that it "generated over 80% of total revenues from the display of ads online." Alphabet Inc., 2020 Annual Report (Form 10-K) 10 (Feb. 3, 2021).

[43] *State of Texas v. Google LLC*, No. 22-01-88230-D (377th Dist. Ct., Victoria Cnty., Tex.). (location/incognito) ("Texas AG Action").

that the user interface for Google Account settings "feels like it is designed to make things possible, yet difficult enough that people won't figure it out."

90. Congress also raised concerns about Google's location-tracking practices. As the *Wall Street Journal* reported in June 2022, lawmakers asked the FTC to investigate Google and other technology companies on the basis that collecting and selling users' private information—including location—without proper disclosures might constitute an unfair and deceptive trade practice.[44]

91. Google's misrepresentations concerning the collection and use of users' location data ultimately resulted in enforcement actions by virtually every state Attorney General in the nation. Google paid a total of ***$638.9 million*** as a result of the Attorney General Actions, including $85 million to the State of Arizona,[45] $93 million to the State of California,[46] $20 million to the State of Indiana,[47] $39.9 million to the State of Washington,[48] $9.5 million to the District of Columbia,[49] and $391.5 million to the 40 states that pursued a multistate action.[50] Google also paid an additional $62 million to resolve a private class action arising from the same underlying conduct.[51] All in, Google paid ***more than $700 million*** in fines, penalties, and settlements relating to the location information violations alone—***excluding*** the settlement of the enforcement action brought by the State of Texas, which is discussed in more detail below.

---

[44] Patience Haggin, *Lawmakers Want FTC To Investigate Apple, Google Over Mobile Tracking*, WALL ST. J. (June 24, 2022), https://www.wsj.com/tech/lawmakers-want-ftc-to-investigate-apple-google-over-mobile-tracking-11656077945.

[45] *State of Arizona ex rel. Brnovich v. Google LLC*, No. CV2020-006219 (Ariz. Super. Ct., Maricopa Cnty.).

[46] *People v. Google LLC*, No. 23CV422424 (Cal. Super. Ct. Santa Clara Cnty. Sept. 18, 2023) (final judgment and permanent injunction) ("CA AG Location Tracking Action").

[47] *State v. Google LLC*, No. 49D01-2201-PL-002399 (Ind. Super. Ct. Marion Cnty. Dec. 29, 2022) (settlement agreement) ("Indiana AG Location Tracking Action").

[48] *State v. Google LLC*, No. 22-2-01103-3 SEA (Wash. Super. Ct. King Cnty. May 18, 2023) (consent decree) ("WA AG Location Tracking Action").

[49] *District of Columbia v. Google LLC*, No. 2022-CA-000330-B (D.C. Super. Ct. Dec. 29, 2022) (settlement agreement) ("DC AG Location Tracking Action").

[50] *See* Multistate Assurance of Voluntary Compliance, https://www.nj.gov/oag/newsreleases22/2022-1114_Google-Settlement-Filed-11.11.22.pdf ("Multistate AG Location Tracking Action")

[51] *In re Google Location History Litigation*, No. 5:18-cv-05062-EJD, slip op. at 3, 10 (N.D. Cal. May 3, 2024) (order granting final approval of class action settlement) ("Location Tracking Class Action Litigation").

**2. Google Misrepresented the Privacy Protections Afforded by Its Incognito Mode**

92. Google's misrepresentations concerning users' privacy were not limited to the collection and use of location data. While Google was under attack for its illegal use and collection of users' data, Google also faced enforcement actions and substantial civil litigation arising from its representations concerning the privacy protections afforded by Chrome's "Incognito Mode," including an enforcement action brought by the Texas Attorney General in May 2022 (which also contained claims concerning Google's location-information violations).[52]

93. "Incognito Mode" is a browsing option available to users of the Google Chrome browser. According to the Texas Attorney General, when a user activated Incognito Mode during the relevant period, Google displayed a message beginning, "Now you can browse privately."

94. The privacy implications of Google's Incognito Mode representations were later examined in detail by the federal district court presiding over a related private class action. In denying Google's motion for summary judgment in that class action, the court described the operation of Incognito Mode and addressed the message Google conveyed to users regarding the privacy of their browsing activity:

> When users first open Chrome, they are greeted by a bright, white screen and the colorful Google logo. When users navigate to Incognito mode, the screen goes from white to black, all text is rendered in gray, and users are met with a "spy guy icon." They are told they have now 'gone Incognito,' which, Google explains on the next line, means that they can 'browse privately, and other people who use this device won't see your activity.' Plaintiffs have evidence to show that, internally, Google understood that the 'framing of the feature as 'Incognito' (or, for other browsers, 'Private') made users 'overestimate privacy mode protections,' including that Incognito 'hides browsing activity from Google.'[53]

95. As both the federal district court and the Texas Attorney General concluded, Google's assurances and representations that its users in Incognito mode would "browse privately" were not true. For websites utilizing Google Analytics or Google Ad Manager—which together were deployed on a substantial majority (~70%) of websites—a user browsing in Incognito Mode still had extensive information about their activity transmitted to Google through those website services.

---

[52] *State of Texas v. Google LLC*, Cause No. 22-01-88230-D (Jud. D. Ct., Victoria Cnty., filed Jan. 24, 2022) (petition amended to add Incognito Mode allegations on May 19, 2022) ("Texas AG Incognito/Location Litigation").

[53] *Brown v. Google LLC*, Case No. 4:20-cv-3664 (N.D. Cal. Aug. 7, 2023) (the "Incognito Mode Class Action Litigation"), ECF #969 (ORDER) at 15.

96. As the Texas Attorney General summarized:

> Even when Texans are browsing the internet in Incognito mode, Google continues to track them, profile them, and profit from their data whenever they visit websites using Google Analytics or Google Ad Manager. ***Said another way, Google collects precisely the type of private, personal information from which Texans wish and expect to be protected even when they have undertaken the steps that Google instructs them to take to obtain that protection***. Google's tracking occurred—and continues to occur—no matter how sensitive or personal Texans' online activities are and no matter what steps a Texan takes to prevent it.

97. Google ultimately resolved the Incognito Mode allegations as part of a broader ***$1.375 billion*** settlement with the Texas Attorney General in 2025 that addressed three separate categories of privacy violations: (i) location tracking; (ii) Incognito Mode; and (iii) biometric data. Separately, the related private class action was resolved through an agreement requiring Google to delete billions of data points it had improperly collected, and to implement changes to its data-collection practices on a going-forward basis.[54]

**3. Google Violates State Laws Governing the Collection and Use of Biometric Information**

98. Among the costliest privacy-related liabilities Google incurred were those arising from its failure to comply with state statutes governing the collection and use of biometric information.

99. Beginning in 2008, states enacted laws regulating the collection of biometric identifiers without individuals' consent. Those statutes were widely known. Indeed, Alphabet's Board has expressly identified evolving biometric privacy laws as an area of regulatory risk since at least 2023.

100. Illinois, the first state to enact such legislation, prohibited private entities from collecting or storing biometric identifiers—including retinal or iris scans, fingerprints, voiceprints, and scans of hand or face geometry—without first obtaining the individual's consent.

101. The Illinois statute, enacted in 2008, left little ambiguity regarding the scope of the protected information. It expressly defined a biometric identifier as "a retina or iris scan, fingerprint, voiceprint, or scan of hand or face geometry."

102. Notwithstanding the statute's plain language, Google permitted users in Illinois to upload photographs to its cloud-based Google Photos service, where those images were analyzed to create

[54] *See generally* May 9, 2025 Press Release, *Attorney General Ken Paxton Secures Historic $1.375 Billion Settlement with Google Related to Texans' Data Privacy Rights*

unique facial templates. Google contended that the statutory phrase "scan of face geometry" applied only to scans of an individual's physical face and not to scans generated from photographs. A federal judge in the U.S. District Court for the Northern District of Illinois overseeing a private class action suit alleging violation of the state statute (the "Google Photos / Illinois BIPA Litigation")[55] rejected Google's interpretation, concluding that it found no support in the plain language of the statute, and denied the Company's motion to dismiss. Ultimately, Google had to shell out $100 million in 2022 to resolve those claims.[56]

103. Alphabet knew—certainly no later than the federal judge's 2017 motion to dismiss ruling—that its interpretation of the Illinois statute (and thus of materially identical statutory language) was unsupported. A board adequately focused on ensuring legal compliance would have modified the Company's practices in jurisdictions with comparable biometric privacy statutes.

104. Instead, Google continued collecting biometric information in states with substantially similar laws, exposing itself to hundreds of millions of dollars in additional liability.

105. Texas, for example, enacted a biometric privacy statute—called the "Capture or Use of Biometric Identifier Act"—using language materially indistinguishable from Illinois. Its definition of biometric identifiers—"retina or iris scan, fingerprint, voiceprint, or record of hand or face geometry"—tracks almost word for word the definition in Illinois' statute (i.e., "a retina or iris scan, fingerprint, voiceprint, or scan of hand or face geometry"). The law permits the state to impose penalties of $25,000 for each violation.

106. Indeed, Google's own conduct reveals that it understood creating facial templates from users' photographs violated these statutes. When Google introduced a feature in its "Google Arts & Culture" application in December 2017 that allowed users to superimpose their faces onto works of art, Google tellingly withheld the feature from users in Illinois and Texas while making it available throughout the remainder of the United States.

---

[55] *Rivera v. Google LLC*, No. 2019-CH-00990 (Ill. Cir. Ct. Cook Cnty.).

[56] *Rivera v. Google LLC*, No. 2019-CH-00990 (Ill. Cir. Ct. Cook Cnty. Sept. 28, 2022) (final order and judgment approving $100 million class settlement). The settlement resolved several related lawsuits.

107. Despite that demonstrated understanding, Google continued for approximately ***five years*** after the decision in the Google Photos / Illinois BIPA Litigation to generate facial templates through its Google Photos service for users in Texas. Although Google had already been informed that materially identical statutory language prohibited the practice in Illinois, it continued the same conduct in Texas. Similarly, and tellingly, it continued employing facial-scanning technology in connection with its Google Nest Hub Max product in Texas, but not in Illinois.

108. Although only discovery will reveal why Google chose to comply with Texas biometric law with respect to the Arts and Culture app and defy Texas biometric law with respect to Google Photos and Google Nest Hub Max, one likely explanation is that the use of facial recognition technology was a highly publicized element of the Arts and Culture app—giving users the ability to have their faces superimposed onto fine art images was the entire point of the new feature. Conversely, Google's unspoken or poorly disclosed use of biometric information for the other features was less likely to be noticed by users or targeted by Texas regulators.

109. Google's collection of biometric information in Texas was not limited to its Google Photos service. During the same period, Google also employed facial-scanning technology in connection with its Google Nest Hub Max product in Texas, even as it excluded users in Illinois from accessing the same feature.

110. Google's continued collection of biometric information in Texas ultimately resulted in significant liability for Alphabet's stockholders.

111. In 2022, the Texas Attorney General filed suit alleging that Google had violated the Texas biometric privacy statute continuously since 2015.[57]

112. In October 2025, Google entered into a ***$1.375 billion settlement*** with the Texas Attorney General. The settlement resolved two actions against Google in a single settlement (the "Texas AG Settlement"): (i) the Texas AG Biometric Litigation and (ii) the Texas AG Incognito/Location Litigation.[58]

---

[57] *State v. Google LLC*, No. CV58999 (385th Dist. Ct., Midland Cnty., Tex) (filed Oct. 20, 2022) ("Texas AG Biometric Litigation").

[58] The parties had reached a settlement in principle announced on May 9, 2025, and the settlement was executed on October 31, 2025.

113. Illinois and Texas are not the only states with biometric privacy statutes governing the collection and use of facial geometry. Additional states have enacted materially identical legislation, yet there is no indication that Google has modified its practices to ensure compliance with those statutes when handling scans generated from photographs.

### C. GOOGLE MISUSES DATA RELATING TO WOMEN'S SEXUAL AND MENSTRUAL HEALTH

114. During 2018 and 2019, Google received highly sensitive personal health information concerning sexual and menstrual health of women who used the "Flo Period & Ovulation Tracker" mobile application. According to a subsequently filed class action complaint against Google and Flo Health, Inc., Flo Health repeatedly assured users that the intimate health information they entered into the application would remain private and confidential and would not be disclosed to third parties.

115. Contrary to these assurances, Flo Health incorporated a software development kit ("SDK") developed by Google that transmitted users' personal health information to Google for advertising and analytics purposes. The complaint alleged: "As one of the largest advertisers and data analytics companies in the country, Google knew that the data it received from Flo Health through Fabric and Google Analytics contained intimate health data. Despite knowing this, Google continued to receive, analyze, and use this information for its own purposes, including marketing and data analytics."

116. Google was named as a defendant, along with Flo Health and Facebook, in *Frasco v. Flo Health Inc. et al.*, 3:21-cv-00757-JD (N.D. Cal.) ("Flo Health Litigation"), class action litigation alleging violations of California statutory and common law arising from the disclosure and use of users' highly sensitive health information.

117. Google ultimately agreed to pay $48 million to resolve the claims brought on behalf of women whose personal health information had been disclosed.

### D. GOOGLE PROMISES USERS THEY CAN DISABLE TRACKING, THEN CONTINUES TRACKING THEM ANYWAY

118. As part of its 2022 settlement with numerous states Attorneys General concerning location tracking, Google agreed to provide users with clear notice that users could prevent the collection of location information through the Web & App Activity setting by disabling that feature. A user who elected to disable the setting could therefore reasonably expect that Google would cease collecting information through the user's interactions with mobile applications.

119. That expectation was not borne out in practice. In July 2020, a class of Google users initiated a suit in the Northern District of California in July 2020 alleging that Google improperly and unlawfully intercepted consumers' private activity on third-party applications (the "Web & App Litigation").[59] As the Court explained, Google had developed software development kits ("SDKs") that third-party application developers embedded in their mobile applications. Those SDKs transmitted users' advertising interactions and certain device identifiers to Google even when the user had disabled the Web & App Activity setting in the user's Google account. Google then used that information to provide app developers with valuable attribution and conversion analytics measuring the effectiveness of advertising campaigns. Evidence presented at trial established the extraordinary volume of information collected through this process. One witness testified that the data collected from the phones of just two individuals over a two-month period would fill a stack of paper approximately thirty inches high. The evidence also suggested that, although Google contended that it treated the information "pseudonymously" if the Web & App Activity setting was disabled, the information Google collected was not, in fact, fully anonymized.

120. Following trial, the jury found Google liable for invasion of privacy and intrusion upon seclusion and awarded the plaintiffs $425 million in damages.[60]

### E. GOOGLE RETAINS AND USES CONVERSATIONS IMPROPERLY RECORDED BY ITS DEVICES

121. During the same period in which Google was collecting users' location information without their knowledge or informed consent, it was also capturing recordings of users' private conversations via Google Assistant, Google's voice-activated digital assistant. According to allegations later asserted against Google,[61] Google Assistant allowed the Company to surreptitiously record conversations—and Alphabet then retained transcripts of the conversations and disclosed recordings to third-party contractors. Alphabet had falsely told its users that voice recordings would occur only with users' consent and would not be shared with third parties.

---

[59] *Rodriguez v. Google LLC*, 3:20-cv-04688 (N.D. Cal).

[60] *Rodriguez v. Google LLC*, No. 3:20-cv-04688-RS (N.D. Cal. Sept. 3, 2025) (jury verdict).

[61] *In re Google Assistant Privacy Litig.*, No. 5:19-cv04286-BLF (N.D. Cal.).

122. Google Assistant was designed to activate upon detecting designated "hot words," such as "Hey Google." But according to plaintiffs in a class action suit filed in the Northern District of California in July 2019,[62] the software also falsely interpreted unrelated speech as activation commands, causing Google Assistant to record conversations that users neither intended nor expected Google to capture.

123. In 2019, a whistleblower disclosed to a Belgian news organization that Google had engaged contractors to review recordings that had been captured through these unintended activations and to compare those recordings with transcripts generated by Google to evaluate the performance of its speech-recognition software. The whistleblower provided recordings to the news outlet, a reporter for which wrote: "Among the more than a thousand excerpts that I heard, there were 153 conversations that should never have been recorded and during which the command 'Okay, Google' was clearly not given. They were everyday living-room conversations." The reporter further observed: "I estimate that some 30 percent of the conversation excerpts are recorded unintentionally. Very often they're about trivial things. But sometimes they're about highly personal matters, such as relationship problems. Sometimes, they are blazing rows."

124. Following publication of those revelations, individual users of Google Assistant filed a class action lawsuit against Google in the U.S. District Court for the Northern District of California in July 2019 (the "Google Assistant Litigation") arising from the alleged recording, retention, and disclosure of users' private conversations.[63] Google ultimately agreed in January 2026 to pay $68 million to resolve the litigation.

### F. GOOGLE IMPROPERLY USES USERS' CELLULAR DATA CONNECTIONS TO COLLECT INFORMATION

125. Google's handling of Android users' cellular data gave rise to yet another wave of privacy litigation based on allegations that Google disclosed only part of the story regarding its collection of users' information. In July 2020, Android users filed a nationwide class action alleging

---

[62] *Id.*

[63] *Id.*

that Google's disclosures materially understated the circumstances under which it collected data from their devices (the "Nationwide Android Cellular-Data Class Action").[64]

126. According to the plaintiffs' allegations, Google used Android users' cellular data connections to transmit information from their devices even when the devices were idle and the users were not actively interacting with Google's applications or services. Google had told its users that cellular data would be used only when users were actively using Google services or applications.

127. The Nationwide Android Cellular-Data Class Action was resolved in January 2026 for $135 million;[65] a parallel California state action (the "California Android Cellular-Data Class Action") resulted in a jury verdict awarding plaintiffs $314.6 million, which was later resolved by settlement for $350 million.[66]

### G. GOOGLE CONCEALS MATERIAL PRIVACY BREACHES FROM ITS STOCKHOLDERS, RESULTING IN A $350 MILLION SETTLEMENT

128. In addition to misrepresenting its privacy practices to its users and customers, Alphabet has misrepresented its privacy practices to its own stockholders.

129. For years, Alphabet has touted the importance of data privacy and legal compliance to its stockholders. For example, in its 2017 annual report, Alphabet noted that "[p]rivacy concerns relating to our technology could damage our reputation and deter current and potential users or customers from using our products and services."[67] Alphabet was aware that security failures and cyberattacks could "seriously harm" its "reputation and brand, and, therefore, our business, and impair our ability to attract and retain users."[68] Alphabet thus understood that failures to safeguard users' private information posed significant risks to its business and reputation—and, as a result, were matters of great importance to its investors.

130. Yet when those risks materialized, Alphabet knowingly withheld critical information from investors about a significant security failure. In 2018, following the public controversy over

[64] *Taylor v. Google LLC*, Case No. 5:20-cv-07956-VKD (N.D. Cal.).

[65] *Id.*

[66] *Csupo et al. v. Google LLC*, Case No. 19-cv-352557 (Cal. Super. Ct.).

[67] Alphabet Inc., 2017 Annual Report (Form 10-K) 10 (Feb. 5, 2018).

[68] *Id.* at 11.

Cambridge Analytica's harvesting of data from Facebook, Google discovered that a "security glitch" in its Google+ social network had left the private data of hundreds of thousands of users exposed to third-party developers for three years.

131. Stockholders filed a securities class action against Alphabet for hiding this information from stockholders and the public in October 2018 (the "Google+ Securities Litigation").[69] As the Ninth Circuit Court of Appeals articulated on June 16, 2021, in summarizing the plaintiffs' allegations, "Warned by its legal and policy staff that disclosure of these issues would result in immediate regulatory and governmental scrutiny, Google and its holding company Alphabet chose to conceal this discovery, made generic statements about how cybersecurity risks could affect their business, and stated that there had been no material changes to Alphabet's risk factors since 2017."[70] The Ninth Circuit also ruled that the complaint's allegations "raise a strong inference that [defendant Larry] Page, and therefore Alphabet, knew about the [privacy bugs] and that Alphabet intentionally did not disclose this information in its 10-Q statements."[71]

132. The parties to the Google+ Securities Litigation reached a settlement in February 2024 requiring Google to pay $350 million. One third-party account of the settlement described it as "the largest privacy and cybersecurity-related securities class action lawsuit settlement ever[.]"[72]

### H. GOOGLE CONCEALS ITS USE OF USERS' PERSONAL DATA FOR ADVERTISING FOR MORE THAN FOUR YEARS

133. In March 2021, Google was sued in the U.S. District Court for the Northern District of California in a consumer class action challenging its improper use of users' personal information in operating its "Real-Time Bidding" advertising system (the "RTB Class Action").[73] According to the complaint, Google assured users: "We don't sell your personal information to anyone." Further, Google claimed:

---

[69] *In re Alphabet, Inc. Sec. Litig.*, No. 4:18-cv-06245-JSW (N.D. Cal. filed Oct. 11, 2018).

[70] *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 693 (9th Cir. 2021).

[71] *Id.* at 705.

[72] Kevin LaCroix, *Alphabet Google+ User Data Privacy-Related Securities Suit Settles for $350 Million*, The D&O Diary (Feb. 8, 2024), https://www.dandodiary.com/2024/02/articles/securities-litigation/alphabet-google-user-data-privacy-related-securities-suit-settles-for-350-million/ .

[73] *In re Google RTB Consumer Privacy Litig.*, No. 4:21-cv-02155-YGR (N.D. Cal. filed Mar. 26, 2021) ("RTB Class Action").

> ***Advertisers do not pay us for personal information, such as your name or email, and we never share that information with advertisers***, unless you ask us to….We share reports with our advertisers to help them understand the performance of their ads, but we do so without revealing any of your personal information. At every point in the process of showing you ads, we keep your personal information protected with industry-leading security technologies.[74]

134. Despite these assurances, Google in fact collected information from across its products and services—including unique identifiers, device identifiers, geolocation information, IP addresses, and, in some instances, information concerning users' interests, race, religion, sexual orientation, and health status—and made that information available through its Real-Time Bidding system so that advertisers could bid for the opportunity to direct advertisements to particular users. Based largely on documentary evidence cited in the complaint, the Court concluded that the plaintiffs had plausibly alleged seven separate statutory, contractual, and common-law causes of action. In the face of the lawsuit and the court's denial of its motion to dismiss, Google remained recalcitrant, continuing to represent that personal information was not sold to anyone or shared with advertisers. In 2025, Google agreed to settle the suit in exchange for, *inter alia*, an agreement to implement additional disclosures and privacy controls relating to the RTB advertising system and giving users greater control over information shared in ad auctions.

### I. GOOGLE CONTINUES TO VIOLATE THE SAME EUROPEAN PRIVACY REQUIREMENTS, RESULTING IN MORE THAN €600 MILLION IN FRENCH REGULATORY PENALTIES

135. Beginning in 2019, the Commission Nationale de l'Informatique et des Libertés ("CNIL")—France's data protection authority—repeatedly concluded that Google was violating European privacy laws with respect to its collection and use of personal data. In particular, CNIL objected to what it described as Google's use of "forced consent," i.e., design choices that coerced users into agreeing to the collection and use of their data rather than giving them a genuine, freely exercised choice.

---

[74] *In re Google RTB Consumer Privacy Litig.*, 606 F.Supp.3d 935, 940 (N.D. Cal. 2022).

136. The first fine, a €50 million fine in 2019 (the "CNIL 2019 Enforcement"), arose from Google's forcing of Android phones to agree to Google's privacy policies and terms of use.[75] The Alphabet Audit Committee [redacted][76]

137. Despite having been expressly notified of the CNIL fine, [redacted] Alphabet continued to engage in misconduct and found itself on the receiving end of continually escalating fines from CNIL.

138. The second fine, a December 2020 fine of €100 million (the "CNIL 2020 Enforcement"), also arose from violations of European consent rules, this time from Google's failure to comply with French rules relating to the placement of advertising cookies on users' computers without proper consent or information. In connection with this fine, CNIL published specific recommendations for compliance.[77]

139. The technology press observed that cookie compliance had become a central enforcement priority for CNIL. As one publication explained, "Returning to the cookie consent issue, the CNIL has made investigating cookie compliance a particular focus," noting that although the regulator had granted companies a six-month grace period to achieve compliance, it had also warned that it would continue actively enforcing the cookie rules to protect internet users' privacy.[78]

140. Google's public reaction to the second fine was defiance:

---

[75] *GDPR Means Business: Google Hit With 50 Million Fine*, DEBEVOISE & PLIMPTON DEBRIEF (Jan. 28, 2019), https://www.debevoise.com/-/media/files/insights/publications/2019/01/20190128_gdpr_means_business_google_hit_with_50_million_fine.pdf

[76] Exhibit 2 (GOOG-OLERS-220-001604).

[77] *Tough Cookie: French CNIL Hits Google and Amazon With a Total of 135 Million in Fines*, DEBEVOISE & PLIMPTON DATA BLOG (Dec. 22, 2020), https://www.debevoisedatablog.com/2020/12/22/french-cnil-hits-google-amazon-with-e135-million-fines/); https://www.hunton.com/privacy-and-cybersecurity-law-blog/cnil-fines-google-and-amazon-135-million-euros-for-alleged-cookie-violations.

[78] Natasha Lomas, *France Fines Google $120M and Amazon $42M for dropping tracking cookies without consent*, TECH CRUNCH (Dec. 10, 2020), https://techcrunch.com/2020/12/10/france-fines-google-120m-and-amazon-42m-for-dropping-tracking-cookies-without-consent/

> People who use Google expect us to respect their privacy, whether they have a Google account or not. We stand by our record of providing upfront information and clear controls, strong internal data governance, secure infrastructure, and above all, helpful products. Today's decision under French ePrivacy laws overlooks these efforts and doesn't account for the fact that French rules and regulatory guidance are uncertain and constantly evolving. We will continue to engage with the CNIL as we make ongoing improvements to better understand its concerns.[79]

141. After the €100 million fine, CNIL authorities gave companies a clear directive for complying with its consent rules with respect to cookies: it had to be as easy for users to reject cookies as it was for them to accept them.[80]

142. In direct communication with Google, CNIL was even more specific. In February 2021, in response to a suggestion from Google as to how Google would comply with CNIL's 2020 rulings and recommendations, CNIL told Google that a process that involved one click to accept cookies but multiple clicks through a "configure" button to decline was inadequate. If there was one button to accept, there had to be one button to refuse.[81]

143. Google refused to follow this simple directive even after receiving specific instructions from CNIL, wherein CNIL cautioned Google and other companies that they may not make it harder to reject cookies than it was to accept them.[82]

---

[79] *Id.*

[80] Yaël Hirsch, *FRANCE: Cookies – new record sanctions for tech giants – CNIL fines Facebook Ireland 60 million euros and Google 150 million euros*, DLA PIPER PRIVACY MATTERS (Jan. 8, 2022), https://privacymatters.dlapiper.com/2022/01/france-cookies-new-record-sanctions-for-tech-giants-cnil-fines-facebook-ireland-60-million-euros-and-google-150-million-euros/

[81] There is not an official English translation of the December 2021 CNIL decision in which this February 2021 correspondence with Google is discussed. The official French version of the decision is found at https://www.legifrance.gouv.fr/cnil/id/CNILTEXT000044840062 ; *see also* Paul Byrne, *CNIL Calls Organizations to Audit Their Sites and Apps for Cookie Compliance*, COOKIESCAN (Feb. 2, 2021) (referencing CNIL's February 4, 2021 announcement that it had sent letters and emails to Google and other companies concerning the cookie law rules and steps needed to comply with them), https://cookiescan.com/cnil-calls-organizations-to-audit-their-sites-and-apps-for-cookie-compliance/

[82] FRANCE: Cookies – new record sanctions for tech giants – CNIL fines Facebook Ireland 60 million euros and Google 150 million euros. (DLA Piper "Privacy Matters", January 8, 2022 (https://privacymatters.dlapiper.com/2022/01/france-cookies-new-record-sanctions-for-tech-giants-cnil-fines-facebook-ireland-60-million-euros-and-google-150-million-euros/) Paragraph 133 of the original French decision, which notes the requirement of five clicks versus one, reads " En troisième lieu, la formation relève qu'en l'espèce, les utilisateurs résidant en France se rendant sur le moteur de recherche [V] et/ou sur [W] doivent effectuer une seule action pour accepter les cookies, alors qu'ils doivent en effectuer cinq pour les refuser. Il n'est donc pas aussi simple de refuser les cookies que de les accepter."

144. The consequence of Google's defiant response and its decision to implement a consent system that it had already been told by CNIL was inadequate was predictable: a third, even heavier sanction. In December 2021, Google was subjected to a fine of €150 million, with CNIL specifically noting that it had told Google exactly how to comply with French law (the "CNIL 2021 Enforcement").

145. Once again, the fines imposed on Google were reported in the technology press, with one major publication referring to the new fine as a 'spanking.'[83] As one commentator summarized CNIL's findings:

> The CNIL's investigations concluded that the websites offered an easy way to consent to the use of cookies immediately after accessing the websites, but did not provide an equally easy way to refuse the use of cookies. Users had to select multiple options to refuse cookies, but only one option to provide consent to the use of all cookies. . . . According to the CNIL, the companies' cookie notices and consent practices affect the freedom of the website users' consent, as it influences users' choice in favor of consent.[84]

146. On July 20, 2022, Alphabet's full board [redacted][86]

147. On August 24, 2022, a new complaint was filed against Google by CNIL, alleging a new violation by Google of French consent rules: placing advertisements among the emails of Gmail users without first getting users' consent.

148. In the course of CNIL's investigation of the Gmail complaint, CNIL also discovered that Google was still—even after multiple fines—failing to give users even-handed choices with respect to cookies. In this case, the violation was encouraging users to choose cookies that would result in

[83] Natasha Lomas, *France spanks Google $170M, Facebook $68M over cookie consent dark patterns*, TECHCRUNCH (Jan. 6, 2022), https://techcrunch.com/2022/01/06/cnil-facebook-google-cookie-consent-eprivacy-breaches/.

[84] Hunton Andrews Kurth, *CNIL Fines Big Tech Companies 210 Million Euros for Cookie Violations*, NAT'L L. REV. (Jan. 13, 2022), https://natlawreview.com/article/cnil-fines-big-tech-companies-210-million-euros-cookie-violations.

[85] Exhibit 3 (GOOG-OLERS-220-002290 at -2300).

[86] Exhibit 4 (GOOG-OLERS-220-001561).

personalized advertisements rather than those that would not, and failing to inform users that signing up for any type of Google account would result in the placement of some type of cookies on their computers.

149. On September 15, 2023—over a year after the latest complaint was filed with CNIL, and after Google had been in detailed contact with CNIL about the new allegations—the Alphabet Audit Committee [redacted]. Plaintiff is entitled to an inference that [redacted]. And Google persisted in its consent violations.

150. [redacted] CNIL noted that in October 2023 (just weeks after the Audit Committee meeting), Google took steps that it claimed addressed some of CNIL's concerns regarding personalized-advertising cookies, but, in fact, did not. Google's response to unsolicited advertisements in Gmail was particularly superficial: rather than stop displaying ads to users who had not consented to receive them, Google merely changed the ads' color for certain users. As CNIL observed, that cosmetic modification left the challenged conduct entirely intact.

151. CNIL also found that until October 2023, Google users who accepted cookies that would result in personalized advertisements needed to take only one step, but choosing non-personalized advertisements took five steps.[88] This was true notwithstanding the fact that having an imbalanced choice of this type was exactly the same offense for which Google had been fined 150 million euros almost two years prior, in December 2021.

---

[87] Exhibit 5 (GOOG-OLERS-220-002918).

[88] CNIL 2025 Opinion at ¶111, available at: https://www.cnil.fr/sites/default/files/2025-09/cnil_sanction_google_en.pdf

152. Google purported to remedy this violation in October 2023, but still did not tell users that using Google services of any type resulted in some type of cookie being placed on their computer. CNIL considered this to be a separate violation: "The fact that the data subject knows that it is impossible to access Google services without cookies being placed on his or her device is fundamental information that must be brought to his or her knowledge clearly so that he or she can decide, in full knowledge of the facts, whether or not to finalize the creation of his or her account."[89] CNIL also noted that Google's descriptions of the benefits of choosing personalized ads were still unbalanced, even though the number of clicks required to choose one over the other had been equalized.

153. With respect to the separate issue of advertisements delivered into users' Gmail boxes, CNIL discussed at length how clear, unequivocal, and longstanding the French rules relating to this practice were.[90]

154. Finally, following inspections conducted in 2022 and 2023, CNIL issued ***yet another*** enforcement decision. On September 1, 2025, CNIL imposed a €325 million fine against Google relating to its "cookies" practices (the "CNIL 2025 Enforcement"), bringing the total of the fines Google had paid to the CNIL to €625 million.

155. CNIL specifically cited as one of the bases for its historic fine the fact that Google had just been sanctioned in 2021 for similar behavior.[91] CNIL emphasized Google's status as a recidivist in its press release accompanying the order: "the restricted committee considered that the companies had been negligent, given that they had previously been sanctioned by the CNIL on two occasions, in 2020 and 2021, for breaches relating to cookies."[92]

156. By 2025, Google had been warned repeatedly that its consent practices violated French law. CNIL had issued multiple enforcement decisions, published detailed guidance explaining how companies were expected to comply, granted a transition period in which to do so, and repeatedly

---

[89] *Id.* at ¶ 142.

[90] *Id.* at ¶¶ 243-246.

[91] *Id.* at ¶ 244.

[92] Press Release, CNIL, *Cookies and advertisements inserted between emails: GOOGLE fined 325 million euros by the CNIL*, (Sept. 3, 2025), https://www.cnil.fr/en/cookies-and-advertisements-inserted-between-emails-google-fined-325-million-euros-cnil.

increased the penalties imposed on Google for substantially the same conduct. Alphabet's Audit Committee [redacted] despite accumulating €625 million in penalties over the course of five years, the Board [redacted] CNIL's 2025 decision confirmed the consequences of that choice, expressly relying on Google's prior sanctions in 2020 and 2021 as an aggravating factor in imposing the €325 million penalty, which brought Google's total penalties paid to CNIL since 2019 up to €625 million.

## III. GOOGLE ENGAGES IN NEW PRACTICES THAT HAVE EXPOSED IT TO THE SCRUTINY OF REGULATORS AND PRIVACY ADVOCATES

### A. GOOGLE ALLEGEDLY SHARES PRIVATE INFORMATION OF U.S. USERS WITH FOREIGN ENTITIES IN VIOLATION OF FEDERAL LAW

157. In 2024, Congress enacted the Protecting Americans' Data from Foreign Adversaries Act ("PADFAA"). Among other things, PADFAA prohibits data brokers from transferring personally identifiable sensitive data concerning United States persons to foreign adversaries or entities controlled by foreign adversaries. The statute identifies China, Russia, Iran, and North Korea as foreign adversary nations.

158. Congressional concern regarding Google's handling of Americans' personal data long predated PADFAA's enactment. In July 2022, ProPublica reported that Google was "sharing potentially sensitive user data with a sanctioned Russian ad tech company owned by Russia's largest state bank[.]"[93] The article further reported that "Google shared data with [the Russian company] RuTarget about users' browsing websites based in Ukraine. This means Google may have turned over such critical information as unique mobile phone IDs, IP addresses, location information and details about users' interests and

[93] Craig Silverman, *Google Allowed a Sanctioned Russia Ad Company to Harvest User Data for Months*, PROPUBLICA (July 1, 2022), https://www.propublica.org/article/google-russia-rutarget-sberbank-sanctions-ukraine.

online activity, data that U.S. senators and experts say could be used by Russian military and intelligence services to track people or zero in on locations of interest."[94]

159. The report prompted immediate concern from members of Congress. Senator Mark Warner, then Chairman of the Senate Intelligence Committee, stated: "All companies have a responsibility to ensure that they are not helping to fund or even inadvertently support Vladimir Putin's invasion of Ukraine. Hearing that an American company may be sharing user data with a Russian company—owned by a sanctioned, state-owned bank no less—is incredibly alarming and frankly disappointing."

160. Congress ultimately responded by enacting PADFAA. After the statute became law, the Electronic Privacy Information Center ("EPIC") and the Irish Council for Civil Liberties filed a complaint with the FTC alleging that Google's Real-Time Bidding ("RTB") practices violated PADFAA to the extent they continued to make Americans' sensitive personal information available to entities associated with foreign adversaries.[95] The complaint alleged that Google's RTB practices "expose[] America's most sensitive institutions and industries to hacking, blackmail, and compromise by foreign and non-state actors."[96] It further alleged that Google had refused to disclose to Congress the entities participating in its Real-Time Bidding system that received access to Americans' personal information.

161. As recently as May 2026, members of Congress expressed alarm to the Department of Defense that "adversaries are using commercial location data to target U.S. military personnel in an active war zone."

### B. GOOGLE BREAKS ITS PROMISE TO PROTECT REPRODUCTIVE HEALTH LOCATION PRIVACY

162. In the weeks following the Supreme Court's 2022 decision in *Dobbs v. Jackson Women's Health Organization*, which overturned *Roe v. Wade*, Google promised users that it would delete from Google Location History visits to sensitive locations, including counseling centers, domestic violence

---

[94] *Id.*

[95] Complaint and Request for Investigation, Injunction, Penalties, and Other Relief, *In re Google's RTB Practices*, at 1 (Fed. Trade Com'n Jan. 16, 2025) ("FTC RTB Complaint").

[96] *Id.*

shelters, abortion clinics, fertility centers, addiction treatment facilities, weight loss clinics, and cosmetic surgery clinics.

163. Google did not keep that promise. Multiple independent analyses of Google's practices after its announcement found that the Company was ***not*** consistently deleting visits to those sensitive locations as promised. Its failure to do so "could be considered a deceptive practice," according to ten U.S. Senators who submitted a letter to Google in May 2023 outlining their concerns.

164. In January 2024, Electronic Privacy Information Center and Accountable Tech submitted a petition to the FTC alleging that Google broke its promise and left users exposed to serious privacy risks. Only after these public advocates exposed these shortcomings through the FTC process did Google ultimately fulfill its commitment. By then, however, its credibility regarding its privacy promises had been further eroded.

### C. GOOGLE VIOLATES ITS PROMISE TO NOTIFY USERS OF GOVERNMENT DEMANDS FOR THEIR DATA

165. In April 2026, the Electronic Frontier Foundation ("EFF") alerted the New York and California Attorneys General that Google was violating its own privacy policy with respect to user information sought by government subpoenas.

166. Specifically, EFF alleges that, subject to limited exceptions that are not material here, Google promises to notify users when it receives a government subpoena so that users have an opportunity to challenge the subpoena before Google discloses their information. Indeed, Google's Privacy & Terms page indicates that, when Google receives a request for information from a government agency, it will "send an email to the user account before disclosing information." According to EFF, however, Google has violated that promise, particularly in response to subpoenas issued by U.S. Immigration and Customs Enforcement ("ICE"). Indeed, in one such case, according to EFF, Google provided information to ICE concerning a PhD student with dual British and Trinidadian citizenship who had briefly attended a pro-Palestine protest at Cornell University, and did so without first alerting the student, thereby denying him the opportunity to challenge the subpoena.[97]

[97] Letter from F. Mario Trujillo, EFF, to Letitia James, Office of the Attorney General, State of New York (Apr. 14, 2026), https://www.eff.org/document/eff-letter-re-google-notice-new-york.

### D. Congress Renews Concerns About Google's Treatment of Children Under 13 Through YouTube

167. More than a decade after Google agreed—as part of its settlement with the FTC and the New York Attorney General—to stop violating COPPA, bipartisan members of Congress raised new concerns about whether Google was complying with the commitments it made in that settlement.

168. In 2023, Senators Edward Markey and Marsha Blackburn urged the FTC to investigate research indicating that "YouTube and Google are facilitating the vast collection of children's data without parental consent, as well as disregarding YouTube's own policies and its 2019 FTC Consent Decree by showing targeted advertisements on videos for kids."

169. Following the Senators' request for an investigation, the *New York Times* revealed that a report by Adalytics found that YouTube may have been violating COPPA through its advertisements on children's videos and tracking of children.[98] Fairplay, Common Sense Media, and the Center for Digital Democracy then also submitted their own request that the FTC investigate, relying on follow-up testing that they said demonstrated interest-based advertising on "Made for Kids" videos.[99]

## IV. AS A RESULT OF THE BOARD'S OVERSIGHT FAILURES, ALPHABET HAS SHELLED OUT BILLIONS OF DOLLARS IN FINES, PENALTIES, SETTLEMENTS, AND JUDGMENTS AND CONTINUES TO FACE ADDITIONAL RISK

### A. Defendants' Decision to Knowingly Ignore Google's Illegal Privacy Practices Has Already Cost The Company Billions of Dollars

170. Alphabet has amassed a mountain of fines, penalties, settlements, and judgments with respect to its data use and privacy practices. Just from 2019 to the present, Alphabet's misconduct has cost the Company more than ***$4.49 billion***, as set forth below:

| Date | Description | Fine/Penalty/ Settlement/Judgment |
|---|---|---|
| Jan. 1, 2019 | CNIL 2019 Enforcement | $56.9 million (€50M) |
| Sept. 4, 2019 | FTC/NY COPPA Settlement | $170 million ($136M to FTC; $34M to NY) |
| Dec. 7, 2020 | CNIL 2020 Enforcement | $121.2 million (€100M) |
| Dec. 31, 2021 | CNIL 2021 Enforcement | $170.6 million (€150M) |

[98] Nico Grant, Natasha Singer & Aaron Krolik, *YouTube Ads May Have Led to Online Tracking of Children, Research Says*, N.Y. Times (Aug. 17, 2023), https://www.nytimes.com/2023/08/17/technology/youtube-google-children-privacy.html.

[99] Barbara Ortutay, *Children's Advocates Ask FTC To Investigate Google For Targeting Ads to Kids*, Associated Press (Aug. 23, 2023), https://apnews.com/article/google-youtube-ftc-children-ads-tracking-17028ccfb5f82c87527520530f06966b.

| DATE | DESCRIPTION | FINE/PENALTY/ SETTLEMENT/JUDGMENT |
|---|---|---|
| Dec. 2021 | Settlement of New Mexico AG Chromebooks Litigation | $3.85 million |
| Apr. 2022 | Settlement of the Google Photos / Illinois BIPA Litigation | $100 million |
| Oct. 3, 2022 | Settlement of Arizona AG Location Tracking Litigation | $85 million |
| Nov. 14, 2022 | Multistate AG Location Tracking Action | $391.5 million |
| Dec. 29, 2022 | Settlement of Indiana AG Location Tracking Action | $20 million |
| Dec. 29, 2022 | Settlement of DC AG Location Tracking Action | $9.5 million |
| May 18, 2023 | Settlement of WA AG Location Tracking Action | $39.9 million |
| Sept. 14, 2023 | Settlement of CA AG Location Tracking Action | $93 million |
| Feb. 2024 | Settlement of the Google+ Securities Litigation | $350 million |
| May 3, 2024 | Settlement of Location Tracking Class Action Litigation | $62 million |
| July 3, 2025 | Settlement of Flo Health Litigation | $48 million |
| Sept. 1, 2025 | CNIL 2025 Enforcement Action | $379.8 million (€325M) |
| Sept. 3, 2025 | Jury verdict in favor of plaintiffs in Web & App Litigation | $425 million |
| Sept. 23, 2025 | Settlement of COPPA Class Action | $30 million |
| Oct. 31, 2025 | Texas AG Action Settlement (settlement of the Texas AG Biometric Litigation and the Texas AG Incognito/Location Tracking Litigation) (settlement announced on May 9, 2025 and executed on October 31, 2025) | $1.375 billion |
| Dec. 23, 2025 | Settlement of California Android Cellular-Data Class Action | $350 million |
| Jan. 22, 2026 | Settlement of the Google Assistant Litigation | $68 million |

| DATE | DESCRIPTION | FINE/PENALTY/ SETTLEMENT/JUDGMENT |
|---|---|---|
| Jan. 2026 | Settlement of Nationwide Android Cellular-Data Class Action | $135 million |
| May 1, 2026 | Preliminary approval of settlement in Google Play Child-Privacy Litigation (settlement in principle reached Sept. 10, 2025) | $8.25 million |
| **TOTAL:** | | **$4,492,500,000** |

### B. DEFENDANTS' MISCONDUCT CONTINUES TO JEOPARDIZE THE COMPANY'S STABILITY AND OPPORTUNITY FOR GROWTH

171. As discussed herein, Google's business depends on users trusting the Company with their most sensitive personal information. That trust is a core business asset. When users lose confidence in Google's willingness or ability to protect their privacy, they are less likely to use its products, reducing the user engagement on which Google's advertising revenues depend.

172. Alphabet was well aware of the importance of maintaining users' trust, admitting that "[o]ur brands have been, and may in the future be, negatively affected by . . . reputational issues . . . [and] data privacy and security issues and developments."[100] Alphabet also noted that its failure to comply with privacy, data protection, and data usage laws and regulations "could harm our business, reputation, financial condition, and operating results."[101] In a study conducted by Google itself, along with Ipsos, researchers determined that "a remarkable 49% of participants said a positive privacy experience with their second-brand choice would lead them to switch from their first-choice brand."[102]

173. Google's repeated disregard for privacy also exposes Alphabet to broader regulatory and legislative risks. Highly publicized privacy failures invite lawmakers and regulators to impose restrictions on the broader business model that depends on collecting and monetizing personal information. Because Google's business depends heavily on those practices, sweeping privacy reforms

[100] Alphabet Inc., 2023 Annual Report (Form 10-K) 13 (Jan. 31, 2024).

[101] *Id.* at 20.

[102] Maria Helena Marinho & Elizabeth Tran, *Customers Want Control Over Their Data—And Won't Hesitate to Switch Brands To Get It*, Google (Feb. 2023) (discussing the results of a study of 16,000 people), https://business.google.com/en-all/think/measurement/customer-data-privacy/ .

pose a significant threat to Alphabet's long-term value. The market has recognized this risk before. Following the Cambridge Analytica scandal involving Facebook, Alphabet's stock price fell amid expectations of broader privacy regulation, and market analysts warned investors that Alphabet could suffer collateral consequences from the regulatory backlash. Defendants' oversight failures put Google at risk of the same type of harm.

## V. DATA PRIVACY IS MISSION-CRITICAL FOR ALPHABET

174. Google's entire business model is built around information. As the Company stated repeatedly in its annual reports, "Our mission to organize the world's information and make it universally accessible and useful is as relevant today as it was when we were founded in 1998."[103] The protection of users' personal data and maintaining consumer trust that Google will safeguard that data are fundamental to Google's business model and Alphabet's financial performance.

175. Alphabet recognizes that customer data privacy is central to its business model. If users do not trust that Google is keeping their information safe, they will be less likely to use Google's products and services, thereby diminishing the advertising revenue that accounts for approximately 75% of Google's total revenue.

176. Under the "risks" section of its Form 10-K, Alphabet states:

> ***Our business depends on strong brands, and failing to maintain and enhance our brands would hurt our ability to expand our base of users, advertisers, customers, content providers, and other partners.***

177. The Company further explains:

> *Our brands have been, and may in the future be, negatively affected by a number of factors, including, among others, reputational issues, third-party content shared on our platforms, data privacy and security issues and developments, and product or technical performance failures.* For example, if we fail to respond appropriately to the sharing of misinformation or objectionable content on our services and/or products or objectionable practices by advertisers, or otherwise to adequately address user concerns, our users may lose confidence in our brands.
>
> Furthermore, failure to maintain and enhance our brands could harm our business, reputation, financial condition, and operating results. Our success will depend largely on our ability to remain a technology leader and continue to provide high-quality, trustworthy,

[103] Alphabet Inc., 2025 Annual Report (Form 10-K) 3 (filed Feb. 5, 2026).

> innovative products and services that are truly useful and play a valuable role in a range of settings.[104]
>
> ***
>
> ***Data privacy and security concerns relating to our technology and our practices could harm our reputation, cause us to incur significant liability, and deter current and potential users or customers from using our products and services. Computer viruses, software bugs or defects, security breaches, and attacks on our systems could result in the improper disclosure and use of user data and interference with our users' and customers' ability to use our products and services, harming our business and reputation.***
>
> Concerns about, including the adequacy of, our practices with regard to the collection, use, governance, disclosure, or security of personal data or other data-privacy-related matters, even if unfounded, could harm our business, reputation, financial condition, and operating results. Our policies and practices may change over time as expectations and regulations regarding privacy and data change.
>
> ***
>
> Systems and control failures, security breaches, failure to comply with our privacy policies, and/or inadvertent disclosure of user data could result in regulatory and legal exposure, seriously harm our reputation, brand, and business, and impair our ability to attract and retain users or customers….
>
> ***
>
> Further, if any partners with whom we share user or other customer information fail to implement adequate data-security practices, fail to comply with our terms and policies, or otherwise suffer a network or other security breach, our users' data may be improperly accessed, used, or disclosed. If an actual or perceived breach of our or our business partners' or service providers' security occurs, the market perception of the effectiveness of our security measures would be harmed, we could lose users and customers, our trade secrets or those of our business partners may be compromised, and we may be exposed to significant legal and financial risks, including legal claims (which may include class-action litigation) and regulatory actions, fines, and penalties. Any of the foregoing consequences could harm our business, reputation, financial condition, and operating results….[105]

178. Even more specifically, Alphabet has expressly recognized the areas of (a) its handling of biometric information and (b) its handling of user consent to privacy invasions to be key areas of risk for the Company:

> ***Privacy, data protection, data usage, and portability regulations are complex and rapidly evolving areas. Any failure or alleged failure to comply with these laws could harm our business, reputation, financial condition, and operating results.***

---

[104] *Id.*

[105] *Id.*

Authorities around the world have adopted and are considering a number of legislative and regulatory proposals concerning data protection, data usage and portability, and encryption of user data. Additionally, the increasing adoption of AI technologies, which rely on the collection of large amounts of data and use of such data for training purposes, has led data protection authorities around the world to consider and adopt new and evolving interpretations of data protection laws, imposing specific obligations with respect to the processing of personal data, *including required notices, consents, and opt-outs*. Further, the increased risk of inadvertent disclosure of confidential information or personal data in connection with the utilization of AI technologies may result in stronger regulatory scrutiny, leading to legal and regulatory investigations and enforcement actions that may negatively affect our business, even if unfounded. Adverse legal rulings, legislation, or regulation have resulted in, and may continue to result in, fines and orders requiring that we change our practices, which have had and could continue to have an adverse effect on how we provide services, harming our business, reputation, financial condition, and operating results. These laws and regulations are evolving and subject to interpretation, and compliance obligations could cause us to incur substantial costs or harm the quality and operations of our products and services in ways that harm our business. Examples of these laws include:

- The EU General Data Protection Regulation and the United Kingdom General Data Protection Regulations, which apply to all of our activities conducted from an establishment in the EU or the United Kingdom, respectively, or related to products and services that we offer to EU or the United Kingdom users or customers, respectively, or the monitoring of their behavior in the EU or the UK, respectively.

- Various U.S. federal, U.S. state, and foreign privacy laws related to the processing and security of personal data, including (1) comprehensive privacy laws that provide data privacy rights (including, in California, a private right of action in the event of a data breach resulting from our failure to implement and maintain reasonable security procedures and practices) and impose significant obligations on controllers and processors of consumer data; (2) laws imposing obligations on businesses that collect or disclose biometric information (including, in Illinois, Texas, and Washington); (3) laws governing the collection and processing of children and minor's data and how companies provide age appropriate online experiences (including, in the U.S., the Children's Online Privacy Protection Act of 1998, the pending Children and Teens' Online Privacy Protection Act (COPPA 2.0), which passed the U.S. Senate in 2024, and similar U.S. state laws related to children's privacy, such as the New York Child Data Protection Act, and the United Kingdom's Age-Appropriate Design Code); and (4) laws regulating internet-connected devices (such as, in California, the Internet of Things Security Law)….[106]

[106] *Id.* (emphasis added)

These admissions establish that data privacy is not peripheral to Alphabet's business—it is mission critical. Google's ability to collect and monetize user data depends on users' willingness to entrust the Company with their personal information and their confidence that Google will collect, use, share, and safeguard that information lawfully and responsibly. Misconduct involving biometric information or the absence of valid user consent therefore threatens the foundation of Google's principal revenue-generating business and exposes Alphabet to the precise consequences the Company has repeatedly identified: loss of user trust and engagement, reputational damage, regulatory investigations and enforcement actions, class-action litigation, fines and penalties, costly changes to its products and practices, and harm to its financial condition and operating results. Accordingly, compliance with privacy laws—particularly laws governing biometric information and requiring informed consent—is, and has been, a central enterprise risk demanding sustained oversight at the highest levels of the Company.

## VI. DESPITE RECOGNIZING THAT PROTECTING ITS USERS' DATA IS MISSION CRITICAL, ALPHABET'S BOARD FAILED TO IMPLEMENT AND OVERSEE CONTROLS RELATING TO ITS COMPLIANCE WITH CONSUMER PRIVACY LAWS AND REGULATIONS

179. Despite recognizing that maintaining the privacy of its users' data is critical to Alphabet's business, Alphabet's Board failed to implement and oversee a system of internal controls to ensure that the Company was operating in compliance with the various laws and regulations governing data privacy. As set forth above, Alphabet has been subjected to numerous fines, penalties, and settlements as a result of its complete failure to operate in compliance with the myriad laws and regulations applicable to its business. This widespread corporate trauma was not an unforeseeable event. Rather, it was the entirely predictable outcome of (i) Alphabet's adoption of a business model built of skirting privacy laws so it could collect and disseminate its users' data to third parties to drive the advertising revenue that was the lifeblood of its operations and (ii) the Board's complete failure to oversee the Company's compliance with data privacy laws and regulations. Year after year, as the fines and penalties multiplied, the Board sat supine, content to either (i) [redacted].

**"OVERSIGHT" OF DATA PRIVACY IN 2020**

**FULL BOARD OF DIRECTORS "OVERSIGHT"**

180. As the 2020 fiscal year began, Alphabet's board was on notice that the Company was not complying with various laws and regulations concerning data privacy. The Company was facing a series of lawsuits over its data privacy practices, including the Location Class Action Litigation, the NM Google Play Litigation, the Google+ Securities Litigation, the Google Photos Illinois BIPA Litigation, the Google Assistant Litigation, the California Android Cellular-Data Class Action, and the COPPA Class Action.[107] And in the prior year, it had suffered substantial harm in the form of a $170 million settlement in the FTC/NY COPPA Litigation and a €50 million penalty in the CNIL 2019 Enforcement.[108]

181. Alphabet's stockholders, too, were laser focused on the Company's use of its users' private information and compliance with privacy laws. On April 24, 2020, Alphabet published is annual proxy, including a stockholder proposal to create a "Human Rights Risk Oversight Committee," specifically citing the Company's "proliferation [of] digital surveillance by amassing and in some cases, sharing user information, raising significant risks to privacy, which are heightened by the Company's recent moves into health, location and financial data"[109] as presenting significant privacy and human-rights risks. The proposed committee would be composed of independent directors and would provide "an ongoing review of corporate policies and practices . . . to assess how Alphabet manages the current and potential impacts of the company's products and services on human rights[.]"[110]

---

[107] *In re Google Location History Litigation*, 5:18-cv-05062-EJD ("Location Class Action Litigation"); *New Mexico ex rel. Balderas v. Tiny Lab Productions*, 1:18-cv-00854-MV_JFR ("NM Google Play Litigation"); *In re Alphabet Inc. Sec. Litig.*, No. 4:18-cv-06245 (N.D. Cal.) ("Google+ Securities Litigation"); *Rivera v. Google LLC* (No. 2019-CH-00990) ("Google Photos Illinois BIPA Litigation"); *In re Google Assistant Privacy Litigation*, 5:19-cv-04286 (N.D. Cal.) (filed July 25, 2019) ("Google Assistant Litigation"), *Csupo v. Google LLC*, 19-cv-352557 (Cal. Super. Ct.) ("California Android Cellular-Data Class Action"); *Hubbard v. Google LLC*, 5:19-cv-07016-SVK (N.D. Cal.) ("COPPA Class Action").

[108] *FTC v. Google LLC*, 1:19-cv-02642-BAH (D.D.C.) (settled Sept. 4, 2019) ("FTC/NY COPPA Litigation").

[109] Alphabet Inc., 2020 Proxy Statement (Sch. 14A) 66 (filed April 24, 2020), https://www.sec.gov/Archives/edgar/data/1652044/000130817920000203/lgoog2020_def14a.htm

[110] *Id.*

182. The Board assured stockholders that additional oversight was unnecessary. The Board represented that the Board received "quarterly updates . . . on relevant issues," and that the Board "takes this responsibility very seriously."[111] The proposal failed.

183. Against this backdrop, Alphabet's full Board paid little attention to privacy issues during the 2020 fiscal year. According to Alphabet's proxy for the 2020 fiscal year (filed with the SE on April 23, 2021), Alphabet's full Board met four times in 2020.[112]

184. In its Section 220 production, Alphabet produced minutes of two of these four Board meetings: July 15, 2020[113] and October 21, 2020.[114]

185. While the Board sat supine, ***two state attorneys general*** sued Alphabet for misconduct relating to data privacy. First, in February 2020, New Mexico's Attorney General sued Google in federal court, alleging that Google used its G Suite for Education products and Chromebooks provided to New Mexico schools to collect extensive personal information from schoolchildren, including children under age 13, without obtaining parental consent.[115] The complaint alleged that Google collected geolocation information, browsing histories, Google and YouTube search activity, contact lists, and voice recordings, and continued monitoring students when they used Google products outside of school, including on private devices and home networks. New Mexico further alleged that Google used the information for its own commercial purposes despite publicly assuring parents and schools that it would protect student privacy.

186. Second, on May 27, 2020, Arizona Attorney General Mark Brnovich sued Google, alleging that it used deceptive "dark patterns" to track users' physical locations even after location services were turned off. In an interview with the *Washington Post*, Brnovich said, "When consumers

---

[111] *Id*. at 67.

[112] Alphabet Inc., 2021 Proxy Statement (Sch. 14A) 22 (filed April 23, 2021).

[113] Exhibit 6 (GOOG-OLERS-220-001656).

[114] Exhibit 7 (GOOG-OLERS-220-000031).

[115] *See* Complaint, *New Mexico ex rel. Balderas v. Google LLC*, No. 1:20-cv-00143-NF-KHR (D.N.M. Feb. 20, 2020); *New Mexico ex rel. Balderas v. Google LLC*, 489 F. Supp. 3d 1254 (D.N.M. 2020).

try to opt out of Google's collection of location data, the company is continuing to find misleading ways to obtain information and use it for profit."[116]

187. In addition to the Attorneys General Actions, two consumer class actions were launched relating to Alphabet's data privacy practices. On June 2, 2020, a class of consumers filed the Incognito Mode Class Action Litigation.[117] They alleged that Google collected browsing data through its analytics and advertising tools even when users selected "Incognito" or other private-browsing modes.

188. On July 14, 2020, a class of consumers filed the Web & App Litigation, alleging that Google collected activity from third-party mobile apps through its SDKs even after users disabled Google's Web & App Activity controls.[118]

189. [redacted]

[116] *U.S. State of Arizona Files Consumer Fraud Lawsuit Against Google*, REUTERS (May 28, 2020), https://www.reuters.com/article/business/us-state-of-arizona-files-consumer-fraud-lawsuit-against-google-idUSKBN2333EE/.

[117] *Brown v. Google LLC*, 4:20-cv003664 (N.D. Cal.) ("Incognito Mode Class Action Litigation").

[118] *Rodriguez v. Google LLC*, 3:20-cv-04688 (N.D. Cal.) ("Web & App Litigation").

[119] Exhibit 6 (GOOG-OLERS-220-001656). The text of the minutes end at page -1662. [redacted]

[120] Exhibit 6 (GOOG-OLERS-220-001656 at -1657).

[121] *State of Arizona ex rel. Mark Brnovich, Attorney General v. Google LLC*, No. CV2020-006219 (Ariz. Super. Ct., Maricopa Cnty. filed May 27, 2020).

[122] *Brown v. Google LLC*, 20:cv-03664-YGR (N.D. Cal.) ("Incognito Mode Class Action Litigation").

[123] *Rodriguez v. Google LLC*, No. 3:20-cv-04688 (N.D. Cal. filed July 14, 2020).

[redacted].[124]

190. [redacted]

191. [redacted]

192. [redacted][128]

[124] Exhibit 6 (GOOG-OLERS-220-001656 at -1657-58).

[125] Exhibit 6 (GOOG-OLERS-220-001656 at -1658).

[126] *Id.* at -1660.

[127] Exhibit 8 [redacted].

[128] Exhibit 2 (GOOG-OLERS-220-001604-1611).

193. [redacted]

[redacted]

[redacted]

194. [redacted]

[129] Exhibit 7 (GOOG-OLERS-220-000031-104).

[redacted].[131]

**AUDIT COMMITTEE "OVERSIGHT"**

195. Alphabet's Board, like the boards of most corporations, exercises its oversight function through a variety of committees. While the Board maintains overall responsibility for the business and affairs of the corporation, the Alphabet Board delegated certain duties and responsibilities to a variety of standing committees. During the 2020 fiscal year, Alphabet's Board had four committees: (i) the Audit Committee;[132] (ii) the Leadership, Development and Compensation Committee; (iii) the Nominating and Corporate Governance Committee; and the Executive Committee.[133]

196. Alphabet's Audit Committee met six times during the 2020 fiscal year. Alphabet produced minutes of only two of these six meetings: (i) July 27, 2020 and (ii) September 25, 2020.

197. [redacted]

---

[130] *Id.* at -39 through -47.

[131] *Rodriguez v. Google LLC*, No. 3:20-cv-04688-RS (N.D. Cal. filed July 8, 2020) ("Web & App Litigation").

[132] In October 2020, Alphabet amended the charter of the Audit Committee and renamed it the "Audit and Compliance Committee." References to the "Audit Committee" include the Audit and Compliance Committee after October 2020 and the Audit Committee prior to October 2020. According to Alphabet's 2021 Proxy, the Audit Committee charter was amended to give the new Audit and Compliance Committee "increased oversight on matters relating to strategy and financial reporting, competition, civil and human rights, and sustainability, in addition to its existing oversight responsibilities around data privacy and security." Alphabet Inc., 2021 Proxy Statement (Sch.14A) 5 (filed Apr. 23, 2021).

[133] *See* Alphabet Inc., 2020 Proxy Statement (Sch. 14A) 24-26 (filed Apr. 24, 2020); Alphabet Inc., 2021 Proxy Statement (Sch. 14A) 22 (filed Apr. 23, 2021).

198. [redacted].[135]

199. [redacted][136]

200. In July 2020, Android users filed the Nationwide Android Cellular-Data Class Action, alleging Google engaged in unauthorized data transmission and cellular data usage.[137] [redacted] This is particularly notable because the Company had been sued just the year before—in August 2019—in California state court for the same conduct.[138]

201. [redacted]

---

[134] Exhibit 9 (GOOGLE-OLERS-220-002798 at -2802); *see also id.* at -2803 [redacted] -2806 [redacted].

[135] *Id.* at -2807-2813.

[136] Exhibit 10 (GOOG-OLERS-220-001612).

[137] *Taylor v. Google LLC*, 5:20-cv-07956-VKD (N.D. Cal.) ("Nationwide Android Cellular-Data Class Action").

[138] *Csupo v. Google LLC*, No. 19-cv-352557 (Cal. Super. Ct.) ("California Android Cellular-Data Class Action").

[139] Exhibit 11 (GOOG-OLERS-220-000014).

[redacted].

202. [redacted]

203. [redacted]

[redacted]

[140] Exhibit 12 (GOOG-OLERS-220-000851-853).

[141] In 2025, Alphabet settled antitrust-related derivative claims by committing $500 million to compliance reforms, including a standalone Board-level Risk and Compliance Committee. In seeking approval, plaintiffs emphasized that Alphabet previously had bundled financial and accounting oversight together with a sprawling array of legal, regulatory, and enterprise risks under a single Audit Committee. Plaintiffs argued that this arrangement diffused responsibility and deprived significant antitrust, privacy, and other compliance risks of sustained Board attention—leaving some red flags merely recorded rather than addressed and others never reaching the Board at all. Co-Lead Plaintiffs' Unopposed Motion for Preliminary Approval of Settlement and Memorandum in Support at 8–9, *In re Alphabet Inc. S'holder Deriv. Litig.*, No. 3:21-cv-09388-RFL (N.D. Cal. May 30, 2025).

[redacted].[144]

Thus, it appears that Alphabet left it to management—***not the Board***—to ensure that Alphabet complied with data privacy laws, with the Audit Committee being tasked merely with [redacted].

204. Critically, in setting out the Audit Committee's [redacted] the Charter states, [redacted][145] Although the 2020 Audit Committee Charter mentions [redacted] it is far from clear that the Audit Committee was ***mandated to oversee*** data privacy as opposed to merely [redacted][146]

205. On October 21, 2020, the Audit Committee ostensibly met. Alphabet did not produce minutes for this meeting, and thus Plaintiff is entitled to an inference that data privacy was not discussed

---

[142] [redacted]

[143] Exhibit 7 (GOOG-OLERS-220-000031 at -48).

[144] *Id.*

[145] *Id.* at -49.

[146] *Id.*

during this meeting. The Audit Committee [redacted].[147] [redacted].

**"OVERSIGHT" OF DATA PRIVACY IN 2021**

**FULL BOARD OF DIRECTORS "OVERSIGHT"**

206. Moving into the 2021 fiscal year, Alphabet's Board was undoubtedly aware of the Company's ongoing data privacy violations. In December 2020, the CNIL levied a massive €100 million fine against Google concerning its illicit placement of advertising cookies on users' devices without obtaining valid consent—and the Company was in the midst of defending itself against serious changes of privacy-related misconduct in the NM AG Chromebooks Litigation, the Arizona AG Location-Tracking Litigation, the Incognito Mode Class Action Litigation, the Web & App Litigation, and the Nationwide Android Cellular-Data Class Action, all of which had been filed in 2020.[148] And it was still facing the Location Class Action Litigation, the NM Google Play Litigation, the Google+ Securities Litigation, the Google Photos Illinois BIPA Litigation, the Google Assistant Litigation, the California Android Cellular-Data Class Action, and the COPPA Class Action. These glaring red flags of ongoing illegal conduct should have placed the Board on heightened alert that Alphabet was breaking data privacy laws and the Board should have forced Alphabet to put a stop to it.

207. But the Board knew that it could not do that. If Alphabet fully complied with data privacy laws, it impact the practices that relied on illegal conduct and thus make less money. Alphabet provides its services to consumers "for free" and derives the overwhelming majority of revenue from selling ads on Google. Advertisers, in turn, only want to place ads if they think they will reach the right audience. Alphabet's unparalleled access to users' search histories and other valuable information placed the

---

[147] Exhibit 13 (GOOG-OLERS-220-002814-2820).

[148] *New Mexico ex rel. Balderas v. Google LLC*, 1:20-cv-0043-NF-KHR ("NM AG Chromebooks Litigation"); *State of Arizona v. Google LLC*, No. CV2020-006219 (Ariz. Super. Ct., Maricopa Cnty.) ("Arizona AG Location-Tracking Litigation"); *Brown v. Google LLC*, 20-cv-03664-YGR (N.D. Cal.) ("Incognito Mode Class Action Litigation"); *Rodriguez v. Google LLC*, 3:20-cv-04688 (N.D. Cal.) ("Web & App Litigation"); *Taylor v. Google LLC*, 5:20-cv-07956-VKD (N.D. Cal.) ("Nationwide Android Cellular-Data Class Action").

Company in a prime position to assure advertisers that their money would be well spent pushing out ads on Google. Alphabet knew that if it misused its users' information, it could make billions of dollars. Although Alphabet knew that (i) data privacy laws prohibited it from misusing this information for its own gain and (ii) consumers would stop using Google's products (and thus stop giving Alphabet personal information "for free") if they did not trust Alphabet to keep this data safe, the temptation was too great. Alphabet flagrantly and knowingly violated data privacy laws and lied about it.

208. Alphabet knew that making changes to its data privacy practices (i.e., obeying the law) would jeopardize the Google advertising revenue that was integral to Alphabet's very survival.[149] In its Form 10-K for the 2020 fiscal year filed on February 3, 2021, Alphabet disclosed the following:

> ***We generate a significant portion of our revenues from advertising, and reduced spending by advertisers, a loss of partners, or new and existing technologies that block ads online and/or affect our ability to customize ads could harm our business.***
>
> *We generated over 80% of total revenues from the display of ads online in 2020.* Many of our advertisers, companies that distribute our products and services, digital publishers, and content providers can terminate their contracts with us at any time. These partners may not continue to do business with us if we do not create more value (such as increased numbers of users or customers, new sales leads, increased brand awareness, or more effective monetization) than their available alternatives. ***Changes to our*** *advertising policies and* ***data privacy practices***, as well as changes to other companies' advertising and/or data privacy practices *may affect the advertising that we are able to provide, which could harm our business*.[150]

209. Alphabet also knew that if it was caught breaking the law its users would lose trust in the Company and might stop using its products (thus leaving Alphabet with nothing to "sell" to advertisers). Alphabet disclosed the following in its 2020 10-K:

> ***Our business depends on strong brands, and failing to maintain and enhance our brands would hurt our ability to expand our base of users, advertisers, customers, content providers, and other partners.***
>
> Our strong brands have significantly contributed to the success of our business. Maintaining and enhancing the brands within Google Services, Google Cloud and Other Bets increases our ability to enter new categories and launch new and innovative products

[149] In the 2020 Fiscal Year, Alphabet's total revenue was $182.53 billion. Google Advertising accounted for $146.92 billion of the total—a full 80.5%. Alphabet Inc., 2020 Annual Report (Form 10-K) 29, 66 (filed Feb. 3, 2021).

[150] 2020 10-K at 10 (initial emphasis in original; additional emphases added).

> that better serve the needs of our users, advertisers, customers, content providers, and other partners. *Our brands may be negatively affected by a number of factors, including, among others, reputational issues,* third-party content shared on our platforms, *data privacy and security issues and developments*, and product or technical performance failures. For example, if we fail to appropriately respond to the sharing of misinformation or objectionable content on our services and/or products or objectionable practices by advertisers, or to otherwise adequately address user concerns, our users may lose confidence in our brands.[151]

210. For Alphabet to stay in business, it had to "walk the line" between providing ***enough privacy*** that users would continue to use its services (and thus provide their valuable information "for free") but not providing ***so much privacy*** that it had nothing valuable to "sell" to advertisers. With the cash continuing to pour in, the Board took the easy way out. It turned a blind eye to the Company's repeated violations of the law, limited its "oversight" to passively receiving sporadic updates from company management who were earning lavish compensation from the outsized revenue Alphabet was earning via its illegal conduct, and lied to its consumers and investors about its compliance with data privacy laws.

211. Alphabet's Board met four times in 2021.[152] [redacted][153] Although the CNIL had just levied a €100 million fine against Google concerning its illicit placement of advertising cookies on users' devices without obtaining valid consent in December 2020, [redacted]

---

[151] Alphabet Inc., 2020 Annual Report (Form 10-K) 12 (filed Feb. 3, 2021) (initial emphasis in original; additional emphases added).

[152] Alphabet Inc., 2022 Proxy Statement (Sch. 14A) 28 (filed April 22, 2022).

[153] Exhibit 14 (GOOG-OLERS-220-000105-133). The text of the minutes ends at page -111. Following the text of the minutes, Alphabet produced pages -112 – 133 that are redacted entirely as "not responsive." To the extent these pages were the "materials that had been sent to each member of the Board in advance of the meeting," Plaintiff is entitled to an inference that these materials did not relate to the Data Privacy Actions or Data Privacy Issues. None of the other documents in Alphabet's 220 production appear to be materials provided to the Board in connection with the January 21, 2021 meeting and thus Plaintiff is entitled to an inference that the Board was not provided with any materials relating to the Data Privacy Actions or Data Privacy Issues in connection with this meeting.

[redacted].[154] [redacted][155]

212. Following the January 20, 2021 Board meeting, Alphabet was sued in two additional class actions relating to the Company's privacy practices. First, on January 29, 2021, consumers filed a class action against Google and Flo Health in the Northern District of California relating to tracking users' personal health information.[156] Second, in March 2021, consumers filed the RTB Class Action in the Northern District of California relating to Google's Real-Time Bidding system.[157]

213. Following the initiation of these two new privacy-related class actions, [redacted].[158] [redacted]

[154] *Id.* at -106.

[155] *Id.* at -106-111.

[156] *Frasco v. Flo Health Inc.*, No. 3:21-cv-00757-JD (N.D. Cal. filed Jan. 29, 2021).

[157] *In re Google RTB Consumer Privacy Litigation*, No. 4:21-cv-02155-YGR (N.D. Cal. filed Mar. 26, 2021) ("RTB Class Action").

[158] Exhibit 15 (GOOG-OLERS-220-000173-219). The text of the minutes ends at page -183. [redacted]

[159] *Id.* at -174.

214. [redacted]"[160] [redacted].

215. [redacted][161] [redacted]

216. [redacted][162] [redacted][163]

217. On April 21, 2021, Alphabet published its annual proxy including stockholders' narrowed request that at least one independent director on the Board possess "a high level of human and/or civil rights expertise and experience" and be "widely recognized as such, as reasonably determined by Alphabet's Board."[164] The proponents explained that the Company "requires expert, board level oversight of civil and human rights issues to assess risk and develop strategy to avoid causing

[160] *Id.* at -176.

[161] *Id.* at -177.

[162] *Id.* at -179.

[163] *Id.* at -179-180.

[164] Alphabet Inc., 2021 Proxy Statement (Sch. 14A) 63 (filed April 21, 2021), https://www.sec.gov/Archives/edgar/data/1652044/000130817921000256/lgoog2021_def14a.htm

or contributing to widespread violations of human or civil rights," including "privacy violations."[165] They explained that they were "concerned Alphabet's content governance has proven ineffectual and poses risk to shareholder value."[166] In support of the proposal, stockholders cited, among other things, Amnesty International's conclusion that Google's "surveillance-based business model is incompatible with the right to privacy,"[167] the Company's record COPPA settlement, and ongoing litigation concerning children's privacy. The stockholders tied their concerns in part to the Company's long-term financial prospects: "As fiduciaries, our Board is responsible for stewardship of business performance and long-term strategic planning, in light of risk factors like widespread violations of human and civil rights."[168]

218. Once again, the Board opposed the proposal. In its "Opposing Statement," the Board claimed they have "infrastructure in place to address these issues, and we disagree with a number of the claims and characterizations in the proposal."[169] They represented that their Board members "are qualified and equipped to provide risk oversight of civil and human rights issues."[170] Stockholders relied on the Board's assurances, and the proposal was defeated.

219. In June 2021, the Ninth Circuit reversed a lower court's ruling in *In re Alphabet, Inc. Securities Litigation*,[171] and found that stockholders stated a claim for securities law violations relating to Alphabet's failure to disclose security problems relating to users' private information. The underlying complaint alleged that Google knew, as early as March 2018, about a software bug that had exposed the private profile data of hundreds of thousands of Google+ users to third-party developers for approximately three years, but that, Alphabet chose not to disclose these issues in its April and July 2018 Forms 10-Q; instead, it described cybersecurity and privacy problems as risks that *could* or *might* occur. The Ninth Circuit sustained the complaint because Alphabet's risk disclosures were materially

---

[165] *Id*.

[166] *Id*.

[167] *Id*.

[168] *Id*.

[169] *Id*.

[170] *Id*. at 64.

[171] 1 F.4th 687 (9th Cir. 2021).

misleading as the "risks" had, in fact, already materialized. The court also found scienter, as the complaint alleged that senior management knew of the vulnerabilities and intentionally or recklessly failed to disclose them.

220. After this negative development, [redacted].[172] [redacted][173] [redacted][174] [redacted]

[172] Exhibit 16 (GOOG-OLERS-220-000262-289). The text of the minutes ends at page -273. [redacted]

[173] Exhibit 16 (GOOG-OLERS-220-000262-263) [redacted]).

[174] *Id.* at -268.

221. [redacted].[175] [redacted].[176]

**AUDIT COMMITTEE "OVERSIGHT"**

222. Alphabet's Audit Committee met eight times in 2021.[177] Alphabet produced minutes [redacted] Thus, Plaintiff is entitled to an inference that the Audit Committee did not discuss anything relating to data privacy during three of its eight meetings during the 2021 fiscal year.

223. [redacted].[178] [redacted]

Thus, the Audit Committee was scheduled to spend ***at most fifteen minutes*** discussing matters that might have encompassed data privacy.

224. [redacted][179] [redacted]

225. [redacted]

[175] Exhibit 17 (GOOG-OLERS-220-000356-369). The text of the minutes ends at page -364. [redacted]

[176] [redacted] *Id.* at -357. [redacted] *Id.*

[177] Alphabet Inc., 2022 Proxy Statement (Sch. 14A) 30 (filed April 22, 2022).

[178] Exhibit 18 (GOOG-OLERS-220-001291).

[179] Exhibit 19 (GOOG-OLERS-220-001690- 2056) [redacted]

[redacted][180] [redacted][181]

226. At the time of the January 2021 Audit Committee meeting, Alphabet had already incurred at least $390.6 million in settlements, fines, and penalties and was actively defending itself in no fewer than ten lawsuits and investigations challenging its illegal data privacy practices: (i) the Google Photos / Illinois BIPA Litigation;[182] (ii) the Google+ Securities Litigation; (iii) the Google Assistant Litigation; (iv) the California Android Cellular-Data Case; (v) the Nationwide Android Cellular-Data Case; (vi) the New Mexico AG Chromebooks Litigation (on appeal in January 2021); (vii) the Arizona AG Location-Tracking Litigation; (viii) the Multistate AG Location-Tracking Litigation; (ix) the Web & App Activity Litigation; and (x) the CNIL 2020 Proceeding. The January 2021 Audit Committee Materials underscore that the Committee knew that the Company had no intention of attempting to fully comply with data privacy laws but, rather, had made a business decision to "pay the speeding ticket" when its violations inevitably caught up with it. The Audit Committee [redacted]"[183] [redacted]

227. In March 2021, consumers filed the RTB Class Action, a privacy-based class action in the Northern District of California relating to Google's Real-Time Bidding system.[184] Plaintiffs in that case alleged that Google disclosed account holders' personal information—including identifiers,

---

[180] Exhibit 18 (GOOG-OLERS-220-001291 at -1292). [redacted] Exhibit 19 (GOOG-OLERS-220-001690). [redacted]

[181] Exhibit 18 (GOOG-OLERS-220-001291 at -1296).

[182] *Rivera v. Google LLC*, No. 2019-CH-00990 (Ill. Cir. Ct. Cook Cnty.).

[183] Exhibit 19 (GOOG-OLERS-220-001690 at -1693).

[184] *In re Google RTB Consumer Privacy Litigation*, No. 4:21-cv-02155-YGR (N.D. Cal. filed Mar. 26, 2021).

browser-related information, location data, and audience characteristics—to advertisers through its real-time bidding advertising auctions. Plaintiffs alleged that this conduct violated Google's privacy representations, in contravention of its contracts, and various statutes.

228. The Audit Committee [redacted].[185] [redacted]

[redacted]

Thus, [redacted].

[185] Exhibit 20 (GOOG-OLERS-220-000990). The text of the minutes ends at page –997. [redacted] Exhibit 21 (GOOG-OLERS-220-002057 at -2124).

229. In advance of the meeting, the Audit Committee [redacted].

230. The minutes of the meeting, [redacted][187] [redacted]

[redacted]

231. The Audit Committee next met on June 23, 2021, again by videoconference.[188] [redacted]

[186] Exhibit 21 (GOOG-OLERS-220-002057-2238) (the "April 2021 Audit Committee Materials").

[187] Exhibit 20 (GOOG-OLERS-220-000990 at -994).

[188] Exhibit 22 (GOOG-OLERS-220-000257).

[redacted][189] [redacted]

232. The Audit Committee again met via videoconference on July 20, 2021. [redacted][190] [redacted]

[redacted]

233. The Audit Committee ostensibly met on September 22, 2021.[191] Because Alphabet's 220 production contains no minutes for this meeting, Plaintiff is entitled to an inference that data privacy matters were not discussed during this meeting.

234. The Audit Committee met via videoconference on October 19, 2021. [redacted]"[192] [redacted]

---

[189] Exhibit 22 (GOOG-OLERS-220-000257 at -259).

[190] Exhibit 23 (GOOG-OLERS-220-001300).

[191] *See* Exhibit 24 (GOOG-OLERS-220-002821).

[192] Exhibit 25 (GOOG-OLERS-220-000291 at -293).

[redacted].[193]

### "OVERSIGHT" OF DATA PRIVACY IN 2022

### FULL BOARD OF DIRECTORS "OVERSIGHT"

235. As the Board began the 2022 fiscal year, it was enmeshed in at least 11 lawsuits regarding its data privacy practices, including (i) the Incognito Mode Class Action Litigation, (ii) the Web & App Litigation, (iii) the Location Class Action Litigation, (iv) the Google Assistant Litigation, (v) the COPPA Class Action, (vi) the Google+ Securities Litigation; (vii) the Google Photos Illinois BIPA Litigation; (viii) the California Android Cellular-Data Class Action; (ix) the Nationwide Android Cellular Data Class Action; (x) the Flo Health Litigation; and (xi) the RTB Class Action.[194] It was facing at least 2 government proceedings and investigations, including (i) the Arizona AG Tracking Litigation and (ii) the CNIL 2021 Enforcement.[195] And it had expended nearly $350 million in fines, penalties, and settlements relating to violations of data privacy laws. Against this backdrop, Alphabet's full Board paid little attention to privacy issues during the 2022 fiscal year. According to Alphabet's Proxy for the 2022 fiscal year, Alphabet's full Board met five times in 2022.[196] Alphabet's Section 220 production only contained minutes for three Board meetings from 2022. Thus, Plaintiff is entitled to an inference that the Board did not discuss data privacy issues during two of its five meetings during 2022.

---

[193] Exhibit 26 (GOOG-OLERS-220-000867-880).

[194] *Brown v. Google LLC*, No. 4:20-cv-03664 (N.D. Cal.) (the "Incognito Mode Class Action Litigation"); *Rodriguez v. Google LLC*, 20-cv-4688 (N.D. Cal.) (the "Web & App Litigation"); *In re Google Location History Litig.*, 18-cv-5062 (N.D. Cal.) ("Location Class Action Litigation"); *In re Google Assistant Privacy Litig.*, 19-cv-4286 (N.D. Cal.) ("Google Assistant Litigation"); *Hubbard v. Google LLC*, 19-cv-7016 (N.D. Cal.) ("COPPA Class Action"); *In re Alphabet Inc. Securities Litigation*, No. 4:18-cv-06245 (N.D. Cal.) ("Google+ Securities Litigation"); *Rivera v. Google LLC*, No. 2019-CH-0990 (Il. Circ. Ct., Cook Cnty.) ("Google Photos Illinois BIPA Litigation"); *Csupo v. Google LLC*, No. 19-cv-352557 (Cal. Super. Ct.) ("California Android Cellular-Data Class Action"); *Taylor v. Google* LLC, 20-cv-07956 (N.D Cal.) ("Nationwide Android Cellular-Data Class Action"); *Frasco v. Flo Health Inc.*, 21-cv-00757 (N.D. Cal.); *In re Google RTB Consumer Privacy Litigation*, No. 21-cv-2155 (N.D. Cal.) ("RTB Class Action").

[195] *State of Arizona v. Google LLC*, No. CV2020-006219 (Ariz. Super. Ct., Maricopa Cnty.) ("Arizona AG Location-Tracking Litigation"); *CNIL Deliberation* No. SAN-2021-023 (decision issued Dec. 31, 2021 further appealed; appeal affirmed on January 28 2022).

[196] Alphabet Inc., 2023 Proxy Statement (Sch. 14A) 29 (filed Apr. 21, 2023).

236. On January 24, 2022, the Texas AG filed an action alleging that Google misled consumers about its location-tracking practices, in violation of the Texas Deceptive Trade Practices-Consumer Protection Act ("DTPA"). On May 19, 2022, the Texas AG added claims that Google also violated DTPA by continuing to collect browsing data while portraying Incognito mode as private.[197]

237. During its first meeting in 2022 (held via videoconference on January 27, 2022), the Board [redacted][198]

238. On April 13, 2022, Google settled the Google Photos / Illinois BIPA Litigation relating to violations of Illinois biometric data laws, agreeing to pay $100 million.[199] The litigation alleged that Google Photos' Face Grouping feature scanned photographs of Illinois residents and created and stored biometric face templates without providing the notice, obtaining the written consent, or following the retention-and-destruction requirements mandated by the Illinois Biometric Information Act (BIPA).

239. On April 20, 2022, the Board met again via videoconference. [redacted].[200]

---

[197] *State of Texas v. Google LLC*, No. 22-01-88230-D (377th Dist. Ct., Victoria Cnty., Tex.).

[198] Exhibit 27 (GOOG-OLERS-220-001454). [redacted] *Id.* at -1455. [redacted].

[199] *Rivera v. Google LLC*, No. 2019-CH-990 (Ill. Circuit Ct., Cook Cnty.).

[200] Exhibit 28 (GOOG-OLERS-220-001317). [redacted] *Id.* at -1318 and -1322. [redacted]

240. On April 22, 2022, Alphabet published its annual proxy including stockholder Brandon Hardy's request for "an annual report explaining how the Board is managing risks associated with user data collection, privacy, and security[.]"[201] The proponent noted that Alphabet and other internet companies "collect, use, and store substantial amounts of user data and track user behavior across online platforms, creating significant financial, legal, regulatory, and reputational risks, should those data be improperly collected, misused, or access by unauthorized parties."[202] He also observed that governments around the world were passing regulations in favor of greater data privacy protection, and that regulatory scrutiny "is likely to only increase going forward."[203] The proponent cautioned that "Companies who wish to remain competitive must stay ahead of the regulatory curve by proactively managing, mitigating, and disclosing information about such issues."[204]

241. The proponent specifically highlighted Alphabet's own exposure: "Alphabet is particularly exposed to these risks. Unfortunately, the company may not be adequately managing these risks and lacks transparency in its handling of such issues, as evidenced by multiple Congressional inquiries regarding the Company's data practices."[205] The proponent also cited a comprehensive 2018 white paper drafted by Precursor LLC and submitted to the FTC concerning Google's "2004-2018 Privacy Track Record of evidence Unfair and Deceptive Over-collection of Consumers' Personal Data."[206] As the proponent noted, "The study concluded, 'Google has serially harmed consumer welfare in unfairly and deceptively undermining consumers' expectations of, and actual, privacy and data security, as well as undermining consumers' ability to protect their own privacy and data security and that of minors.'" The proponent also noted that Google was subject to privacy class action lawsuits and

[201] Alphabet Inc., 2022 Proxy Statement (Sch. 14A) 89 (filed April 22, 2022), at https://www.sec.gov/Archives/edgar/data/1652044/000130817922000262/lgoog2022_def14a.htm

[202] *Id.*

[203] *Id.*

[204] *Id.*

[205] *Id.*

[206] Scott Cleland, Precursor LLC, A Case Study of Alphabet-Google's 2004-2018 Privacy Track Record of Evident Unfair and Deceptive Over-collection of Consumers' Personal Data Exposes an Evident Gap in the FTC's Remedial Authority to Protect Consumers (July 30, 2018), https://precursorblog.com/files/pdf/case_study_of_google_overcollection_of_private_data_for_ftc_hearings.pdf

that the 2020 RDR Corporate Accountability Index[207] urged that Google should (in the proponents' words) "increase transparency of data inference practices and collection of user information from third parties," and that Google "was less transparent. . . than many of its peers"[208] about policies for data breaches.

242. The Board opposed the proposal, contending that "our existing robust program, controls, data privacy and security operations, and transparent disclosure"[209] rendered the report unnecessary. The Board assured stockholders that "[p]rotecting data privacy and security is critical to maintain our users' trust and to ensuring our long-term business success, and is an important priority for our Board."[210] The Board claimed that "[t]he Audit Committee oversees risks associated with data privacy and security, as well as legal, regulatory, compliance, and reputational risks, and the steps Alphabet takes to prevent, detect, monitor, and actively manage such exposures." They also claimed the Board made sufficient disclosures about such risks and the management of this risk. With these assurances, the proposal was defeated.

243. On July 1, 2022, ProPublica published an article exposing that Google was sharing potentially sensitive user data with Russian entities. Senator Mark Warner—Chair of the Senate Intelligence Committee—was quoted in the article characterizing the allegations "incredibly alarming and frankly disappointing."

[207] The RDR Corporate Accountability Index evaluates the policies and practices of digital platforms and telecommunications companies that affect users' privacy. Among other things, the Index assesses companies' transparency regarding how they collect, handle, and secure user data.

[208] Alphabet Inc., 2022 Proxy Statement (Sch. 14A) 89 (filed April 22, 2022), at https://www.sec.gov/Archives/edgar/data/1652044/000130817922000262/lgoog2022_def14a.htm

[209] *Id.*

[210] *Id.*

244. On July 20, 2022, the Board met again via videoconference.[211] [redacted][213] [redacted]

[redacted]

[redacted]

[211] Exhibit 29 (GOOG-OLERS-220-001445 at -1446).
[212] Exhibit 29 (GOOG-OLERS-220-001445 at -1446).
[213] Exhibit 29 (GOOG-OLERS-220-001445 at -1448).

245. [redacted].[214]

**AUDIT COMMITTEE "OVERSIGHT"**

246. Alphabet's Audit Committee met nine times during 2022.[215] Alphabet did not produce minutes for two of these nine meetings.

247. On January 27, 2022, the Audit Committee met via videoconference.[216] [redacted]"[217] [redacted]

248. The Audit Committee met again on March 26, 2021 via videoconference.[218] [redacted]

---

[214] *State of Arizona v. Google LLC*, No. CV2020-6219 (Ariz. Super. Ct., Maricopa Cnty.).

[215] Alphabet Inc., 2023 Proxy Statement (Schedule 14A), at 31 (filed April 21, 2023).

[216] Exhibit 30 (GOOG-OLERS-220-000450 – 549). [redacted]. Exhibit 31 (GOOG-OLERS-220-002272), Exhibit 32 (GOOG-OLERS-220-001308). [redacted] Exhibit 30 (GOOG-OLERS-220-000450 at -457); [redacted] Exhibit 30 (GOOG-OLERS-220-000450 at -459).

[217] Exhibit 30 (GOOG-OLERS-220-000450 at -451).

[218] Exhibit 33 (GOOG-OLERS-220-000550).

[redacted][219] [redacted][220] [redacted]"[221]

249. On April 13, 2022, Google settled the Google Photos Illinois BIPA litigation, which addressed Google's alleged violations of Illinois biometric data laws, agreeing to pay $100 million.[222]

250. On April 20, 2022, the Audit Committee again met via videoconference. [redacted][223]

251. On June 22, 2022, the Audit Committee met again via videoconference.[224] [redacted][225] [redacted][226] [redacted]

---

[219] Exhibit 33 (GOOG-OLERS-220-000550 at -551).

[220] *Id.*

[221] *Id.*

[222] *Rivera v. Google LLC*, No. 2019-CH-00990 (Ill. Cir. Ct., Cook Cnty.) ("Google Photos Illinois BIPA Litigation").

[223] Exhibit 34 (GOOG-OLER-220-00384 at 0389). [redacted]

[224] Exhibit 35 (GOOG-OLERS-220-001313).

[225] *Id.*

[226] Alphabet's 220 production [redacted]

[redacted]"[227]

252. On July 20, 2022, the Audit Committee again met via videoconference.[228] During this meeting, [redacted]

[redacted] Exhibit 35 (GOOG-OLERS-220-001313 at -1314). [redacted].

[228] Exhibit 4 (GOOG-OLER-220-001561-1603). [redacted] Exhibit 36 (GOOG-OLERS-220-001629-1633). [redacted]

[redacted]

253. The Audit Committee met again via video/telephonic conference on September 21, 2022. [redacted].[229]

254. In October 2022, Google agreed to pay $85 million to settle the Arizona AG Location-Tracking Litigation.

255. The Audit Committee met again via videoconference on December 9, 2022. [redacted].[230] [redacted]

### "OVERSIGHT" OF DATA PRIVACY IN 2023

256. Going into the 2023 fiscal year, the Board should have been on heightened alert to Alphabet's ongoing violations of privacy laws and regulations. During the fourth quarter of 2022, Alphabet had entered into settlements requiring it to pay ***over a half a billion dollars*** for its data privacy misconduct, including (i) an October 2022 agreement to settle the Arizona AG Location Tracking Litigation for $85 million; (ii) a November 2022 agreement to settle the Multistate AG Location Tracking Action for $391.5 million; (iii) a December 2022 agreement to settle the Indiana AG Location Tracking Action for $20 million; and (iv) a December 2022 agreement to settle the DC AG Location Tracking Action for $9.5 million. The Board had every reasons to believe that these settlement would not be the end of Alphabet's data privacy woes, as the Company was continuing to defend itself in (i) the Incognito Mode Class Action Litigation, (ii) the Web & App Litigation, (iii) the Location Class Action Litigation, (iv) the Google Assistant Litigation, (v) the COPPA Class Action, (vi) the Google+ Securities Litigation; (vii) the California Android Cellular-Data Class Action; (viii) the Nationwide

---

[229] [redacted] Exhibit 37 (GOOG-OLERS-220-000553 at -553, -554).

[230] [redacted] Exhibit 38 (GOOG-OLERS-220-000557 at -558).

Android Cellular Data Class Action; (ix) the Flo Health Litigation; and (x) the RTB Class Action.[231] It was facing at least three ongoing government proceedings, investigations, and penalties, each of which had been filed in 2022, including (i) the Texas AG Incognito/Location Tracking Action, (ii) the Texas Biometric Litigation, and (iii) the WA AG Location Tracking Action.[232] Despite these red flags of ongoing non-compliance, Alphabet's full Board paid little attention to privacy issues during the 2023 fiscal year. According to Alphabet's 2024 Proxy (filed with the SEC on April 26, 2024), Alphabet's Board met six times in 2023.[233] Alphabet produced minutes for only ***one*** Board meeting in 2023. Thus, Plaintiff is entitled to an inference that the Board discussed data privacy during—***at most—only one of its six meetings*** during 2023.

---

[231] *Brown v. Google LLC*, No. 4:20-cv-03664 (N.D. Cal.) (the "Incognito Mode Class Action Litigation"); *Rodriguez v. Google LLC*, 20-cv-4688 (N.D. Cal.) (the "Web & App Litigation"); *In re Google Location History Litig.*, 18-cv-5062 (N.D. Cal.) ("Location Tracking Class Action Litigation"); *In re Google Assistant Privacy Litig.*, 19-cv-4286 (N.D. Cal.) ("Google Assistant Litigation"); *Hubbard v. Google LLC*, 19-cv-7016 (N.D. Cal.) ("COPPA Class Action"); *In re Alphabet Inc. Securities Litigation*, No. 4:18-cv-06245 (N.D. Cal.) ("Google+ Securities Litigation"); *Csupo v. Google LLC*, No. 19-cv-352557 (Cal. Super. Ct.) ("California Android Cellular-Data Class Action"); *Taylor v. Google* LLC, 20-cv-07956 (N.D Cal.) ("Nationwide Android Cellular-Data Class Action"); *Frasco v. Flo Health Inc.*, 21-cv-00757 (N.D. Cal.); *In re Google RTB Consumer Privacy Litigation*, No. 21-cv-2155 (N.D. Cal.) ("RTB Class Action").

[232] *State of Texas v. Google LLC*, No. 22-01-99230-D ((377th Dist. Ct., Victoria Cnty., Tex.) ("Texas AG Incognito/Location Tracking Action"); *State of Texas v. Google LLC*, No. CV58999 (385th Dist. Ct. Midland Cnty, Tex.) ("Texas AG Biometric Litigation"); *State v. Google LLC*, No. 22-2-01103-3-SEA (Wash. Super. Ct., King Cnty) ("WA AG Location Tracking Action").

[233] Alphabet Inc., 2024 Proxy Statement (Schedule 14A) 28 (filed April 26, 2024).

## Full Board of Directors "Oversight"

257. On April 19, 2023, the Board met.[234] [redacted].[235] [redacted].[236] [redacted]

[redacted]

[234] Exhibit 39 (GOOG-OLERS-220-000706 – 788). [redacted]; Exhibit 40 (GOOG-OLERS-220-001673). [redacted]

[235] Exhibit 39 (GOOG-OLERS-220-000706-708) [redacted]

[236] Exhibit 39 (GOOG-OLERS-220-000706 at -712).

258. On April 21, 2023, Alphabet published its annual proxy, including Arjuna Capital's proposal requesting a "report assessing the feasibility of reducing the risks of abortion-related law enforcement requests by expanding consumer privacy protections and controls over sensitive personal data."[237] The proposal noted that over 650 Google employees had petitioned the Company "to safeguard people's abortion-related search and location data."[238] Even as the Company faced an extraordinary wave of privacy investigations, enforcement actions, and litigation,[239] the Board told stockholders that the Company has "robust privacy controls and tools that empower users to manage data privacy . . ."[240] The Board went so far as to represent that they "practice data minimization on behalf of our users" and that "[p]rotecting our users' privacy and securing their data is core to Google's work."[241] The proposal was defeated.

259. The 2023 Proxy also included Harrington Investments' proposal asking for a "performance review" of the Audit Committee, noting that there was "increasing concern regarding the impact on public well-being of Alphabet's data privacy, content management, corporate transparency, and artificial intelligence operations," which "raise[d] doubts about the Committee's ability to oversee these issues."[242] The proposal specifically highlighted the $391.5 million settlement of the Multistate AG Location Tracking Action, its $85 million settlement of the Arizona AG Location Tracking Litigation, and its $100 million settlement of the Google Photos/Illinois BIPA Litigation. Thus, stockholders were not merely raising generalized concerns about privacy oversight—they specifically identified Alphabet's repeated violations of data privacy laws and the commitments it had made to its users about how their data would be used, the massive harm these violations had inflicted on Alphabet, and concerns that senior Alphabet executives were themselves aware of the underlying misconduct.

---

[237] Alphabet Inc., 2023 Proxy Statement (Sch. 14A) 83 (filed April 21, 2023), https://www.sec.gov/Archives/edgar/data/1652044/000130817923000739/lgoog2023_defa14a.htm

[238] *Id.*

[239] *See infra* ¶210, 237.

[240] Alphabet Inc., 2023 Proxy Statement (Sch. 14A) 84 (filed April 21, 2023), https://www.sec.gov/Archives/edgar/data/1652044/000130817923000739/lgoog2023_defa14a.htm

[241] *Id.*

[242] *Id.* at 101.

260. In response, the Board claimed that the Audit Committee "has the requisite experience, skill set, and protocols to conduct the robust risk oversight sought by the proponent."[243] It noted that the Board was "ultimately responsible for risk oversight at Alphabet" and that the Board had "delegated to its committees oversight of risks associated with their respective areas of responsibility."[244] They assured stockholders that the Audit Committee was responsible for "major risk exposures," including data privacy, and that the Audit Committee had "rigorous frameworks and processes for fulfilling these responsibilities, and regularly evaluates and adjusts its strategies to best meet the needs of the Board and Alphabet."[245] The Board represented that the Audit Committee "regularly discusses these risks with senior management, regularly evaluating the company's robust data privacy, use and protection policies and protocols and reviewing any material incidents, litigation and investigation risks as it relates to antitrust, cybersecurity, IP, and other matters."[246] Notably, the Company did not reassure investors that the Audit Committee "regularly discussed" these risks ***with the Board***, or that the Board required or received regular reports from the Audit Committee addressing these risks. According to the Board, the Audit Committee maintained "***primary responsibility*** for oversight of these risks" and only ***retained discretion*** to elevate risks to the full Board.[247] In other words, the Audit Committee ***was not required*** to elevate mission critical risk issues to the Board for evaluation and consideration. This proposal was also defeated.

261. Defendants' representations that protecting user privacy was "core" to the Company's business, that it had implemented "robust privacy controls," that it practiced data minimization, and that it remained committed to protecting users' sensitive health-location information and their privacy while browsing in Incognito Mode are difficult to square with the myriad legal actions in which the Company was embroiled at the time of the 2023 proxy and that would ultimately cause the Company to expend over $4 billion in fines and settlements.

---

[243] *Id.*

[244] *Id.* at 102.

[245] *Id.*

[246] *Id.*

[247] *Id.* ("While primary responsibility for oversight of these risks sits with the Audit Committee, it *may* elevate issues that requires the attention of the full Board.") (emphases added).

262. Alphabet's 220 production does not contain minutes of ***any*** additional meetings of the full Board during the remainder of 2023. Thus, Plaintiff is entitled to an inference that the Board did not discuss data privacy issues ***at all*** during the five additional meetings the Board had in 2023. The Board's failure in this regard is particularly notable because Alphabet continued to find itself under fire for privacy-related issues throughout the remainer of 2023. In August 2023, Senators Markey and Blackburn raised concerns with the FTC about Google tracking and targeting children. And in September 2023, Google agreed to pay $100 million to settle the CA AG Location Tracking Action. As Alphabet continued to suffer corporate trauma, the full Board remained supine.

**AUDIT COMMITTEE "OVERSIGHT"**

263. According to Alphabet's 2024 Proxy, the Audit Committee met eight times in 2023.[248] Alphabet's Section 220 Production contains minutes for only four Audit Committee meetings. Thus, Plaintiff is entitled to an inference that the Audit Committee discussed data privacy issues during—at most—four of its eight meetings in 2023.

264. The Audit Committee met on January 26, 2023. [redacted]

[redacted]

[248] Alphabet Inc., 2024 Proxy Statement (Sch. 14A) 30 (filed April 26, 2024).

265. [redacted].

266. In advance of the meeting, [redacted]

267. [redacted].

268. The Audit Committee met again via video/teleconference on March 14, 2023. [redacted][251] [redacted].[252]

[249] Exhibit 41 (GOOG-OLERS-220-000561-705). The text of the minutes ends at page -569. [redacted]

[250] Exhibit 42 (GOOG-OLERS-220-000789–791, at -790).

[251] Exhibit 43 (GOOG-OLERS-220-002885–2907).

[252] [redacted] Exhibit 43 (GOOG-OLERS-220-002885 at -2904).

269. On April 27, 2023, the parties to the Location Tracking Class Action Litigation reached a settlement whereby the Company would pay $62 million to resolve claims relating to Google's alleged tracking and storage of users' location information while the "Location History" setting was turned off. Alphabet has not produced any documents purporting to reflect discussion of the Location Tracking Class Action Litigation at this meeting, so Plaintiff is entitled to an inference that it was not discussed.

270. [redacted].[254] [redacted].[255] [redacted][256] [redacted][257] [redacted][258] A[redacted].[259]

[253] Exhibit 44 (GOOG-OLERS-220-000979-989). The text of the minutes ends at page -982. [redacted]

[254] Exhibit 45 (GOOG-OLERS-220-002908-2917). [redacted] *Id.* at -2909. [redacted]. *Id.* at -2915.

[255] Exhibit 5 (GOOG-OLERS-220-002918-2924).

[256] *Id.* at -2919.

[257] *Id.* at -2920.

[258] *Id.* at -2921.

[259] Exhibit 46 (GOOG-OLERS-220-001634-635).

271. The Audit Committee ostensibly met on October 18, 2023. Alphabet did not produce minutes for this meeting, and thus Plaintiff is entitled to an inference that data privacy was not discussed during this meeting. [redacted][260] [redacted][261] [redacted];[262] one was redacted nearly fully as Not Responsive with the exception of the factual update that the [redacted]";[263] [redacted][264]

272. The Audit Committee met on December 11, 2023. [redacted].[265]

**"OVERSIGHT" OF DATA PRIVACY IN 2024**

**FULL BOARD OF DIRECTORS "OVERSIGHT"**

273. Going into the 2024 fiscal year, the Board should have been on heightened alert to Alphabet's ongoing violations of privacy laws and regulations. During the 2023 fiscal year, Alphabet had expended an additional $132.9 million settling actions relating to its data privacy practices, including (i) a $39.9 million settlement of the WA AG Location Tracking Action and (ii) a $93 million settlement of the CA AG Location Tracking Settlement Action. It was still enmeshed in at least nine ongoing lawsuits relating to its data privacy conduct, including (i) the Web & App Litigation, (ii) the Google Assistant Litigation, (iii) the COPPA Class Action, (iv) the Google+ Securities Litigation; (v)

---

[260] Exhibit 47 (GOOG-OLERS-220-001636-1640).

[261] *Id.* at -1639.

[262] *Id.* at -1638.

[263] *Id.* at -1637.

[264] *Id.* at -1640.

[265] Exhibit 48 GOOG-OLERS-220-000792-807. [redacted] *Id.* at -793. [redacted] (Exhibit 49 (GOOG-OLERS-220-000882 – 892)) [redacted] Exhibit 49 (GOOG-OLERS-220-000882 at -883).

[redacted]

the California Android Cellular-Data Class Action; (vi) the Nationwide Android Cellular Data Class Action; (vii) the Flo Health Litigation; (viii) the RTB Class Action; and (ix) the Google Play Child-Privacy Litigation.[266] It was facing at least three government proceedings and investigations, including the Texas AG Incognito/Location Tracking Action, the Texas Biometric Litigation, and the CNIL 2025 Enforcement.[267] And it had just settled, *inter alia*, the Incognito Mode Class Action Litigation (settled December 28, 2023) and the Location Tracking Class Action Litigation (preliminary approval December 3, 2023).[268] Despite these red flags of ongoing non-compliance, Alphabet's full Board paid little attention to privacy issues during the 2024 fiscal year. According to Alphabet's 2025 Proxy (filed with the SEC on April 25, 2025), Alphabet's Board met six times in 2024.[269] Alphabet produced minutes of only four of these six meetings. Thus, Plaintiff is entitled to an inference that the Board discussed data privacy during—at most—four of its six meetings.

274. On January 24, 2024, Alphabet's Board met. [redacted]

[266] *Rodriguez v. Google LLC*, 20-cv-4688 (N.D. Cal.) (the "Web & App Litigation"); *In re Google Assistant Privacy Litig.*, 19-cv-4286 (N.D. Cal.) ("Google Assistant Litigation"); *Hubbard v. Google LLC*, 19-cv-7016 (N.D. Cal.) ("COPPA Class Action"); *In re Alphabet Inc. Securities Litigation*, No. 4:18-cv-06245 (N.D. Cal.) ("Google+ Securities Litigation"); *Csupo v. Google LLC*, No. 19-cv-352557 (Cal. Super. Ct.) ("California Android Cellular-Data Class Action"); *Taylor v. Google* LLC, 20-cv-07956 (N.D. Cal.) ("Nationwide Android Cellular-Data Class Action"); *Frasco v. Flo Health Inc.*, 21-cv-00757 (N.D. Cal.); *In re Google RTB Consumer Privacy Litigation*, No. 21-cv-2155 (N.D. Cal.) ("RTB Class Action"); *A.B. Google LLC*, 5:23-cv-03101-PCP (N.D. Cal.) ("Google Play Child-Privacy Litigation").

[267] *State of Texas v. Google LLC*, No. 22-01-99230-D (377th Dist. Ct., Victoria Cnty., Tex.) ("Texas AG Incognito/Location Tracking Action"); *State of Texas v. Google LLC*, No. CV58999 (385th Dist. Ct. Midland Cnty, Tex.) ("Texas AG Biometric Litigation").

[268] *Brown v. Google LLC*, No. 4:20-cv-03664 (N.D. Cal.) (the "Incognito Mode Class Action Litigation") (settlement reached on December 28, 2023); *In re Google Location History Litigation*, 5:18-cv-05062-EJD (N.D. Cal.) ("Location Tracking Class Action Litigation").

[269] Alphabet Inc., 2025 Proxy Statement (Sch. 14A) 24 (filed Apr. 24, 2025).

[270] Exhibit 50 (GOOG-OLERS-220-002723-2797 at -2724).

[redacted][271] [redacted]

275. [redacted],[272] [redacted]

[redacted]

[redacted][273]

[redacted]

[271] Exhibit 51 (GOOG-OLERS-220-000840 at -0843-0844).

[272] Exhibit 50 (GOOG-OLERS-220-002723-2797, at 2743).

[273] *Id.* at -2752.

[redacted]

276. On January 18, 2024, the Electronic Privacy Information Center ("EPIC") and Accountable Tech filed an administrative complaint with the FTC alleging that Google engaged in unfair and deceptive practices—and violated its 2011 FTC Consent Order—by failing to honor its promise to promptly delete location records revealing visits to abortion clinics and other sensitive medical facilities.

277. On February 5, 2024, the parties in the Google+ Securities Litigation filed a stipulation providing for a $350 million cash settlement of the securities claims concerning Alphabet's disclosures about the Google+ data-security vulnerabilities.

[redacted]

[274] *Id*. at -2754

278. The Board met on April 17, 2024.[275] [redacted].[276] [redacted][277] [redacted][278] [redacted]

[redacted]

279. On April 26, 2024, Alphabet published its annual proxy. The proxy included Boston Common Asset Management's proposal requesting a report on online safety for children. The proponent specifically noted Alphabet's "legacy issues stemming from YouTube's record $170 million fine paid

---

[275] Exhibit 52 (GOOG-OLERS-220-003842-3844).

[276] *Id.* [redacted]

[277] Exhibit 52 (GOOG-OLERS-220-003842 at -3845). The text of the minutes ends at page -3853. [redacted]

[278] Exhibit 53 (GOOG-OLERS-220-005207-5213).

to the [FTC] [in] response to allegations that YouTube illegally harvested children's data."[279] The proponent further noted that, "Alphabet does not have performance targets linked to children's online safety for investors and stakeholders to . . . assess compliance with emerging regulatory standards."[280]

280. The Board opposed this proposal, reassuring stockholders that "Google and YouTube are committed to sharing data that sheds light on how the policies and actions of government affect privacy, security, and access to information online, and have voluntarily issued detailed, timely disclosures regarding compliance and product changes in relation to new regulations."[281] Once again, the stockholder proposal was defeated.

281. On June 18, 2024, the U.S. District Court for the Northern District of California sustained the complaint in the Google Play Child-Privacy Litigation, denying the Company's motion to dismiss.[282] Among other things, the Court found that the plaintiffs had adequately alleged that the Company had actual knowledge that personal data was being collected from apps that were primarily child-directed.[283]

282. On July 18, 2024, the Alphabet Board met. [redacted].[284] [redacted]

[279] Alphabet Inc., 2024 Proxy Statement (Sch. 14A) 102 (filed Apr. 26, 2024).

[280] *Id.*

[281] *Id.* at 104.

[282] *A.B. v. Google LLC*, 5:23-cv-03101-PCP, 2024 WL 3052969 (N.D. Cal. June 18, 2024).

[283] *Id.* at *5.

[284] Exhibit 54 (GOOG-OLERS-220-004443–4444) [redacted]

[redacted][285] [redacted]

[redacted][286]

[redacted]

283. On October 16, 2024, the Board met. [redacted].[287] [redacted]"[288] [redacted]

[285] *Id.* at -4450. [redacted].

[286] Exhibit 55 (GOOG-OLERS-220-005215-5222).

[287] Exhibit 56 (GOOG-OLERS-220-004094-4095) [redacted]

[288] *Id.* at 4097. The text of the minutes ends at page -4102. [redacted]

[redacted][289] [redacted]”[291]

**AUDIT COMMITTEE “OVERSIGHT”**

284. Alphabet’s Audit Committee met eleven times in 2024.[292] Alphabet produced minutes from only ***four*** of these eleven meetings. Thus, Plaintiff is entitled to an inference that the Audit Committee discussed matters relating to data privacy during—***at most***—four of its eleven meetings during 2024.

285. The Audit Committee met on January 24, 2024. [redacted]

[redacted]

[289] Exhibit 57 (GOOG-OLERS-220-005223-5234).

[290] Exhibit 57 (GOOG-OLERS-220-005223 at -5230).

[291] *Id.* at -5232.

[292] Alphabet Inc., 2025 Proxy Statement (Sch. 14A) 28 (filed Apr. 25, 2025).

[redacted]

286. [redacted].[293] [redacted]

287. [redacted][294] [redacted][295] [redacted]”[296] [redacted].[297]

[293] Exhibit 58 (GOOG-OLERS-220-003438-3812) (the “January 2024 Audit Committee Meeting Materials”).

[294] Exhibit 59 (GOOG-OLERS-220-000814-822). The text of the minutes ends at page -822. [redacted]

[295] [redacted] (Exhibit 58 (GOOG-OLERS-220-0003438.) [redacted] Exhibit 58 (GOOG-OLERS-220-0003438 at -3592).

[296] Exhibit 59 (GOOG-OLERS-220-000814 at -818). [redacted] Exhibit 58 (GOOG-OLERS-220-003438 at 3625-3636). [redacted]

[297] Exhibit 58 (GOOG-OLERS-220-003438).

288. [redacted].[298] [redacted][299]

[redacted]

[redacted]

---

[298] Exhibit 60 (GOOG-OLERS-220-0003835-3841). The text of the minutes ends at page -838. [redacted].

[299] Exhibit 60 (GOOG-OLERS-220-003835 at -3836). [redacted] were produced at Exhibit 61 (GOOG-OLERS-220-004053-4061). [redacted] *Id.* at -4054:

[redacted][300] [redacted].[301]

[redacted]

[redacted]

289. The Audit Committee ostensibly met again on April 16, 2024. Alphabet did not produce any minutes for this meeting, so Plaintiff is entitled to an inference that the Board did not discuss

---

[300] [redacted] Exhibit 62 (GOOG-OLERS-220-004062-4069). [redacted]

[301] Exhibit 60 (GOOG-OLERS-220-003835 at -3837). [redacted] Exhibit 63 (GOOG-OLERS-220-004051 at -4052). [redacted]

anything relating to data privacy at this meeting. Materials relating to this meeting[302] [redacted]

[redacted]

290. The Audit Committee met again on June 5, 2024. [redacted][303] [redacted]"[304] [redacted]

[redacted]

[302] Alphabet's 220 production [redacted] (i) Exhibit 64 (GOOG-OLERS-220-001647-1655) and (ii) Exhibit 65 (GOOG-OLERS-220-001641-1646).

[303] Exhibit 66 (GOOG-OLERS-220-004032-4050 at 4033). The text of the minutes ends at page -4035. [redacted]

[304] Exhibit 67 (GOOG-OLERS-220-004073-4079).

[redacted].

291. The Audit Committee ostensibly met again on July 14, 2024. Alphabet did not produce any minutes for this meeting, so Plaintiff is entitled to an inference that the Committee did not discuss anything relating to data privacy at this meeting. [redacted][305] (ii) [redacted][306] and (iii) [redacted]"[307]

292. On September 4, 2024, the Audit Committee met. During the meeting [redacted][308] [redacted][309] [redacted][310]

293. [redacted][311] [redacted][312] [redacted]

---

[305] Exhibit 68 (GOOG-OLERS-220-004712-4723 at 4715).

[306] *Id.*

[307] *Id.* at -4717.

[308] Exhibit 69 (GOOG-OLERS-220-004088-4093 at -4089).

[309] *Id.*

[310] *Id.* at -4090.

[311] Exhibit 70 (GOOG-OLERS-220-004732-4740 at -4739).

[312] *Id.*

[redacted][313] [redacted]

[redacted]

294. The Audit Committee ostensibly met again on October 15, 2024. Alphabet did not produce any minutes for this meeting, so Plaintiff is entitled to an inference that the Committee did not discuss anything relating to data privacy at this meeting.[314]

295. The Audit Committee ostensibly met again on November 20, 2024. Alphabet did not produce any minutes for this meeting, so Plaintiff is entitled to an inference that the Committee did not discuss anything relating to data privacy at this meeting.[315]

[313] Exhibit 70 (GOOG-OLERS-220-004732 at 4739).

[314] [redacted] Exhibit 71 (GOOG-OLERS-220-004750 at -4756, -4757).

[315] [redacted] Exhibit 72 (GOOG-OLERS-220-004758 at -4760, -4761, -4762).

**"OVERSIGHT" OF DATA PRIVACY IN 2025**[316]

296. Going into the 2025 fiscal year, the Board should have been on heightened alert to Alphabet's ongoing violations of privacy laws and regulations. During the 2024 fiscal year, Alphabet had expended more than $400 million on additional settlements of lawsuits relating to its data privacy practices, including (i) a $350 million settlement of the WA AG Location Tracking Action and (ii) a $93 million settlement of the CA AG Location Tracking Action. It was still facing least eight ongoing lawsuits relating to its data privacy conduct, including (i) the Web & App Litigation, (ii) the Google Assistant Litigation, (iii) the COPPA Class Action; (iv) the California Android Cellular-Data Class Action; (v) the Nationwide Android Cellular Data Class Action; (vi) the Flo Health Litigation; (vii) the RTB Class Action; and (viii) the Google Play Child-Privacy Litigation.[317] And it was facing at least three ongoing government proceedings and investigations, including the Texas AG Incognito/Location Tracking Action, the Texas Biometric Litigation, and the CNIL 2025 Enforcement.[318] Despite these red flags of ongoing non-compliance, Alphabet's full Board paid little attention to privacy issues during the 2025 fiscal year. According to Alphabet's 2026 Proxy, Alphabet's Board met eight times in 2025.[319] Alphabet produced minutes for ***only three*** of these eight meetings. Thus, Plaintiff is entitled to an inference that the Board discussed data privacy during—***at most***—three of its eight meetings.

297. On January 16, 2025, EPIC and the Irish Council for Civil Liberties filed a complaint with the FTC alleging that Google's Real-Time Bidding system violates the FTC Act and PADFAA by transmitting personally identifiable information—including users' locations, health, finances, political views, sexuality, online activity, and employment in the military or intelligence community—in a

[316] Alphabet's 2026 Proxy indicated that the Board met 8 times in 2025, and the Audit Committee met 13 times in 2025. Alphabet Inc., 2026 Proxy Statement (Sch. 14A) 24, 26 (filed April 24, 2026).

[317] *Rodriguez v. Google LLC*, 20-cv-4688 (N.D. Cal.) (the "Web & App Litigation"); *In re Google Assistant Privacy Litig.*, 19-cv-4286 (N.D. Cal.) ("Google Assistant Litigation"); *Hubbard v. Google LLC*, 19-cv-7016 (N.D. Cal.) ("COPPA Class Action"); *Csupo v. Google LLC*, No. 19-cv-352557 (Cal. Super. Ct.) ("California Android Cellular-Data Class Action"); *Taylor v. Google* LLC, 20-cv-07956 (N.D. Cal.) ("Nationwide Android Cellular-Data Class Action"); *Frasco v. Flo Health Inc.*, 21-cv-00757 (N.D. Cal.); *In re Google RTB Consumer Privacy Litigation*, No. 21-cv-2155 (N.D. Cal.) ("RTB Class Action"); *A.B. Google LLC*, 5:23-cv-03101-PCP (N.D. Cal.) ("Google Play Child-Privacy Litigation").

[318] *State of Texas v. Google LLC*, No. 22-01-99230-D (377th Dist. Ct., Victoria Cnty., Tex.) ("Texas AG Incognito/Location Tracking Action"); *State of Texas v. Google LLC*, No. CV58999 (385th Dist. Ct. Midland Cnty, Tex.) ("Texas AG Biometric Litigation").

[319] Alphabet Inc., 2026 Proxy Statement (Schedule 14A) 24 (filed April 24, 2026).

manner that made it accessible to foreign adversaries. The complaint alleged that senior Google executives had known of the system's security deficiencies for more than a decade, and EPIC and ICCL asked the FTC to impose civil penalties, prohibit the transmission of sensitive data to foreign adversaries, and require Google to remove identifying information from RTB bid requests.[320] In addition, the complaint alleged that "Pichai was aware of the security flaws of its RTB system and did not remedy them," citing a 2021 email from Chief Marketing Officer Lorraine Twohill to Pichai urging him to:

> Be more focused about which parts of the ads business we want to get behind (i.e. real time bidding on user data = bad; contextual ads in search = good)[321]

298. On January 30, 2025, the Board met. [redacted].[322] [redacted][323]

[redacted]

---

[320] *In re Matter of Google's RTB Practices*, Complaint (filed Jan. 16, 2025), https://epic.org/wp-content/uploads/2025/01/EPIC-ICCL-Enforce-In-re-Googles-RTB-Complaint.pdf

[321] *Id.*, at 1, 17.

[322] Exhibit 73 (GOOG-OLERS-220-004235 at 4235-4236). [redacted]

[323] The minutes indicate that the [redacted] *Id.* at -4238. [redacted] depicted above.

299. On April 16, 2025, the Board met. [redacted][324] [redacted]”[325]

[redacted]

300. On April 25, 2025, Alphabet published its annual proxy. The proxy included the National Legal and Policy Center’s proposal requesting a report on AI data usage oversight. The proponent noted several of the Company’s “past abuses” concerning data privacy, including (i) Google’s $5 billion settlement of class-action claims for “pervasively tracking their internet use through browsers set in ‘private’ mode,”[326] (ii) Google’s “abandoned plans to remove third-party cookies from its Chrome

[324] Exhibit 74 (GOOG-OLERS-220-004404 at 4405) [redacted].

[325] Exhibit 74 (GOOG-OLERS-220-004404 at 4408). The text of the minutes ends at page -4413. [redacted]. Exhibit 57 (GOOGLE-OLERS-220-005223-5253 at -5250).

[326] Alphabet Inc., 2025 Proxy Statement (Sch. 14A) 85 (filed April 25, 2025), https://www.sec.gov/Archives/edgar/data/1652044/000130817925000512/goog012701-defa14a.htm.

browser after advertisers expressed concerns about the effectiveness of Google's personalized advertising – Alphabet's largest revenue driver,"[327] drawing further scrutiny from UK regulators, and (iii) Alphabet's "longstanding ties with U.S. intelligence agencies, which raises concerns about Alphabet's role in surveillance on U.S. citizens."[328]

301. The Board recommended that Alphabet stockholders reject this proposal, claiming that "Google is deeply committed to user privacy and maintains protocols regarding private data and tracking" and its "policies are designed to protect user privacy and safety through responsible data practices, including limits on the personal information that is used and saved, [and] use of advanced privacy technologies to help keep personal information private."[329] While the Board never cited any actual oversight action by the Board or any of its committees concerning these policies and protocols and the Company's actual protection of users' private data, they nevertheless managed to defeat the proposal.

302. On May 9, 2025, the Texas Attorney General announced a settlement of its Texas AG Incognito/Location Tracking Action[330] and the Texas AG Biometric Litigation for the extraordinary amount of $1.375 billion.

303. On July 1, 2025, a California jury ruled in plaintiffs' favor in the California Android Cellular-Data Class Action, awarding plaintiffs $314.6 million. The litigation concerned Google's alleged use of class members' paid cellular data to transmit information from Android devices without consent, including while the devices were idle. Following the verdict, Google agreed to a $350 million settlement and to revise consumer-facing materials to disclose and obtain consent for the challenged transfers.

304. On July 3, 2025, Google reached a settlement in principle in the Flo Health Litigation, requiring it to pay $48 million to settle claims that, despite assurances that their information would remain private, the Flo period- and pregnancy-tracking app transmitted users' sensitive reproductive-

---

[327] *Id*.

[328] *Id*.

[329] *Id*. at 86.

[330] *State of Texas v. Google LLC*, No. 22-01-88230-D (377th Jud. Dist. Ct., Victoria Cnty., Tex.); *State v. Google LLC*, No. CV58999 (385th Dist. Ct., Midland Cnty., Tex.).

health information to Google and other third parties through embedded software-development kits without consent.

305. On September 1, 2025, the CNIL imposed a $380 million fine on Alphabet for displaying advertisements between users' emails without their consent and placing cookies when users created Google accounts. French data privacy authorities explicitly cited Google's repeated violations of the same regulatory provisions as the reason for the extraordinary fine.

306. On October 22, 2025, the Board met. [redacted].[331] [redacted][333]

**AUDIT COMMITTEE "OVERSIGHT"**

307. The Audit Committee met thirteen times in 2025. Alphabet produced minutes of ***only five*** of these thirteen meetings. Thus, Plaintiff is entitled to an inference that the Board discussed data privacy during—***at most***—five of its thirteen meetings and did not discuss this topic ***at all*** during the remaining eight. [redacted]

[331] Exhibits 75, 74 (GOOG-OLERS-220-005361 at 5361-5362; 4404 at 4405). [redacted]

[332] *Id.* at 5369. [redacted]. Exhibit 76 (GOOG-OLERS-220-004792-4809 at -4805).

[333] Exhibit 75 (GOOG-OLERS 220-005361 at 5369). The text of the minutes ends at page -5372. [redacted]

308. On January 29, 2025, the Audit Committee met. [redacted][334]

309. On March 12, 2025, the Audit Committee met via videoconference. [redacted]. The minutes state that [redacted][335] [redacted].

[334] The minutes note that [redacted]. Exhibit 77 (GOOG-OLERS-220-004123 at 4124). [redacted] Exhibit 78 (GOOG-OLERS-220-004779-4791 at -4780) [redacted] 4781-4782 [redacted] -4783 -4791 [redacted]. [redacted]. Exhibit 77 (GOOG-OLERS-220-004123 at -4129).

The text of the minutes ends at page -4130. [redacted]

[335] Exhibit 79 (GOOG-OLERS-220-004112).

310. On April 15, 2025, the Audit Committee met via videoconference. [redacted][336]

311. On May 30, 2025, the Audit Committee met via videoconference. [redacted][337] [redacted].[338]

**THE BOARD CONTINUES TO OPPOSE STOCKHOLDER CALLS FOR ACTION TO ADDRESS DATA PRIVACY CONCERNS IN 2026**

312. On April 24, 2026, Alphabet published its 2026 annual proxy. The proxy included Zevin Asset Management's proposal requesting that Alphabet prepare a report evaluating whether deficiencies in Alphabet's governance exposed the Company to operational, reputational, regulatory, and legal risks arising from its privacy practices. As the proponents explained, "Alphabet's business model depends heavily on the processing and storage of user and enterprise customer data across Google Services and Google Cloud." They noted that "[w]hen customers misuse Google products, or when the Company's own data-governance practices contradict their terms of service, Alphabet risk exposure includes: operational risk, when misuse triggers regulatory intervention . . .[,] reputational risk[,] . . . regulatory

[336] [redacted] Exhibit 80 (GOOG-OLERS-220-004351-4358). [redacted]. *Id.* at -4357. The text of the minutes ends at page 4359. [redacted] was produced at Exhibit 81 (GOOG-OLERS-220-004330- 4340). [redacted] *Id.* at -4334. [redacted].

[337] Exhibit 82 (GOOG-OLERS-220-004393).

[338] Exhibit 82 (GOOG-OLERS-220-004393-4403).

penalties leading to fines . . . [, and] litigation and class-action exposure." The proposal specifically cited many of the same lawsuits and settlements alleged in this Complaint, including the Incognito Mode litigation, the CNIL enforcement actions, and the $425 million location tracking verdict.

313. Once again, however, the Board insisted that its existing governance structures were adequate. The Board recommended a vote against the proposal, claiming that it had (i) "implemented a robust, multi-layered framework for data privacy and security," (ii) maintained "rigorous oversight of legal, regulatory, and reputational risks associated with data governance," and (iii) adequate disclosures with respect to these risks. Ignoring the onslaught of litigation it was facing and the myriad penalties and fines to which it had been subjected, Alphabet boldly proclaimed, "our existing policies and technical safeguards effectively mitigate the risks cited by the proponent." The Board assured stockholders that "our governance structure directly addresses the fundamental concerns of this proposal," including that the Risk and Compliance Committee "oversees principal legal, policy, reputational, and operational risks, including compliance with global laws and regulations[,] periodically reviews risks[,] and meets regularly in executive sessions with key management personnel[.]" The Board thus urged stockholders to reject the proposal; yet again, the proposal was defeated.

## VII. THE PROXY DEFENDANTS VIOLATED SECTION 14(A) OF THE EXCHANGE ACT AND SEC RULE 14A-9 BY CAUSING ALPHABET TO FILE MATERIALLY MISLEADING PROXY STATEMENTS

314. The Director Defendants violated Section 14(a) of the Exchange Act and SEC Rule 14a-9 by causing Alphabet to issue proxy statements that (i) failed to disclose, among other things, grave deficiencies in Alphabet's controls over data privacy, serious legal and regulatory risks with respect to data privacy, and Alphabet's oversight failures and (ii) falsely reassured stockholders that Alphabet and its Board were exercising effective oversight over data privacy.

### A. THE DIRECTOR DEFENDANTS CAUSED ALPHABET TO ISSUE THE MATERIALLY FALSE OR MISLEADING 2023 PROXY STATEMENT.

315. On April 21, 2023, Director Defendants Page, Brin, Pichai, Hennessy, Arnold, Chávez, Doerr, Ferguson, Shriram, and Washington caused Alphabet to file its annual proxy statement with the SEC in connection with its upcoming annual meeting of stockholders (the "2023 Proxy"). In the 2023

Proxy, the Director Defendants solicited shareholder votes, among other things, (i) to elect directors Page, Brin, Pichai, Hennessy, Arnold, Chavez, Doerr, Ferguson, Ann Mather, Shriram, and Washington; (ii) to cast an advisory vote to approve compensation for Alphabet's named executive officers, and (iii) on a number of stockholder proposals. The Director Defendants caused the proxy to contain a number of false and misleading statements about Alphabet's oversight of data privacy. As a result, (i) stockholders were deprived of the opportunity to make fully informed decisions on the director elections, the advisory vote on compensation, and the stockholder proposals and (ii) Alphabet was harmed as Defendants remained on the Board and were permitted to continue to allow the Company to violate privacy laws and regulations.

316. The 2023 Proxy included a section titled "Shareholder Proposals." The Shareholder Proposals section contained two separate proposals put forward by shareholders who were concerned with Alphabet's failure to properly self-regulate its compliance with data privacy laws: Proposal 15, "Stockholder Proposal Regarding a Performance Review of the Audit and Compliance Committee"; and Proposal 9, "Stockholder Proposal Regarding a Report on Reproductive Rights and Data Privacy."[339]

317. Stockholder Proposal 15 specifically enumerated a number of the failures of the Alphabet Audit Committee that are detailed in this Complaint, to the extent that they were known to stockholders in early 2023. It listed, among others, Google's failure to follow the law regarding location tracking, biometric information collection, and concealment of security vulnerabilities for users' personal data. The stockholders requested that "the Board commission an independent assessment of the role of its Audit and Compliance Committee in ensuring effective Board oversight, above and beyond legal compliance, of material risks to public well-being from company operations."[340] One of the potential remedies suggested for consideration by the auditor was "delegating risk issues to a separate board committee," something that Alphabet later did under duress to settle a class action lawsuit.[341]

318. The Director Defendants opposed Stockholder Proposal 15, and in so doing, (i) failed to disclose, among other things, grave deficiencies in Alphabet's controls over data privacy, serious legal

[339] Alphabet Inc., 2023 Proxy Statement (Sch. 14A) 101-102, 83-84 (filed Apr. 21, 2023).

[340] *Id.* at 101.

[341] *Id.* at 101.

and regulatory risks with respect to data privacy, and Alphabet's oversight failures and (ii) falsely reassured stockholders that Alphabet and its Board were exercising effective oversight over data privacy.

319. Specifically, the Director Defendants caused the Proxy to state:

> The Audit Committee has a key role in oversight of matters raised in the stockholder proposal including data privacy, alleged antitrust violations, and risks related to AI. Successfully managing these and other areas of risk are all critical to maintaining our customers' and stakeholders' trust and to ensuring our long-term business success, and are important priorities of the Audit Committee and our Board. The Audit Committee regularly discusses these risks with senior management, regularly evaluating the company's robust data privacy, use and protection policies and protocols and reviewing any material incidents, litigation and investigation risks as it relates to antitrust, cybersecurity, IP, and other matters."[342]

These statements concerning the extent of the Audit Committee's oversight of data privacy were materially false and misleading because, in reality, the Audit Committee paid scant attention to data privacy issues, as discussed *supra*, and allowed the Company to repeatedly violate data privacy laws and regulations and to repeatedly break its commitments to its users concerning collection and use of their private data.

320. In addition to causing the 2023 Proxy to contain materially false and misleading statements concerning the extent of the Audit Committee's oversight over data privacy matters, the Director Defendants also failed to disclose in their response to Stockholder Proposal 15 the multiple formal proceedings that were underway at the time the Proxy Statement was issued, which concretely demonstrated the legitimacy of the stockholders' proposal and the lack of candor in the Director Defendants' response to that proposal. Those formal proceedings included the Texas AG Biometric Litigation, litigation concerning users' reproductive health information, third-party application data, and Android data practices; and fines and ongoing investigations by French privacy regulators concerning unlawful consent practices in France. The existence of all of these private and public proceedings on multiple data privacy fronts was a compelling reason for stockholders to support Stockholder Proposal 15, the information was not information of a type that would be widely known to Alphabet stockholders, and Alphabet's withholding of the information was a purposeful withholding of material information.

---

[342] *Id.* at 102.

321. Individually and in combination, the Director Defendants' inaccurate reassurances and withholding of material information rendered the 2023 Proxy Statement materially false and misleading. These false and omissive statements deprived Alphabet's shareholders of adequate information to make a reasonably informed decision about (i) director elections; (ii) named executive officer compensation; and (iii) the stockholder proposals.

### B. The Director Defendants Caused Alphabet To Issue The Materially False And Misleading 2024 Proxy

322. On April 26, 2024, the Director Defendants caused Alphabet to file its annual proxy statement with the SEC in connection with its upcoming annual meeting of stockholders (the "2024 Proxy"). In the 2024 Proxy, the Director Defendants solicited shareholder votes, among other things, to elect directors Page, Brin, Pichai, Hennessy, Arnold, Chavez, Doerr, Ferguson, Shriram, and Washington. The Director Defendants caused the 2024 Proxy to contain false and misleading statements about Alphabet's oversight of data privacy. As a result, (i) stockholders were deprived of the opportunity to make fully informed decisions on the director elections and (ii) Alphabet was harmed as Defendants remained on the Board and were permitted to continue to allow the Company to violate privacy laws and regulations.

323. In his Letter from the Chair of the Board of Directors, Director Defendant Hennessy touted the Company's commitment to "protecting the safety and privacy of users," claiming that "[r]egular reports and updates from the Audit and Compliance Committee and our senior management have ensured that ***our Board is deeply involved in the oversight of*** the company's AI strategy, as well as any ***emerging issues that may arise at the cutting-edge of AI development, from protecting the safety and privacy of users***, to our longstanding commitment to human rights, to developing ways to accelerate climate action." In reality, as set forth herein, the Board was not exercising meaningful oversight over data privacy, the Company was embroiled in myriad lawsuits and enforcement actions and had already expended over $1.6 billion in fines and settlements for its privacy-related misconduct. The Proxy did not disclose these past fines, settlements, and ongoing lawsuits stemming from Alphabet's ongoing privacy violations.

324. Further, the 2024 Proxy informed stockholders that "[e]nsuring proper use of our platforms and protecting the data privacy and security of our users is fundamental to maintaining our users' trust and to ensuring our long-term business success."[343] Despite this, the Director Defendants did not disclose the Company's long history of privacy-related violations and the extensive harm these violations had inflicted (and were continuing to inflict) on Alphabet.

325. Individually and in combination, the Director Defendants' inaccurate reassurances and withholding of material information rendered the 2024 Proxy Statement materially false and misleading. These false and omissive statements deprived Alphabet's shareholders of adequate information to make a reasonably informed decision about director elections, resulting in the Director Defendants being re-elected to the Board and thus permitted to continue to fail to oversee Alphabet's data privacy policies and practices, further harming the Company.

### C. THE DIRECTOR DEFENDANTS CAUSED ALPHABET TO ISSUE THE MATERIALLY FALSE AND MISLEADING 2025 PROXY

326. On April 25, 2025, the Director Defendants caused Alphabet to file its annual proxy statement with the SEC in connection with its upcoming annual meeting of stockholders (the "2025 Proxy"). In the 2025 Proxy, the 2025 Proxy Defendants solicited shareholder votes, among other things, (i) to elect directors Page, Brin, Pichai, Hennessy, Arnold, Chavez, Doerr, Ferguson, Ann Mather, Shriram, and Washington and (ii) on a number of stockholder proposals. The Director Defendants caused the proxy to contain a number of false and misleading statements about Alphabet's oversight of data privacy. As a result, (i) stockholders were deprived of the opportunity to make fully informed decisions on the director elections and the stockholder proposals and (ii) Alphabet was harmed as Defendants remained on the Board and were permitted to continue to allow the Company to violate privacy laws and regulations.

327. The National Legal and Policy Center submitted Stockholder Proposal 11, which requested that Alphabet prepare "a report, at reasonable cost, omitting proprietary or legally privileged information, to be published within one year of the Annual Meeting and updated annually thereafter, which assesses the risks to the Company's operations and finances, and to public welfare, presented by

[343] 2024 Proxy at 12.

the real or potential unethical or improper usage of external data in the development, training, and deployment of its artificial intelligence offerings; what steps the Company takes to mitigate those risks; and how it measures the effectiveness of such efforts." In support of this proposal, the National Legal and Policy Center flagged Alphabet's "suspect record on data ethics" and its "[p]ast abuses" concerning data privacy. In opposing this Proposal, the Director Defendants caused the 2025 Proxy to claim that Alphabet's "AI and data governance frameworks, coupled with our stringent privacy and safety policies, provide comprehensive oversight of AI development and data usage risks." Further, the Director Defendants caused the 2025 Proxy to state:

> ***Google is deeply committed to user privacy and maintains protocols regarding private data and tracking***. Our policies are designed to protect user privacy and safety through responsible data practices, including limits on the personal information that is used and saved, use of advanced privacy technologies to help keep personal information private, and privacy protocols followed throughout the product development lifecycle. (You can find out more about our policies at https://safety.google/security-privacy/.) ***We understand the importance of safeguarding user information and have implemented measures to protect it. We also provide our users with clear and accessible information about how their data is used and offer them meaningful privacy controls. We employ advanced security technologies and practices to protect user data from unauthorized access, use, or disclosure. And we are committed to complying with all applicable privacy laws and regulations, such as the European Union's General Data Protection Regulation.***[344]

328. These statements were materially false and misleading because, despite Alphabet's alleged "deep commitment" to user privacy and "complying with applicable privacy laws and regulations," Alphabet was engaged in widespread violations of data privacy laws and regulations and had already expended over $1.6 billion in fines and settlements for this misconduct.

329. Similarly, Proposal 12—submitted by Shareholder Association for Research & Education on behalf of the United Church of Canada Pension Plan—requested that Alphabet "publish an independent third-party Human Rights Impact Assessment (the "Assessment"), examining the actual and potential human rights impacts of Google's artificial intelligence-driven targeted advertising policies and practices." In support of this Proposal, the proponent noted, "Algorithmic systems are

---

[344] 2025 Proxy at 86.

deployed to deliver targeted advertisements, determining what users see and can result in and exacerbate systemic discrimination and human rights violations. Google's current ad infrastructure is driven by third-party cookies, which enable entities to track users online by accumulating significant personal data -- putting user privacy at risk." In urging stockholders to reject this Proposal, the Director Defendants caused the 2025 Proxy Statement to tout that Alphabet's "policies are carefully designed to protect user privacy and safety" and that Alphabet "implement[s] strong privacy safeguards and data minimization techniques, provide[s] transparency about data practices, and offer[s] controls that empower users to make informed choices and manage their information." These statements, too, were materially false and misleading because Alphabet was engaged in widespread violations of data privacy laws and regulations and had already expended over $1.6 billion in fines and settlements for this misconduct.

330. Individually and in combination, the Director Defendants' inaccurate reassurances and withholding of material information rendered the 2025 Proxy Statement materially false and misleading. These false and omissive statements deprived Alphabet's shareholders of adequate information to make a reasonably informed decision about director elections, resulting in the Director Defendants being re-elected to the Board and thus permitted to continue to fail to oversee Alphabet's data privacy policies and practices, further harming the Company.

### D. THE DIRECTOR DEFENDANTS CAUSED ALPHABET TO ISSUE THE MATERIALLY FALSE OR MISLEADING 2026 PROXY STATEMENT

331. On April 24, 2026, the Director Defendants caused Alphabet to file its annual proxy statement with the SEC in connection with its upcoming annual meeting of stockholders (the "2026 Proxy"). In the 2026 Proxy, the Director Defendants solicited shareholder votes, among other things, (i) to elect directors Page, Brin, Pichai, Hennessy, Arnold, Chavez, Doerr, Ferguson, Ann Mather, Shriram, and Washington; (ii) to cast an advisory vote to approve compensation for Alphabet's named executive officers, and (iii) on a number of stockholder proposals. The Director Defendants caused the proxy to contain a number of false and misleading statements about Alphabet's oversight of data privacy. As a result, (i) stockholders were deprived of the opportunity to make fully informed decisions on the director elections, the advisory vote on compensation, and the stockholder proposals and (ii) Alphabet

was harmed as Defendants remained on the Board and were permitted to continue to allow the Company to violate privacy laws and regulations.

332. The 2026 Proxy included a section titled Shareholder Proposals. The Shareholder Proposals section contained a proposal put forward by shareholders who were concerned with Alphabet's failure to properly self-regulate its compliance with data privacy laws: Shareholder Proposal 11, titled "Shareholder Proposal Regarding a Report on Data Privacy."[345]

333. Shareholder Proposal 11 proposed that "the Board of Directors issue public reporting…assessing operational, reputational, regulatory and legal risks to Alphabet, Inc…arising from gaps in the Company's policies, controls, and oversight systems of customer and user data processed through Google Services and Google Cloud." In making this proposal, the Shareholder exhaustively detailed many of the concerns and damages to Alphabet reflected in this Complaint, including:

> Operational risk when misuse triggers regulatory intervention, including mandated tool restrictions, audits, or requirements to modify or localize cloud infrastructure. For example, Google settled a lawsuit in 2023 alleging that the Company collected personal information from users browsing with Chrome's "incognito mode."
>
> Reputational risks tied to data access and misuse in jurisdictions with expansive government access to personal data. Misuse of Google Cloud infrastructure can lead to violations of service-level agreements or data-processing terms if cloud tools are misused by customers or accessed by government actors beyond terms of service. For example, Google's participation in Project Nimbus may not align with its data governance principles that prohibit uses that "violate, or encourage the violation of, the legal rights of others," or for any "invasive" purpose, or anything "that can cause death, serious harm, or injury to individuals or groups of individuals." By accepting alert mechanisms and contract terms that limit Google's ability to restrict governmental use of its cloud services, the Company appears to conflict with its acceptable use policy.
>
> Regulatory penalties leading to fines under the European Union's General Data Protection Regulation (GDPR) of up to 4% of global annual revenue. Google has already faced major GDPR actions, including a €50 million fine from France's data protection authority for inadequate transparency and consent processes.

[345] Alphabet Inc., 2026 Proxy Statement (Sch. 14A) 87-88 (Apr. 24, 2026).

> Litigation and class-action exposure when data is collected, processed, or accessed in ways inconsistent with user expectations or product disclosures. For example, in 2025, a U.S. federal jury ordered Google to pay US$425 million in damages for violating the privacy rights of almost 100 million users who alleged Google continued collecting device and usage data after they disabled tracking settings.

334. The Director Defendants caused Alphabet to respond to Shareholder Proposal 11 Proxy by stating, in part, "Our Board believes that our existing policies and technical safeguards effectively mitigate the risks cited by the proponent. We continuously invest in building products that are secure by default, ensuring that data protection is an inherent feature rather than an afterthought."[346] The Director Defendants also caused Alphabet to represent that "We maintain an industry-leading privacy and data protection program consisting of controls designed to identify, govern, and mitigate material data privacy and data protection risks. These controls include processes to review products and services against privacy, minimization, and data protection policies throughout the development cycle."[347]

335. The Director Defendants' statements in the 2026 Proxy Statement were materially false and misleading because they did not disclose the multiple occasions in the recent past when Google had been fined or paid extraordinary money damages in private litigation for having insufficient protections of customers' personal data. Indeed, some of the cases in which Google paid heavy fines were premised on the argument that Google had built products that had the harvesting of data, not the protection of data, as inherent features of its technology.

336. Individually and in combination, the Director Defendants' inaccurate reassurances and withholding of material information rendered the 2026 Proxy Statement materially false and misleading. These false and omissive statements deprived Alphabet's shareholders of adequate information to make a reasonably informed decision about director elections, resulting in the Director Defendants being re-elected to the Board and thus permitted to continue to fail to oversee Alphabet's data privacy policies and practices, further harming the Company.

---

[346] *Id.* at 88.

[347] *Id.* at 88.

## VIII. DEFENDANTS' FIDUCIARY DUTIES

### A. DEFENDANTS' FIDUCIARY DUTIES UNDER *CAREMARK* AND *MASSEY*

337. By reason of their positions as directors, officers, and/or controlling stockholders of Alphabet and because of their ability to control the business and corporate affairs of Alphabet, Defendants at all relevant times owed fiduciary duties to Alphabet and its stockholders, including the highest obligation of care, loyalty, good faith, oversight, and candor.

338. Under *Caremark* and its progeny, directors and officers of a Delaware corporation have specific fiduciary duties to: (a) implement an information and reporting system and controls of compliance; and (b) oversee and monitor the operations of that information and reporting system. Alphabet's directors and officers were also required to ensure that Alphabet operated in full compliance with the law, that Alphabet only pursue lawful business by lawful acts, and that Alphabet not seek profit by violating the law.

339. As detailed below, Alphabet's directors and officers variously (i) sought profit by allowing the Company to continue pursuing activities that it had reason to know were unlawful and (ii) failed to oversee and monitor Alphabet's operations by consciously ignoring red flags of conduct that violated the law.

340. Alphabet's directors and officers also failed to implement an information and reporting system and controls of compliance by failing to ensure that concerns with Alphabet's legal compliance were adequately shared with the Board committees and communicated to the full Board by those committees.

341. Alphabet's own policies additionally impose particular responsibilities on the Company's directors. Alphabet's Corporate Governance Guidelines provide, among other things, that directors have a duty "to oversee management's performance to ensure that Alphabet operates in an effective, efficient and ethical manner in order to provide value for Alphabet's stockholders" and that the Board "has responsibility for risk oversight, with reviews of certain areas being conducted by the relevant Board committees." The Board is responsible "for oversight of . . . significant litigation and regulatory exposures, and other current matters that may present material risk to Alphabet's or its subsidiaries' or controller affiliates' financial performance, operations . . . prospects or reputation . . . ."

342. As a direct and proximate result of the directors', officers', and controlling stockholders' violations of their fiduciary duties, Alphabet has suffered significant harm—including, *inter alia*, the nearly $4.5 billion in fines, penalties and settlements detailed herein; the substantial costs of defending itself in connection with these legal actions and the myriad ongoing legal actions relating to Alphabet's violations of data privacy laws and regulations; and the ongoing damage to its reputation and goodwill that will have a substantial financial impact in the future.

343. For their misconduct alleged in further detail in this Complaint, Defendants are liable to Alphabet.

### B. ALPHABET'S AUDIT COMMITTEE WAS RESPONSIBLE FOR MONITORING AND ADDRESSING DATA PRIVACY ISSUES

344. Although the title and duties of Alphabet's Audit Committee have changed over time since the Company's formation in 2016, the Audit Committee has had express responsibility from the start for ensuring the Company's compliance with "risks and exposures associated with….operational infrastructure, particularly reliability, business continuity, capacity, security, and data privacy."[348] Every year, through a variety of committee name changes, data privacy has been listed as an express duty of the Audit Committee (later known as the Audit and Compliance Committee and ultimately Risk and Compliance Committee).[349]

### C. ALPHABET'S FULL BOARD OF DIRECTORS IS RESPONSIBLE FOR MONITORING ALPHABET'S DATA PRIVACY COMPLIANCE

345. In 2022, the Board began to describe data privacy as one of the Board's top priorities. "Protecting data privacy and security is critical to maintaining our users' trust and to ensuring our long-term business success and is an important priority of our Board." The Board expressly recognized that this responsibility extended to privacy laws and regulations both in and outside the United States and

[348] Alphabet Inc., 2016 Proxy Statement (Sch. 14A) 20 (filed Apr. 29, 2016), https://www.sec.gov/Archives/edgar/data/1652044/000130817916000384/lgoog_def14a.htm.

[349] *See* Alphabet Inc., 2017 Proxy Statement (Sch. 14A) 29 (filed Apr. 27, 2017); Alphabet Inc., 2018 Proxy Statement (Sch. 14A) 24 (filed Apr. 27, 2018); Alphabet Inc., 2019 Proxy Statement (Sch. 14A) 28 (filed Apr. 30, 2019); Alphabet Inc., 2020 Proxy Statement (Sch. 14A) 24 (filed Apr. 24, 2020); Alphabet Inc., 2021 Proxy Statement (Sch. 14A) 24 (filed Apr. 23, 2021); Alphabet Inc., 2022 Proxy Statement (Sch. 14A) 30 (filed Apr. 22, 2022); Alphabet Inc., 2023 Proxy Statement (Sch. 14A) 31 (filed Apr. 21, 2023); Alphabet Inc., 2024 Proxy Statement (Sch. 14A) 30 (filed Apr. 26, 2024); Alphabet Inc., 2025 Proxy Statement (Sch. 14A) 26 (filed Apr. 25, 2025).

explicitly mentioned its responsibility to monitor adherence to the EU General Data Protection Regulation (which Alphabet was found to have repeatedly violated, notwithstanding prior enforcement actions and regulatory warnings).[350]

346. In 2025, as part of a settlement of a class action derivative suit based on Google's anti-competitive practices, Alphabet agreed to create a new "Risk and Compliance Committee."[351] But even with the creation of this committee—which assumed the Audit Committee's oversight of data privacy issues—the full Board continued to list data privacy as one of its specific oversight responsibilities.[352]

## IX. DERIVATIVE ALLEGATIONS

347. Plaintiff brings this action derivatively to redress injuries suffered by the Company as a direct result of the breaches of fiduciary duty and other breaches by Defendants.

348. Plaintiff has owned Alphabet stock continuously during the time of the wrongful course of conduct by the Defendants alleged herein and continues to hold Alphabet stock.

349. Plaintiff will adequately and fairly represent the interests of Alphabet and its stockholders in enforcing and prosecuting the Company's rights.

## X. DEMAND ON THE BOARD IS EXCUSED AS FUTILE

350. Plaintiff has not made a demand on Alphabet's Board to bring suit asserting the claims herein because pre-suit demand is excused as a matter of law.

351. Alphabet's Demand Board consists of ten directors: Defendants Page, Brin, Pichai, Hennessey, Arnold, Chávez, Doerr, Ferguson, Shriram, and Washington (the "Demand Board").

352. As set forth below, (i) a majority of the Demand Board cannot disinterestedly or independently consider a demand because each of the Demand Board members faces a substantial likelihood of liability for breach of fiduciary duty and (ii) a majority of the Demand Board member are disabled by conflicts of interest.

---

[350] Alphabet Statement Opposing Shareholder Proposal 14, Alphabet Inc. SEC Form 14A 2022 (https://www.sec.gov/Archives/edgar/data/1652044/000130817922000262/lgoog2022_def14a.htm).

[351] *In re Alphabet Inc. Deriv. S'holder Litig.*, C.A. No. 3:21-cv-9388-RFL (D.I. 86) (N.D. Cal.).

[352] "Board's Role in Risk Oversight," SEC Form 14A 2026 (https://www.sec.gov/ix?doc=/Archives/edgar/data/1652044/000130817926000342/goog-20260424.htm).

### A. DEMAND IS FUTILE BECAUSE EVERY MEMBER OF THE DEMAND BOARD FACES A SUBSTANTIAL LIKELIHOOD OF LIABILITY FOR BREACHING THEIR FIDUCIARY DUTIES

353. Demand is futile including because the entire Demand Board faces a substantial likelihood of liability for (i) allowing Alphabet to persist in violating users' privacy rights for more than a decade and (ii) failing to exercise oversight concerning Alphabet's data privacy practices.

354. Under Delaware law, directors breach their oversight duties when they fail to implement a board-level system of internal controls or, having implemented such a system, consciously ignore red flags that put them on notice of illegal conduct. Under *Caremark* and its progeny, directors and officers of a Delaware corporation have the specific fiduciary duties to implement an information and reporting system and to monitor it to ensure that they are informed of risks requiring their attention.[353]

355. Each of the Demand Board members knew that the Company was engaging in ongoing data privacy violations. Numerous public reports, investigative findings, lawsuits, and state and regulatory enforcement actions documented the Company's persistent mishandling of users' data privacy. In presentations to the Board, [redacted]. The members of the Demand Board were well aware that they did not have sufficient controls in place to halt the privacy violations. Each of the members of the Demand Board was also aware of, and responsible for, the Company's publication of annual proxies in which the Board made false assurances to investors with respect to the Company's internal controls and oversight over data privacy issues. Because the Board has consciously turned a blind eye to systemic evidence of privacy violations, every member of the Demand Board faces a substantial likelihood of liability.

356. When material red flags mounted—including foreign and domestic enforcement actions, escalating class litigation, and repeated regulatory findings—the Board [redacted] supporting a strong inference of bad-faith inattention. Alphabet's books and records, along with other information obtained by Plaintiff through its investigation, demonstrate that Alphabet's Board failed to engage in any meaningful oversight relating to (i) the Company's collection, retention, and user of users' confidential personal information; (ii) the Company's compliance with

---

[353] *See In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996).

applicable state, federal, and international legislation and applicable judicial consent orders relating to data privacy; and/or (iii) the risks to the Company created by such violations of data privacy laws and the Board's oversight failures.

357. The books and records Alphabet produced reveal scant Board-level consideration of many of the significant privacy issues that have exposed the Company to substantial legal, financial, and reputational harm. In view of the substantial evidence of the pattern of privacy violations, the long list of significant red flags that the Board failed to heed, and the Board's laissez-faire attitude in the face of mounting corporate traumas, there is more than a plausible inference that Alphabet's Board consciously ignored flaring red flags and/or consciously chose to prioritize profits over compliance.

358. The contemporaneous records underscore that, at critical junctures in 2020, the Board did not receive or meaningfully engage with core privacy red flags, including state attorneys general actions, European government penalties, and privacy class actions. For example, the Board [redacted] Similarly, the Audit Committee—for which the Company produced just two sets of meetings, out of six meetings the Committee ostensibly held in 2020—[redacted], according to the minutes.

359. This pattern persisted in 2021 and beyond, despite escalating privacy liabilities, including nine-figure GDPR penalties and large settlements, further evidencing bad faith. The minutes do not reflect the Board discussing the many red flags emerging in those years, including the flood of privacy class actions and the substantial settlements and penalties the Company was forced to pay. Indeed, Google's privacy violations continued even after it paid hundreds of millions of dollars to states, CNIL, and private litigants.

360. Even where privacy risks were nominally on committee agendas, the record shows that the directors failed to ensure that the results and findings were escalated to the full Board and failed to act on significant control failures. For example, [redacted]gle's

[redacted].

361. The Demand Board also faces a substantial likelihood of liability because the directors repeatedly assured stockholders that privacy oversight was robust while failing to implement and monitor a functioning system. Each time Alphabet's stockholders expressed concern regarding the Company's history of privacy-related misconduct and the adequacy of the Board's oversight, the Board assured stockholders that the Company's compliance systems were effective and urged them to reject proposals aimed at increasing oversight. Moreover, the Demand Board faces a substantial likelihood of liability because they caused the Company to issue false and misleading proxy statements as set forth in Section VII *supra*. Defendants Page, Brin, Pichai, Hennessy, Arnold, Doerr, Ferguson, Shriram, and Washington were Company directors and caused the Company to issue each of the false and misleading proxy statements in 2020 through 2026, each of which Proxy Statement was issued "By order of the Board of Directors." Defendants Pichai and Hennessy specifically signed each of the false and misleading proxy statements as the Company's CEO and Chairman, respectively. Defendant Chavez was a Company director and caused the Company to release the false and misleading proxy statements in 2023 through 2026. Each of the members of the Demand Board was aware of, and responsible for, the Company's publication of annual proxies in which the Board made these false assurances to investors with respect to the Company's internal controls and oversight over data privacy issues.

362. Because the very directors who would consider a demand face a substantial likelihood of liability for sustained, systemic noncompliance and for issuing false and misleading assurances about oversight, demand is excused as futile.

### B. DEMAND IS ALSO FUTILE BECAUSE AT LEAST HALF OF THE DEMAND BOARD LACKS INDEPENDENCE

363. In addition to being conflicted because they face a substantial likelihood of liability with respect to these claims, at least six of the ten members of the Demand Board—Page, Brin, Pichai,

Shriram, Doerr, and Arnold—are also conflicted because they lack independence from Page and Brin, who face a substantial likelihood of liability.

**PAGE AND BRIN**

364. As noted above, Page are Brin face a substantial likelihood of liability for failing to oversee Alphabet's internal controls over data privacy. In addition, Page and Brin—as Alphabet's controlling stockholders—caused the Company to adopt an illegal "pay the speeding ticket" business model pursuant to which Alphabet prioritized gathering and monetizing user data over compliance with the law, and thus Page and Brin face a substantial likelihood of liability under *Massey*. Page and Brin lack independence from each other and thus are incapable of considering a demand against each other.

365. Page and Brin are Alphabet's co-founders and controlling stockholders; neither Page nor Brin is an independent director under the NYSE listing standards. Page is the Chair of the Executive Committee. Page and Brin lack independence from one another as they have a close relationship with deep ties spanning more than thirty years. They met at Stanford in 1995, when Page was 22 years old, and Brin was 21 years old. They used Defendant Brin's data mining system on a research project together at Stanford in 1996, during which they became friends. Defendants Page and Brin developed an algorithm together called "PageRank," which returned search rankings based on the number of times a search term appeared and based on the number of times other pages linked to the result. The program became so popular that they both suspended their Ph.D. studies to start Google, which they initially ran out of their dorm rooms.

366. During Google's early years, Defendants Page and Brin worked side-by-side, sharing the same tiny office, communicating about major issues impacting Google, and serving as the final decision-makers on all major decisions involving the Company. They have jointly provided direction for the Company for over 30 years.

367. Page and Brin are Alphabet's controllers. Under the Company's dual-class voting structure, Defendants Page and Brin control a majority of Alphabet's total voting power. As of March 31, 2026, they held an aggregate of 747,991,138 of Alphabet's Class B shares, giving them 52.7% voting control.

368. Moreover, combined with Doerr, Page and Brin hold an aggregate of 770,340,078 Class B shares, together exercising 54.3% voting control over Alphabet. The voting control exercised by each of Defendants Page, Brin, and Doerr as of March 31, 2026, is set forth in the chart below:

| NAME | CLASS B SHARES | PERCENTAGE OWNED | VOTING CONTROL |
|---|---|---|---|
| Larry Page | 389,051,160 | 46.5 | 27.4% |
| Sergey Brin | 358,939,978 | 42.9 | 25.3% |
| L. John Doerr | 22,348,940 | 2.7 | 1.6% |
| **TOTAL** | 770,340,078 | 92.1 | 54.3% |

369. Defendants Page and Brin have owned and exercised majority voting control of Alphabet's stock since Google's IPO in 2004. According to Alphabet's publicly filed proxy statements, Page and Brin have controlled between 51% and 55.7% of Alphabet's voting power in every year between 2014 and the present.

370. Defendants Page and Brin have maintained majority voting control throughout this period despite the fact that stockholders have presented proposals at annual stockholder meetings to amend Alphabet's certificate of incorporation to implement a one-vote-per-share policy. Each year, the Board—controlled by Page and Brin—voted their controlling shares against such proposals, thus single-handedly defeating them. The Alphabet Board also made recommendations to stockholders against these proposals even though the current dual-class voting structure deprives the Company's public stockholders of the ability to press for corporate reform or to hold management accountable for misconduct.

371. As of November 2024, Institutional Shareholder Services ("ISS") rated Alphabet a "10," its highest risk category, for the Governance Quality Score.

372. Defendants Page and Brin not only exercise control over Alphabet's voting power, but they also dominate and control the entire 10-member Board. As holders of the majority vote, Page and

Brin can remove any director of the Board—or the entire Board—at any time for any reason.[354] Alphabet has repeatedly admitted in its annual reports through the relevant period that Page and Brin "have significant influence over all matters requiring stockholder approval," as well as the ability to elect all of the Company's directors.[355]

373. As a result of the domination and control by Defendants Page and Brin, the other directors on the Board are prevented from taking any remedial action. Because—as Alphabet's public statements concede—Defendants Page and Brin exercise control over the election of directors due to their voting control and have the power to remove any director that would take legal action against them, any stockholder demand made to the Board would be futile.

**PICHAI**

374. Pichai cannot independently evaluate a demand because his position and financial interests are dependent on Alphabet's controlling stockholders, Page and Brin. Unlike many public-company chief executive officers, Pichai does not have an employment agreement and serves at the pleasure of Page and Brin, who made him CEO and who retain voting control of Alphabet. Throughout Pichai's career at Alphabet, Page and Brin have elevated him through the Company's ranks, resulting in extraordinary personal wealth derived almost entirely from his compensation and equity holdings in Alphabet. Indeed, as recently as March 2026, the Board approved a compensation package for Pichai reportedly valued at approximately $692 million. Upon information and belief, Pichai's service at Alphabet has made him a billionaire. Given Page's and Brin's continuing control over his employment and compensation, Pichai cannot be expected to objectively consider pursuing claims against them and therefore lacks independence for purposes of evaluating a litigation demand.[356]

---

[354] *See* Alphabet Inc. Certificate of Incorporation, Article IX, §2 ("Any director or the entire Board of Directors may be removed from office at any time, with or without cause, by the affirmative vote of the holders of at least a majority of the voting power of the issued and outstanding shares of capital stock of the Corporation then entitled to vote in the election of directors.").

[355] *See, e.g.*, Alphabet Inc., 2023 Annual Report (Form 10-K) 22 (Jan. 31, 2024); Alphabet Inc., 2022 Annual Report (Form 10-K) 20 (Feb. 3, 2023).

[356] *See, e.g.*, Alphabet Inc., 2026 Proxy Statement (Schedule 14A) (Apr. 24, 2026) 30 (admitting that Pichai is not considered an independent director).

**SHRIRAM**

375. Shriram—who is not an independent director under the NYSE listing standards—also lacks independence from Page and Brin for purpose of considering a demand against them. Shriram is a longstanding and close friend of Page and Brin. Shriram was one of four initial angel investors in Google and one of the first directors. As one of the first investors, he wrote a crucial $250,000 seed check to help stand up the Company. He met regularly with Page and Brin, helped incorporate the Company, and assisting with obtaining a licensing agreement with Stanford for the algorithm on which Google was based. He jointly licenses the use of Moffett Airfield with them.

376. Due to Shriram's early investment in Google—which investment would have required Page and Brin's consent—he has made hundreds of millions to billions of dollars.

377. Institutional proxy advisor ISS views Shriram as too tightly connected to the Company and its founders to be an independent director. In 2018, ISS recommended against the nomination of Shriram to the Compensation Committee "due to poor stewardship" and his failure to require "performance-conditioned compensation" for Company executives.[357]

378. Because of all of these personal and professional ties, Shriram is incapable of considering a demand to institute litigation against either Page or Brin.

**DOERR**

379. Doerr lacks independence from Page and Brin for purpose of considering a demand against them. Doerr is the Chair and a former general partner at Kleiner Perkins Caufield & Byers, LLC ("Kleiner Perkins"), a venture capital firm, and remains a managing member of numerous Kleiner Perkins investment funds.

380. Doerr met Defendants Brin and Page in Doerr's capacity as a partner at Kleiner Perkins and would later go on to invest in Google. Doerr has a close personal relationship with Page and Brin. Doerr helped secure numerous investments from Google and affiliated entities controlled by Page and Brin in private companies managed by Kleiner Perkins through its funds. Last year alone, through March 31, 2026, Google Ventures (Alphabet's venture capital arm) and Capital G (Alphabet's

[357] Alicia Ritcey & Alistair Barr, *Google Staff in Rare Push Want Executive Pay Tied to Diversity*, BLOOMBERG, June 5, 2018.

independent growth equity fund) invested $42 million in private companies in which Kleiner Perkins-affiliated funds were co-investors. Furthermore, Doerr was also an early investor in Google; as a result, he holds Class B voting shares, and thus enjoys disproportionate voting power.

381. Two major proxy advisory funds, ISS and Glass Lewis, have questioned Doerr's independence on several occasions based on the close relationship between Alphabet and Kleiner Perkins and Doerr's other financial connections to the Company. For example, as far back as 2004, ISS raised Doerr's relationship with Kleiner Perkins as a reason for its belief that Google's governance was below par.[358]

382. In 2015, Glass Lewis recommended that stockholders withhold renomination votes from Doerr because of his lack of independence.[359]

383. In 2015, ISS also recommended that investors withhold votes for Doerr's reelection to the Board's Compensation Committee. Doerr had approved excessively lucrative compensation packages to Alphabet executives the previous year.

384. In recent years, including 2018 and 2020, ISS again recommended against the nomination of Doerr to the Compensation Committee "due to poor stewardship" and his failure to require "performance-conditioned compensation" for Company executives.[360]

385. Because of all of these personal and professional ties, Doerr is incapable of considering a demand to institute litigation against either Page or Brin.

**HENNESSY**

386. Hennessy lacks independence from Page and Brin for the purpose of considering a demand against them. Hennessy is a professor at Stanford. Over the years, he has occupied a number of influential positions at the school. He has served as Chair of the Department of Computer Science (1994-1996), Dean of the School of Engineering (1996-1999), Provost (1999-2000), and President

---

[358] Andrew Countryman, *Google's governance below par, service says*, CHICAGO TRIBUNE, Aug. 24, 2004.

[359] Kaja Whitehouse, *Shareholders urged to protest Google pay*, USA TODAY, June 2, 2015.

[360] Alicia Ritcey & Alistair Barr, *Google Staff in Rare Push Want Executive Pay Tied to Diversity*, BLOOMBERG, June 5, 2018.

(2000-2016). He is the founder, and currently serves as the Director, of the Knight-Hennessy Scholars Program.

387. According to the *Wall Street Journal*, "Mr. Hennessy's role at Google has created the closest intersection with his Stanford duties."[361] In 2004—several months before Google's IPO—the Company appointed Hennessy to the Board, after extensive courting by Defendant Doerr, one of Google's original investors and directors. He received 65,000 options to buy Google stock at a price of $20 per share. Defendant Hennessy has invested money with Defendant Doerr's firm, Kleiner Perkins, and after Google's IPO, Hennessy received 10,556 Google shares as part of an earlier investment in a Kleiner Perkins fund.

388. With his positions at Stanford and Google, Defendant Hennessy effectively sits on two sides of a business relationship. Google licenses its internet search technology from Standard, where Defendants Page and Brin started the Company and were Ph.D. students. As payment, Stanford received shares in an offering that the school has since sold for $336 million. Standard continues to receive what it describes as "modest" annual licensing fees from Google.

389. One of Defendant Hennessy's predecessors at Stanford, Donald Kennedy, told the *Wall Street Journal* that he had expressed concern over some of Hennessy's business activities. "In 2004, after a big Google stock-option grant to Mr. Hennessy became public, Mr. Kennedy says he called a Stanford administrator and asked the university to take a close look. 'I was worried that there might be a perception on the part of reporters and the public that there could be a conflict of interest, he says."[362] Paul Aiken, Executive Director of the Authors Guild, also called Defendant Hennessy's personal holdings in Google "a great concern" and says "there seems to be both a personal and institutional profit motive here."

390. Hennessy thus has much to lose by voting to initiate litigation against Defendants Page and Brin, including the risk of losing millions of dollars of donations to Stanford. He would not risk his prestigious positions at Stanford or the Company's continued support of the university by voting to

[361] John Hechinger & Rebecca Buckman, *The Golden Touch of Stanford's President*, WALL ST. J., Feb. 24, 2007).

[362] John Hechinger & Rebecca Buckman, *The Golden Touch of Stanford's President*, WALL ST. J., Feb. 24, 2007.

initiate litigation against the Company's controllers. Accordingly, Defendant Hennessy lacks independence from Defendants Page and Brin, rendering any pre-suit demand on him futile.

**ARNOLD**

391. Arnold lacks independence from Page and Brin for purpose of considering a demand against them. Arnold is not independent because her compensation as an Alphabet director is a material component of her income. Upon election to the Board, Arnold received a stock award of $1 million, which is likely about triple her annual salary as a bioengineering professor at the California Institute of Technology.[363] Her directorship fees (which totaled $75,000 in 2025) plus annual stock award—which in 2025 had a grant date fair value of $362,396—also likely approaches or exceeds her salary as a professor. Because Page and Brin are Alphabet's controlling stockholders, they have the power to remove Arnold from her directorship and thus to take away a material part of her income. Arnold thus cannot independently consider a demand to institute a lawsuit against either Page or Brin.

**CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**

**(Against All Director Defendants For Breach Of Fiduciary Duty: Massey Claim)**

392. Plaintiff repeats and realleges all of the preceding allegations as if fully set forth herein.

393. As Alphabet's directors, Defendants Page, Brin, Pichai, Arnold, Hennessy, Chávez, Doerr, Ferguson, Shriram, and Washington were required to ensure that Alphabet operated in full compliance with the law, that Alphabet "only pursue 'lawful business' by 'lawful acts,'" and that Alphabet not "seek profit by violating the law."

394. As detailed here, Alphabet violated various privacy laws and regulations (and broke its commitments to its users about how its data would be collected, stored and used) by causing its products to collect and disseminate its users' data by impermissible means to maximize the Company's advertising revenue.

---

[363] *See* Academic Jobs.com, CalTech Salaries ("Recent data from the American Association of University Professors (AAUP) Faculty Compensation Survey highlights impressive figures: full professors average $278,400 annually, associate professors $192,100, and assistant professors $162,300 as of fiscal year 2022-23."); available at: https://www.academicjobs.com/employers/caltech-california-institute-of-technology/3128/salaries

395. By allowing Alphabet to violate the various privacy laws and regulation appliable to its business, the Director Defendants caused Alphabet to seek profit by violating the law.

396. As a direct and proximate result of the Director Defendants' decision to allow Alphabet to break the law, Alphabet has sustained significant damages, both financially and to its corporate image and goodwill. To date, Alphabet has incurred nearly $4.5 billion in damages in the form of fines, penalties, and settlements as a result of its violations of data privacy laws, substantial costs in defending itself against the various legal actions against it, threats of future liability, reputational damage, and other costs, damages and liabilities.

397. For their conscious and bad faith misconduct alleged herein, the Director Defendants are liable to the Company.

**SECOND CLAIM FOR RELIEF**

**(Against All Director Defendants For Breach Of Fiduciary Duty: Caremark Claim)**

398. Plaintiff repeats and realleges all of the preceding allegations as if fully set forth herein.

399. As Alphabet's directors, Defendants Page, Brin, Pichai, Arnold, Hennessy, Chávez, Doerr, Ferguson, Shriram, and Washington owed Alphabet the highest obligation of loyalty, good faith, due care, oversight, and candor.

400. The fiduciary duties these directors owed to Alphabet included, without limitation, implementing and overseeing a system to monitor data privacy within Google's platforms as well as Alphabet's legal compliance with all applicable laws and regulations. The Director Defendants had a fundamental duty to make good faith efforts to ensure that the Company was not violating the law and risking users' privacy.

401. The Director Defendants consciously breached their fiduciary duties and violated their corporate responsibilities by, among other things, (i) failing to monitor and oversee Alphabet's data privacy policies and practices to ensure that the Company was operating in compliance with the law and (ii) ignoring red flags that the Company was not operating in compliance with the law, including the repeated fines, penalties, and settlements detailed herein.

402. These actions (and failures to act) were not good-faith exercises of prudent business judgment to protect and promote the Company's corporate interests and those of its stockholders.

403. As a direct and proximate result of the Director Defendants' conscious failure to perform their fiduciary duties, Alphabet has suffered significant damages, both financially and to its corporate image and goodwill. Such damages to Alphabet include, and/or will include: payment of substantial settlements, liabilities, and regulatory fines and penalties; legal costs; increased regulatory scrutiny; reputational damages; declining users; declining revenue; declining stock price, increased cost of capital, and other costs, damages, and liabilities.

404. For their conscious and bad faith misconduct alleged herein, the Director Defendants are liable to the Company.

## THIRD CLAIM FOR RELIEF

## (Against All Officer Defendants for Breach of Fiduciary Duty)

405. Plaintiff repeats and realleges all of the preceding allegations as if fully set forth herein.

406. As executive officers of Alphabet, Officer Defendants Porat, Enright, Walker, and Mulholland owed Alphabet the highest obligation of loyalty, good faith, due care, oversight, and candor.

407. The fiduciary duties the Officer Defendants owed included the obligation to operate the Company in compliance with state and federal laws, and European laws, and without undue risk to users' privacy; the duty to implement and oversee programs to ensure compliance with laws and regulations concerning privacy, particularly with respect to underage users; the duty to ensure that Alphabet's products were safe fort its customers to use and would not cause harm; and the duty to report significant risks to the Board, civil authorities, and Alphabet and its stockholders.

408. The Officer Defendants, individually and collectively, breached their fiduciary duties and/or acted with gross negligence in at least the following ways:

(a) Acting in conscious disregard of the red flags that Google's platforms create and exploit privacy risks for its users and that Alphabet was benefitting financially from such misconduct;

(b) Consciously and repeatedly failing to implement, maintain, audit, and/or monitor a compliance and safety program to detect, prevent, and address the privacy violations caused by Alphabet's online platforms;

(c) Consciously disregarding their duties to investigate red flags and other evidence of wrongdoing and to remedy any misconduct uncovered; and

(d) Consciously failing to report to the Board and/or covering up red flags that Alphabet's platforms trample on the privacy rights of its users, including its underage users.

409. As officers of the Company, the Officers Defendants are not entitled to exculpation under 8 *Del. C.* § 102(b)(7).

410. The Officer Defendants had actual or constructive knowledge that they caused the Company to fail to maintain adequate internal controls and failed to provide adequate oversight to protect the Company from liability related to federal, state, and European laws and regulations concerning privacy.

411. These actions were not good-faith exercises of product business judgment to protect and promote the Company's corporate interests and those of its stockholders.

412. As a result of the Officer Defendants' breaches of fiduciary duty—including their conscious and/or grossly negligent failure to perform their fiduciary duties—Alphabet has sustained significant damages both financial and to its corporate image and goodwill. Such damages to Alphabet caused by the Officer Defendants' misconduct include and/or will include payment of substantial settlements, liabilities, and regulatory fines and penalties; legal costs; increased regulatory scrutiny; reputational damages; declining users; declining revenue; declining stock price, increased cost of capital, and other costs, damages, and liabilities.

413. As a result of the misconduct alleged herein, the Officer Defendants are liable to the Company.

**FOURTH CLAIM FOR RELIEF**

**(Against The Controlling Stockholder Defendants For Breach Of Fiduciary Duty)**

414. Plaintiff incorporates by reference and realleges each and every allegation set forth above as if fully set forth herein.

415. As controlling stockholders of Alphabet, Defendants Page and Brin owed and owe Alphabet the highest obligation of loyalty, good faith, due care, oversight, and candor in managing the Company's affairs.

416. Defendants Page and Brin violated and breached their duties of loyalty, good faith, due care, oversight and candor by creating a culture of lawlessness within Alphabet and_directing and carrying out business plans based on violation of data privacy laws and regulations and breaches of commitment to uses concerning how their data would be collected and used.

417. As a direct and proximate result of the misconduct alleged herein, the Company has suffered significant damages and will continue to suffer, as alleged herein.

**FIFTH CLAIM FOR RELIEF**

**(Against The Director and Officer Defendants For Unjust Enrichment)**

418. Plaintiff incorporates by reference and realleges each and every allegation set forth above as if fully set forth herein.

419. By their wrongful acts, the Director and Officer Defendants were unjustly enriched at the expense of, and to the detriment of, Alphabet in the form of salaries, bonuses, and/or other forms of compensation.

420. The Director Defendants' and the Officer Defendants' enrichment was directly and causally related to acts that have materially damaged Alphabet.

421. These benefits were accepted by the Director Defendants and the Officer Defendants under such circumstances that make it inequitable for them to be retained. As alleged herein, the Director Defendants and the Officer Defendants breached their fiduciary duties and/or abused their positions of control at Alphabet and therefore are not justified in retaining the benefits conferred upon them. These benefits should be disgorged to the Company.

422. Additionally, the wrongful conduct alleged herein was continuous, connected, and ongoing throughout the period of misconduct described herein. The wrongful conduct thus resulted in continuous, connected, and ongoing hard to the Company.

423. Plaintiff, as an Alphabet stockholder and representative of Alphabet, seeks restitution from the Director Defendants and the Officer Defendants, and each of them, and seeks an order form

this Court disgorging all profits, benefits, and other compensation obtained by the Director Defendants and the Officer Defendants, and each of them, for their wrongful conduct and breaches of fiduciary duty.

**SIXTH CLAIM FOR RELIEF**

**Violation of Section 14(a) of the Exchange Act**

**(Against The Director Defendants)**

424. Plaintiff incorporates by reference and realleges each and every allegation set forth above as if fully set forth herein.

425. SEC Rule 14a-9, 17 C.F.R. §240.a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement form of proxy, notice of meeting or other communication written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

17 C.F.R. § 240.14a-9(a).

426. During their respective tenures, the Director Defendants had control over Alphabet and used that control to either negligently or knowingly cause Alphabet to disseminate the false and misleading proxy statements described above, *supra* § VII.

427. These proxy statements materially misrepresented Alphabet's managerial approach to, and business situation regarding, and legal compliance with respect to, data privacy. Further, those statements misrepresented the Board's conduct in overseeing data privacy and privacy compliance issues, materially omitting the Board's failure to implement adequate compliance oversight.

428. As alleged herein, Alphabet's proxy statements contained false statements of material fact and omitted material facts necessary to make the remaining statements not false and misleading in violation of 17 C.F.R. § 240.14a-9(a). These misleading disclosures regarding data privacy, legal compliance, and the oversight associated with those categories are material because maintaining the security and privacy of users' data is mission-critical to Alphabet's business. Those disclosures and nondisclosures, therefore, would be a material factor that stockholders considered in voting whether to

elect or re-elect director nominees, whether to support to defeat stockholder proposals, and whether to cast advisory votes on named executive officer compensation; and thereby, they induced stockholders to casts votes on these matters based on materially incomplete or false information.

429. As alleged herein, the Proxy Defendants violated 17 C.F.R. § 240.14a-9(a) by preparing and authorizing written communications which were materially false and/or misleading, providing them to the public in at least a negligent manner.

430. At all relevant times to the dissemination of the materially false and/or misleading proxy statements, the Director Defendants were aware of, and/or had access to, the facts concerning Alphabet's data privacy violations, legal compliance, and the oversight associated with those categories.

431. As a result, Alphabet has been injured and is entitled to damages and equitable relief, in an amount and nature to be demonstrated at trial.

## SEVENTH CLAIM FOR RELIEF

### Violation of Section 29(b) of the Exchange Act

### (Against The Director Defendants)

432. Plaintiff incorporates by reference and realleges each and every allegation set forth above as if fully set forth herein.

433. The Director Defendants each received incentive compensation and fees, including stock awards, while engaging in conduct that violates Section 14(a) of the Exchange Act. The Director Defendants' incentive compensation and fees should be rescinded under Section 29 of the Exchange Act because these Defendants violated Section 14(a) by issuing false and misleading reports to Alphabet stockholders regarding the nature or, and responsibility for, violations of federal law and regulations. All payments the Director Defendants received are therefore voidable by Alphabet under Section 29(b) of the Exchange Act.

434. Alphabet is in privity with the Director Defendants with respect to the incentive compensation and fees provided by Alphabet to these Defendants. The Director Defendants engaged in prohibited conduct in violation of the securities laws as alleged herein,

435. Alphabet has been injured by the misconduct of the Director Defendants. Accordingly, Alphabet is entitled to damages (i.e., rescission of the incentives, compensation, and fees granted to the Director Defendants).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests the following relief:

A. An order declaring that Plaintiff may maintain this action on behalf of Alphabet;

B. An order declaring that Defendants have breached their fiduciary duties to Alphabet;

C. An order declaring that Defendants have been unjustly enriched as a result of the misconduct alleged herein;

D. An order determining and awarding to Alphabet the damages sustained as a result of the violations set forth above by all Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

E. An order requiring Defendants to disgorge all profits, benefits, and other compensation obtained by Defendants to the Company;

F. An order directing Alphabet and Defendants to take all necessary actions to reform and improve Alphabet's corporate governance, internal controls, and policies by implementing a Board-level reporting and information system—and to monitor that system-to ensure that the Company addresses the rampant privacy violations in which the Company has been involved, the Company operates in compliance with all civil and criminal laws and regulations relating to privacy;

G. An order against all Defendants and in favor of the Company for extraordinary equitable and injunctive relief as permitted by law and/or equity as this Court deems just an appropriate;

H. Awarding Plaintiff costs and disbursements for this action, including reasonable attorneys' fees and expenses;

I. Granting such other relief as this Court deems just and appropriate.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: September 22, 2026

**GRANT & EISENHOFER P.A.**

*/s/ Rebecca A. Musarra*
Rebecca A. Musarra (SBN 291250)
**GRANT & EISENHOFER P.A.**
Christine M. Mackintosh (*pro hac vice* to be filed)
Matthew P. Denn (*pro hac vice* to be filed)
Demetrius Davis (*pro hac vice* to be filed)
123 Justison Street, 7th Floor
Wilmington, Delaware 19801
Telephone: (302) 622-7000
E-mail: rmusarra@gelaw.com
cmackintosh@gelaw.com
mdenn@gelaw.com
ddavis@gelaw.com

**COTCHETT PITRE & MCCARTHY LLP**
*/s/ Mark C. Molumphy*
Mark C. Molumphy (SBN 168009)
Tyson Redenbarger (SBN 294424)
Gia Jung (SBN 340160)
San Francisco Airport Office Center
840 Malcolm Road
Burlingame, CA 94010
Telephone: (650) 697-6000
E-mail: mmolumphy@cpmlegal.com
tredenbarger@cpmlegal.com
gjung@cpmlegal.com

**VERIFICATION**

*Oklahoma Law Enforcement Retirement System v. Larry Page et al.*, (N.D. Cal)

I, DUANE MICHAEL, do hereby declare:

1. I am the Executive Director of the Oklahoma Law Enforcement Retirement System ("OLERS"), located in Oklahoma City, Oklahoma. OLERS is the plaintiff in the above-titled action.

2. I verify that I have reviewed the Verified Stockholder Derivative Complaint and Jury Demand (the "Complaint") to be filed in this action and that the facts stated in the Complaint, as they concern OLERS, are true to my personal knowledge. I believe the facts pleaded in the Complaint on information and belief or investigation of counsel are true.

3. OLERS has not received, been promised or offered, and will not accept any form of compensation, directly or indirectly, for prosecuting this action or serving as a representative party in this action except: (i) such fees, costs, or other payments as the Court expressly approves to be paid to OLERS; or (ii) reimbursement, by its attorneys, of actual and reasonable out-of-pocket expenditures incurred directly in connection with the prosecution of this action.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 17th day of September 2026.
Oklahoma City, Oklahoma

Duane Michael
Executive Director
Oklahoma Law Enforcement Retirement System